[NOT YET SCHEDULED FOR ORAL ARGUMENT]

## NO. 25-1213

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

PRINTING TEXTILES, LLC DBA BERGER TEXTILES,

Plaintiff - Appellant

v.

UNITED STATES, ECKER TEXTILES, LLC,

Defendant - Appellee

---

BRIEF OF APPELLANT

APPEALS FROM THE UNITED STATES COURT OF INTERNATIONAL TRADE IN NO. 1:23-cv-00192-TCS, SENIOR JUDGE TIMOTHY C. STANCEU

Kyl J. Kirby
Kyl J. Kirby, Attorney and
Counselor at Law, P.C.
1400 Lipscomb Street
Fort Worth, Texas 76104
(214) 632-0841

*Counsel for Plaintiff-Appellant*

Christopher Berridge
Email: christopher.berridge@usdoj.gov

U.S. Department of Justice Civil Division
Commercial Litigation Branch
PO Box 480
Ben Franklin Station Washington, D.C.
20044
Tel: (202) 353-0537
Fax: (202) 305-2062

*Attorney for Defendant-Appellee*
UNITED STATES

George W. Thompson
Email: gwt@gwthompsonlaw.com
Thompson & Associates, PLLC
1050 Connecticut Avenue, NW
Suite 500
Washington, DC 20036
Tel/Fax: 202-772-2039

*Attorney for Defendant-Appellee*
ECKER TEXTILES, LLC

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 25-1213

**Short Case Caption** Printing Textiles, LLC v. US

**Filing Party/Entity** Printing Textiles, LLC dba Berger Textiles

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 01/24/2025

Signature: /s/ Kyl J. Kirby

Name: Kyl J. Kirby

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Printing Textiles, LLC dba Berger Textiles | n/a | n/a |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable  ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below)  ☑ No  ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable  ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................................. i

TABLE OF CONTENTS .................................................................................... iv

TABLE OF AUTHORITIES ............................................................................... v

STATEMENT OF RELATED CASES ................................................................ 1

JURISDICTIONAL STATEMENT ..................................................................... 1

STATEMENT OF THE ISSUES ......................................................................... 2

STATEMENT OF THE CASE ............................................................................ 2

SUMMARY OF PLAINTIFF-APPELLANT'S ARGUMENTS ......................... 3

ARGUMENTS .................................................................................................... 3

    A. Standard Of Review ................................................................................. 3

    B. Legal Standard For Substantial Evidence Determinations ......................... 4

    C. Legal Standard for Arbitrary And Capricious Determinations .............….. 6

    D. Legal Standard For Scope Determinations ………………………….…. 7

    E. Statement Of Facts ………………………………………………………. 8

    F. Commerce Misapplied The Primary Criteria For Determining Scope Under 19 C.F.R. § 351.225 By Failing To Consider The 19 C.F.R. § 351.225(k)(1) And Thereby Expanding The Scope Of The *Order* ….….. 34

    G. The *Order* and Commerce's Impermissibly Unlawful Interpretation Denied Berger Adequate Notice And Commerce Failed To Address Due Process Concerns Of Vague Language In The Scope Of The *Order*

    H. Commerce's Plain Language And K(1) Factor Analysis Of *Order* Scope Language Is Unreasonable, Arbitrary, And Not Supported By Law ….... 38

CONCLUSION ................................................................................................ 58

ADDENDUM

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|

*Ad Hoc Shrimp Trade Action Committee v. U.S.*, 515 F.3d 1372 (Fed. Cir. 2008) …...……………………………………………………...……...…… 17

*AK Steel Corp.* v. *United States,* 226 F.3d 1361 (Fed. Cir. 2000) ……...…… 12

*A.L. Patterson, Inc. v. United States*, 2013-1526 (Fed. Cir. 2014) …………...…… 4

*Allegheny Bradford Corp. v. United States*, 28 CIT 830, 342 F. Supp. 2d 1172 (2004) …………………………………………………………….... 10, 37

*Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141 (2000) …...…... 5

*Altx, Inc. v. United States*, 370 F.3d 1108 (Fed. Cir. 2004) ……………...…... 5

*ArcelorMittal Stainless Belg. N.V. v. United States*, 694 F.3d 82 (Fed. Cir. 2012) …………………………………………………………….... 7, 11, 14, 19

*Arnold P'ship v. Dudas*, 362 F.3d 1338 (Fed. Cir. 2004) ………………………. 6

*Bell Supply Co. v United States*, 83 F.Supp. 3d 1311 (2015) …………….... 9, 11

*Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) ……………………………………………...…… 4

*Brown v. Gardner* , 513 U.S. 115, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994) …... 40

*Burlington Truck Lines v. United States*, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)……………………………………………………………….. 5

*Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States,* 701 F.3d 1367 (Fed.Cir.2012) …………………………………………………...…… 4

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 132 S.Ct. 2156, 183 L.Ed.2d 153 (2012) ……………………………………………...…… 35, 37

*CS Wind Vietnam Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) .............. 5

*Diamond Sawblades Manufacturers' Coalition v. United States*, 405 F.Supp.3d 1345 (CIT. 2019) …………………………………………………………..... 5, 36

*Dickinson v. Zurko*, 527 U.S. 150 (1999) ……………………………….…….. 4

*Dong-A Steel Co. v. United States*, 475 F.Supp.3d 1317 (2020) ……………..… 40

*Duferco Steel, Inc. v. United States*, 25 CIT 493, 146 F.Supp.2d 913 (2001) …………………………………………………………………. ….. 10, 14

*Duferco Steel, Inc. v. United States,* 296 F.3d 1087 (Fed. Cir. 2002) .10-11, 14

*DWA Holdings LLC v. United States* , 889 F.3d 1361 (Fed. Cir. 2018) ……..... 40

*Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068 (Fed. Cir. 2001) ………… ……………………………………………….……………..… 9-10, 12-13

*Elysium Tiles, Inc. v. United States*, 719 F.Supp.3d 1289 (2024) ……….……. 40

*Ericsson GE Mobile Commc'ns, Inc. v. United States,* 60 F.3d 778 (Fed.Cir.1995) ……………………………………………………………………..... 9

*Ericsson Ge Mobile*, 955 F.Supp. 1510 (1997) ………………………….…. 22

*FAG Italia Sp.A. v. United States,* 291 F.3d 806 (Fed. Cir. 2002) …………. 12

*Fedmet Res. Corp. v. United States*, 755 F.3d 912 (Fed. Cir. 2014) …… 12, 18-19

*Fuji Photo Film Co. v. Int'l Trade Comm'n*, 474 F.3d 1281 (Fed. Cir. 2007) …. 35

*Full Member Subgroup of the Am. Inst. of Steel Constr., LLC v. United States*, 547 F.Supp.3d 1211 (2021) ……………………………………..……... 40

*Global Commodity Grp. LLC v. United States*, 709 F.3d 1134 (Fed. Cir. 2013) ……………………………………………………….…..……...… 9

*Goodluck India Ltd. v. United States*, 11 F.4th 1335 (Fed. Cir. 2021) …………. 4

*Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) ………………………………………………………………...…... 35

*King Supply Co., LLC v. United States,* 674 F.3d 1343 (Fed.Cir.2012) ..... 4, 9, 48

*Maquilacero S.A. De C.V. v. United States*, 256 F.Supp.3d 1294 (2017) …..... 39

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984) ….. 4

*Meridian Prod. v. United States*, 890 F.3d 1272 (Fed. Cir. 2018) ..…………….. 7

*Meridian Products*, *LLC v. United States*, 851 F.3d 1375 (Fed. Cir. 2017) ……. 3

*Mid Continent Nail Corp. v. United States*, 2012-1682, 2012-1683 (Fed. Cir. Jul 18, 2013) ………………………………………………………………….. 35

Mid Continent Nail Corp. v. United States, 725 F.3d 1295 (Fed. Cir. 2013) …………………………………………………………………... 9-10, 35, 37

*Mid Continent Nail Corp. v. United States*, 770 F.Supp.2d 1372 (Ct. Int'l Trade 2011) ………………………………………………………………….. 11, 18

*Milecrest Corp. v. United States*, 264 F.Supp.3d 1353 (Ct. Int'l Trade 2017) .... 35

*Mitsubishi Elec. Corp. v. U.S.*, 11 F.3d 1070 (1993) …………………………... 22

*Mitsubishi Elec. Corp. v. United States,* 16 CIT 730, 802 F.Supp. 455 (1992) .. 22

*Mitsubishi Polyester Film, Inc. v. United States*, 228 F. Supp. 3d 1359 (Ct. Int'l Trade 2017) …………………………………………………………….. 11-12, 18

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ……………………………………………………………………… 6

*Nyeholt v. Sec'y of Veterans Affairs*, 298 F.3d 1350 (Fed. Cir. 2002) …………. 35

*OMG, Inc. v. United States*, 972 F.3d 1358 (Fed. Cir. 2020) ………..………….. 7

*Osi Pharm., LLC v. Apotex Inc.*, 939 F.3d 1375 (Fed. Cir. 2019) ……………… 4

*Pac Fung Feather Co., Ltd. v. United States,* 19 CIT 1451, 911 F.Supp. 529 (1995), *aff'd,* 111 F.3d 114 (Fed.Cir.1997) …………………………………… 35

*Perfectus Aluminum, Inc. v. United States*, 391 F.Supp.3d 1341 (2019) …….... 40

*Polites v. United States,* 755 F.Supp.2d 1352 (CIT 2011) …………………….. 12

*Quiedan Co. v. United States*, 927 F.3d 1328 (Fed. Cir. 2019) ……………….... 1

*Russello v. United States*, 464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) … 40

*Russ Berrie & Co. v. United States*, 329 F.Supp.3d 1345 (2018) …………...… 40

*Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 146 F.Supp.3d 1331 (Ct. Int'l Trade 2016) …………………………………………………. 3-4

*Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 776 F.3d 1351 (Fed. Cir. 2015) ……………………………………………….…..…... 7, 10

*Shenzhen Xinboda Industrial Co., Ltd. v. United States*, 279 F.Supp.3d 1265 (CIT. 2017) ………………………………………………………….…..… 13

*Smith Corona Corp. v. United States,* 915 F.2d 683 (Fed.Cir.1990) …………... 9

*Star Pipe Products v. United States*, 393 F.Supp.3d 1200 (CIT 2019) ……….. 36

*Sunpreme Inc. v. United States*, 946 F.3d 1300 (Fed. Cir. 2020) (en banc) …….. 3

*Tai-Ao Aluminum (Taishan) Co. v. United States*, 983 F.3d 487 (Fed. Cir. 2020) ……………………………………………………………....……... 36

*Tak Fat Trading Co. v. United States*, 396 F.3d 1378 (Fed. Cir. 2005) ………... 4

*Trade Assocs. Group v. United States*, 961 F. Supp. 2d 1306 (2014) ...……. 11, 32

*USEC Inc. v. United States,* 34 Fed.Appx. 725 (Fed.Cir.2002) ……………..… 17

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 102 S.Ct. 1186 (1982) …………………………………………………………………….. 36

*Viraj Group v. United States*, 476 F.3d 1349 (Fed.Cir.2007) …………………. 17

*Walgreen Co. v. United States*, 620 F.3d 1350 (Fed. Cir. 2010) ……………. 5, 11

*Wheatland Tube C v. United States,* 161 F.3d 1365 (Fed. Cir. 1998) ……. 5, 9, 36

*Whirlpool Corp. v. United States*, 144 F.Supp.3d 1296 (Ct. Int'l Trade 2016) ... 32

*Worldwide Door Components, Inc. v. United States*, 119 F.4th 959 (Fed. Cir. 2024) …………………………………………………………………….. 4

**Statutes**

28 U.S.C. § 1295(a)(5) ……………………………………………………… 1

19 U.S.C. § 1516a(a)(2)(B)(vi) ………………………………………….……1

19 U.S.C. § 1516a(b)(1)(B)(i) …………………………………………….….. 3

28 U.S.C. § 1581(c) ……………………………………………………....… 1

28 U.S.C. § 2107 ……………………………………………………….…... 1

28 U.S.C. § 2645(c) …………………………………………………….…... 1

**Regulations**

19 C.F.R. § 351.225 …………………………………...…………..……… 1, 9

19 C.F.R. § 351.225(k) …………………………………...……......… 10

19 C.F.R. § 351.225(k)(l) …………………………...……………….. 9, 16, 39

19 C.F.R. § 351.225(k)(l)(i) …………………………....…………….….. 33

**Other**

2A N. Singer & S. Singer, Sutherland on Statutory Construction § 46.6 (7th ed. 2014) .................................................................................................. 13

Acrylic Coated Polyester Camouflage Fabric https://rockywoods.com/products/acrylic-coated-polyester-camouflage-fabricrealtree-ap-grey ...…………………………………………….................…… 31

Acrylic-coated Cotton Fabric https://www.french-nc.com/shop/Fabrics/French-Fabrics/Acryliccoated-Cotton-Fabric.htm ....................................................................................... 29

Acrylic-coated / Wipe off https://lacigale-usa.com/productcategory/tablecloths/acrylic-coated/ ............. 30

CBP Antidumping and Countervailing Duties (AD/CVD) Update August/September 2016 https://www.cbp.gov/sites/default/files/assets/documents/2016-35Oct/Final%20August%20-%20September%202016%20ADCVD%20Update%2010042016.pdf ............ 53

Certain Softwood Lumber Products from Canada, 67 Fed.Reg. 36,070, 36,071 (May 22, 2002) ……………………………………………….………..…….. 48

Engineered Process Gas Turbo–Compressor Systems, Whether Assembled or Unassembled, and Whether Complete or Incomplete, from Japan, 62 Fed.Reg. 32,584 (June 16, 1997) …………………………………………...………. 48

Letter from Kyl J. Kirby, Kyl J. Kirby, Attorney and Counselor at Law, P.C., to the Secretary of Commerce re Application of Scope Ruling on Antidumping Duty Order on Certain Artist Canvas from the People's Republic of China (December 15, 2022) …………………………………………………………………… 2

Live Swine from Canada, 70 Fed.Reg. 12,181, 12,182 (Mar. 11, 2005) ……... 47

Marimekko Coated Cotton Fabrics https://www.finnstyle.com/mapvccofa.html ....................................................... 30

Memorandum to James Maeder, Associate Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, from Erin Begnal, Director, Office III, AD/CVD Operations, regarding Final Scope Ruling on the Antidumping Duty Order on Certain Artist Canvas from the People's Republic of China: Berger Textiles' Canvas Banner Matisse (Aug. 15, 2023) …………..…. 2

Norman J. Singer & Shambie Singer, Statutes and Statutory Construction § 47.23 (7th ed. 2014) (Sutherland) …………………………………………….… 40

*Notice of Antidumping Duty Order: Certain Artist Canvas from the People's Republic of China*, 71 Fed. Reg. 31154 (June 1, 2006) .................................... 1, 8

## STATEMENT OF RELATED CASES

This case has not previously been before this Court or any court other than the U.S. Court of International Trade ("CIT") below. There is no case known to counsel to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

The CIT had jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(vi) and 28 U.S.C. § 1581(c). *Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 146 F.Supp.3d 1331, 1334 (Ct. Int'l Trade 2016). On October 8, 2024, the CIT issued a final judgment that sustained a determination by U.S. Department of Commerce ("Commerce") that Plaintiff-Appellant Printing Textiles, LLC dba Berger Textiles ("Berger" or "Plaintiff-Appellant") imports of "Canvas Banner Matisse" ("CBM") are within the scope of an antidumping duty order on certain artist canvas from the People's Republic of China ("China"). *See Notice of Antidumping Duty Order: Certain Artist Canvas from the People's Republic of China*, 71 Fed. Reg. 31154 (June 1, 2006) (the "*Order*"). Appx00001-00002. *See also* the CIT opinion. Appx00003-00024. Berger filed a timely notice of appeal on November 24, 2024. The U.S. Court of Appeals for the Federal Circuit ("CAFC") has jurisdiction under 28 U.S.C. §§ 1295(a)(5), 2107, and 2645(c). *Quiedan Co. v. United States*, 927 F.3d 1328, 1330 (Fed. Cir. 2019).

1

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

The issues of law are (1) Whether contrary to Commerce's decision,
Commerce unlawfully expanded the scope of the *Order* and Commerce's scope
interpretation exceeded the limits of a (k)(1) analysis and is unsupported by
substantial evidence (2) Whether contrary to Commerce's decision, the *Order* is
void-for-vagueness and unconstitutional and Commerce's scope interpretation
exceeded the limits of a (k)(1) analysis and is unsupported by substantial
evidence (3) Whether Commerce's Scope Ruling that Berger's CBM purchased
from China is covered by the scope of the *Order*, based on the plain scope
language and the (k)(1) factors, is unsupported by substantial evidence.

## STATEMENT OF THE CASE

Following an administrative proceeding (the "scope inquiry") under a 19
C.F.R. § 351.225 proceeding, Commerce issued the contested determination as
"Final Scope Ruling on the Antidumping Duty Order on Certain Artist Canvas
from the People's Republic of China: Berger Textiles' Canvas Banner Matisse"
(Aug. 15, 2023), APPX00458-00478 ("*Final Scope Ruling*"). Commerce issued
the *Final Scope Ruling* in response to an Application of Scope Ruling (or "*Scope
Request*") (Dec. 15, 2022) (APPX00029-00327, Appx80005-80303) submitted
by Printing Textiles. Accordingly, the relevant facts to the case herein involve
Berger's challenge to Commerce's decisions, as further detailed below.

## SUMMARY OF PLAINTIFF-APPELLANT'S ARGUMENTS

Berger asserts that Commerce unlawfully expanded the scope of the *Order*, that the *Order* is void-for-vagueness and unconstitutional, and Berger's CBM falls outside the scope of the *Order* (i.e., the product is expressly not covered by the plain language of the scope of the *Order*). The *Final Scope Ruling* is not otherwise supported by substantial evidence on the record and/or is not in accordance with law.

## ARGUMENTS

### A. Standard Of Review.

The CAFC reviews CIT "decisions de novo and apply anew the same standard it used. *Sunpreme Inc. v. United States*, 946 F.3d 1300, 1308 (Fed. Cir. 2020) (en banc). Under that standard, this court must uphold the agency's determinations unless they are 'unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also Sunpreme*, 946 F.3d at 1308: See also *Shenyang Yuanda*, 146 F.Supp.3d at 1354 & N. 63. The plain meaning of an antidumping or countervailing duty order, including whether an ambiguity exists with respect to the scope of the order, is a question of law reviewed de novo. *Meridian Products, LLC v. United States*, 851 F.3d 1375, 1382 (Fed. Cir. 2017). In contrast, '[t]he question of whether a product meets the unambiguous scope terms presents a question of fact

reviewed for substantial evidence.' *Id*." *Worldwide Door Components, Inc. v. United States*, 119 F.4th 959, 968 (Fed. Cir. 2024). The CAFC "will set aside agency actions found to be arbitrary and capricious." *Shenyang Yuanda*, 146 F.Supp.3d at 1340 (citing *Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States,* 701 F.3d 1367, 1377 (Fed.Cir.2012) ) (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 284, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) ). The CAFC considers whether " 'the administrative record contain[s] substantial evidence to support' Commerce's decision and whether that decision was 'rational." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). *Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1341-42 (Fed. Cir. 2021). "While respecting agency expertise, the Supreme Court 'has stressed the importance of not simply rubber-stamping agency fact-finding.' *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999)." *A.L. Patterson, Inc. v. United States*, 2013-1526, *7 (Fed. Cir. 2014). *See also Osi Pharm., LLC v. Apotex Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019).

## B. Legal Standard For Substantial Evidence Determinations.

" 'Commerce is entitled to substantial deference with regard to its interpretations of its own antidumping duty orders.' *King Supply Co., LLC v. United States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012) (citing *Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1382 (Fed. Cir. 2005) ). 'This broad deference is

4

not unlimited, however, since 'Commerce cannot interpret an antidumping duty order so as to change the scope of that order, nor can Commerce interpret an order in a manner contrary to its terms.' ' *Id.* (quoting *Walgreen Co. v. United States*, 620 F.3d 1350, 1354 (Fed. Cir. 2010) ). 'Substantial evidence requires 'more than a mere scintilla,' but is satisfied by 'something less than the weight of the evidence.' ' *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (citations omitted). Commerce's consideration should reflect a sound decision-making process, see *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962), taking into account all evidence on the record, including that which may detract from the ultimate conclusion, *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016). But, whatever the result, the agency's rationale must not be arbitrary, capricious, or an abuse of discretion. *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998)." *Diamond Sawblades Manufacturers' Coal. v. United States*, 405 F.Supp.3d 1345, 1351 (2019). "Commerce's total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders the Department's determination unsupported by substantial evidence." *Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141, 1165 (2000).

## C. Legal Standard For Arbitrary And Capricious Determinations.

"Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citations omitted). An abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are unsupported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors. *Arnold P'ship v. Dudas*, 362 F.3d 1338, 1340 (Fed. Cir. 2004).

## D. Legal Standard For Scope Determinations.

In determining the scope of an order, Commerce will consider:

(1) The descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission.

(2) When the above criteria are not dispositive, the Secretary will further consider:

(i) The physical characteristics of the product;

(ii) The expectations of the ultimate purchasers;

(iii) The ultimate use of the product;

(iv) The channels of trade in which the product is sold; and

(v) The manner in which the product is advertised and displayed.

"[T]he plain language of an antidumping order is 'paramount' in determining whether particular products are included within its scope" and, "[i]n reviewing the plain language of a duty order, Commerce must consider the [ § 351.225(k)(1) factors]." *Meridian Prod. v. United States*, 890 F.3d 1272, 1277 (Fed. Cir. 2018). *Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 776 F.3d 1351, 1354 (Fed. Cir. 2015) (describing "a two-step process" in which "Commerce must [first] consider the scope language contained in the order itself, the descriptions contained in the petition, and how the scope was defined in the investigation and in the determinations issued by Commerce and the ITC"); *ArcelorMittal Stainless Belg. N.V. v. United States*, 694 F.3d 82, 87 (Fed. Cir. 2012) ("[T]he first step in a scope ruling proceeding is to determine whether the governing language is in fact ambiguous, and thus requires analysis of the regulatory factors [i.e., the (k)(1) sources] previously outlined. If it is not ambiguous, the plain meaning of the language governs."). "If the (k)(1) materials are not dispositive, Commerce then considers the (k)(2) criteria ....") (internal citations omitted). *OMG, Inc. v. United States*, 972 F.3d 1358, 1363 (Fed. Cir. 2020).

## E. Statement Of Facts.

### Scope of the *Order*

In pertinent part, the scope language in the *Order* reads as follows:

"The products covered by this order are ***artist canvases*** regardless of dimension and/or size, whether assembled or unassembled, ***that have been primed/coated***, whether or not made from cotton, whether or not archival, whether bleached or unbleached, and ***whether or not containing an ink receptive top coat. Priming/coating includes the application of a solution, designed to promote the adherence of artist materials***, such as paint or ink, to the fabric. Artist canvases ( *i.e.*, pre–stretched canvases, canvas panels, canvas pads, canvas rolls (including bulk rolls that have been primed), printable canvases, floor cloths, and placemats) are tightly woven prepared painting and/or printing surfaces. Artist canvas and stretcher strips (whether or not made of wood and whether or not assembled) included within a kit or set are covered by this proceeding."

*Order*, 71 Fed. Reg. at 31155 (emphasis added).

### Berger's CBM

The Chinese-origin CBM of the scope ruling request is 600 denier 100% polyester fabric woven (i.e., warp and weft) filament fiber, weighing approximately 270 GSM, that has been coated with polyvinyl acetate / acrylate type polymers. One side of the fabric has been coated and is visible to the naked eye. The coated side has hydrophobic sealing and fireproof agents. The bottom priming/coating does not promote the adherence of artistic materials. The fabrics are imported as rolls in various lengths with no designs. *See Scope Request* at Cover Sheet.

**F. Commerce Misapplied The Primary Criteria For Determining Scope Under 19 C.F.R. § 351.225 By Failing To Consider The 19 C.F.R. § 351.225(k)(1) And Thereby Expanding The Scope Of The *Order*.**

At the outset, the CIT held that Commerce did not fail to consider, or misapply, the "(k)(1)" sources to "expand" the scope of the *Order*. APPX00013. Although Berger asserts that CBM is excluded based on the plain scope language, the Commerce (k)(1) analysis is unlawful.

The language of an order dictates its scope. Commerce has broad authority "to interpret and clarify its antidumping duty orders." *Ericsson GE Mobile Commc'ns, Inc. v. United States,* 60 F.3d 778, 782 (Fed.Cir.1995) (citing *Smith Corona Corp. v. United States,* 915 F.2d 683, 686 (Fed.Cir.1990) ), *as corrected on reh'g* (Sept. 1, 1995). *See also King Supply,* 674 F.3d at 1349. " 'We therefore afford 'significant deference to Commerce's interpretation of a scope order,' so long as Commerce's interpretation is not 'contrary to the order's terms' and does not 'change the scope of the order.' " *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1300 (Fed. Cir. 2013) (quoting *Global Commodity Grp. LLC v. United States*, 709 F.3d 1134, 1138 (Fed. Cir. 2013)). *See also Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1072 (Fed. Cir. 2001) (citing *Wheatland Tube*, 161 F.3d at 1370). In construing the language of the order, "Commerce cannot delegate to itself the power to expand the reach of an order through silence." *Bell Supply Co. v United States*,_CIT_, 83 F.Supp. 3d 1311, 1324

(2015). Stated another way, "Commerce cannot find authority in an order based on the theory that the order does not deny authority." *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1096 (Fed. Cir. 2002).

"Scope orders may be interpreted as including subject merchandise only if they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it." *Mid Continent*, 725 F.3d at 1300 (quoting *Duferco Steel, Inc. v. United States,* 296 F.3d 1087, 1089 (Fed. Cir. 2002) ). Although the petition and the investigation proceedings may aid in Commerce's interpretation of the final order, the order itself "reflects the decision that has been made as to which merchandise is within the final scope of the investigation and is subject to the order." *Id.* at 1096–97. Therefore, if Commerce conducts a scope ruling without reference to the language of an order it is not interpreting that order.

In interpreting the scope of the orders, Commerce is limited to clarifying the scope based on the actual words of the orders. See 19 C.F.R. § 351.225(k); *Duferco Steel,* 296 F.3d at 1097. "{A} scope determination is not in accordance with the law if it changes the scope of an order or interprets an order in a manner contrary to the order's terms." *Allegheny Bradford Corp. v. United States*, 28 CIT 830, 842, 342 F. Supp. 2d 1172, 1193 (2004) (citing *Duferco Steel*, 296 F. 3d at 1094-95; *Eckstrom Indus.*, 254 F.3d at 1072; *Shenyang Yuanda*, 776 F.3d at 1344.

The "cornerstone" of the Court's analysis "rest{s} on the language of the order." *Duferco Steel*, 296 F.3d at 1097; see also *Walgreen*, 620 F.3d at 1357 (quoting *Duferco Steel*). "In a scope ruling proceeding, a predicate for the interpretive process is language in the order that is subject to interpretation." *ArcelorMittal Stainless*, 694 F.3d at 84 (citations and internal quotations omitted). In construing the language of the order, "Commerce cannot delegate to itself the power to expand the reach of an order through silence." *Bell Supply*, 83 F.Supp. at 1324. Stated another way, "Commerce cannot find authority in an order based on the theory that the order does not deny authority." *Duferco Steel*, 296 F.3d at 1096. Instead, "{s}cope orders may be interpreted as including subject merchandise only if they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it." *Id*. at 1089. Furthermore, the Court should avoid interpreting the language of the order to be "vague and open-ended," *Trade Assocs. Group v. United States*, 961 F. Supp. 2d 1306, 1318 (2014), because "Commerce's discretion to define and clarify the scope of an investigation is limited by concerns for transparency of administrative actions," *ArcelorMttal*, 694 F.3d at 90.

"Commerce should give consideration to petitioners' intended meaning when examining a petition's description of the subject merchandise. *See* [228 F.Supp.3d 1379] *Mid Continent Nail*, 770 F.Supp.2d at 1379 ("Commerce failed

to address the Petitioners' Scope Letter which made clear the Petitioners' intention that their proposed scope language would include subject goods packaged with non-subject items. This failure alone renders the Final Scope Ruling unsupported by substantial evidence."); see also [*Fedmet Res. Corp. v. United States*, 755 F.3d 912, 921 (Fed. Cir. 2014)] ('[T]he reason why the (k)(1) sources are afforded primacy in the scope analysis is because interpretation of the language used in the orders must be based on the meaning given to that language during the underlying investigations.')." *Mitsubishi Polyester Film, Inc. v. United States*, 228 F. Supp. 3d 1359, 1379 (Ct. Int'l Trade 2017).

It is well established that operative terms in such orders must be given effect as written, so that they are not rendered "mere surplusage." *See, e.g., Eckstrom Indus.*, 254 F.3d at 1073 (Fed. Cir. 2001) (rejecting construction of antidumping order that rendered certain language "mere surplusage")' *AK Steel Corp.* v. *United States,* 226 F.3d 1361, 1370 (Fed. Cir. 2000) (same); *FAG Italia Sp.A. v. United States,* 291 F.3d 806 (Fed. Cir. 2002) ({w}e read statutes not in isolation but as a whole, settling on a construction that reduces terms to surplusage only where we can find no other reasonable reading of the statute") (internal citations omitted). "While Commerce has latitude in interpreting the ... Orders, it may not render parts of the Order 'mere surplasage." *Polites v. United States,* 755 F.Supp.2d 1352, 1357 (CIT 2011), *quoting Eckstrom*

*Industries, supra,* 254 F.3d at 1073. *See also* 2A N. Singer & S. Singer, Sutherland on Statutory Construction § 46.6 (7th ed. 2014) (explaining that "{i}t is an elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute"; that "{c}ourts construe a statute to give effect to all its provisions, so that no part is inoperative or superfluous, void, or insignificant" ; and that "{c}ourts assume that every word, phrase, and clause ... is intended and has some meaning") (footnotes omitted)." *Shenzhen Xinboda Industrial Co., Ltd. v. United States*, 279 F.Supp.3d 1265, 1307-08 (CIT. 2017). *See Eckstrom Indus.,* 254 F.3d at 1073 (rejecting Commerce's interpretation of order covering "certain" stainless steel butt-weld pipe fittings within certain dimensions, where Commerce's interpretation "essentially reduces to an interpretation of the Order as covering *any* stainless steel butt-weld pipe fittings" within those dimensions) (emphasis original).

The products covered by this *Order* are **artist canvases** regardless of dimension and/or size, whether assembled or unassembled, **that have been primed/coated**, whether or not made from cotton, whether or not archival, whether bleached or unbleached, and whether or not containing an ink receptive top coat. **Priming/coating includes the application of a solution, designed to promote the adherence of artist materials**, such as paint or ink, to the fabric. Thus, when read in the entirety, the plain meaning and context of the reference

"designed to promote the adherence of artist materials" in the scope language compels a narrow interpretation of the words "priming/coating". There can be no doubt that Commerce, on promulgating the *Order*, intended for the two sentences in question to serve as dispositive scope language. Commerce could not also have intended that these same two sentences would leave the scope of the *Order* as vague and open-ended as defendant's arguments would have the court presume. As discussed in detail below, as Tara intended, and as the ITC and Commerce have recognized, it is unequivocally clear that Tara's specific acrylic latex "gesso" bottom "adherence" priming/coating formula is a prerequisite to artist canvas under the *Order*.

*See ArcelorMittal*, 694 F.3d at 90 ("Commerce is not at liberty to ignore the plain terms of an order in what appears to be, in retrospect, an effort to better reflect the intent of the petitioners."); *Duferco*, 25 CIT 493 at 501, 146 F.Supp.2d at 922 (noting that while "this Court has previously held that Commerce must give ample deference to the petitioner's intent when examining a petition's description of the subject merchandise," the Court should "avoid subjective issues of intent and, instead, look to the petition's language to determine whether the class or kind of merchandise at issue was expressly included"), rev'd on other grounds, 296 F.3d 1087 (Fed. Cir. 2002).

The *Order* states that "artist canvases" … "have been primed/coated" … "whether or not containing an ink receptive top coat" … and that the "[p]riming/coating includes the application of a solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric." Interestingly in its *Final Scope Ruling*, Commerce stated that Berger's CBM is within the scope of the *Order* because the "CBM is a canvas roll and/or printable canvas that is primed/coated and is a woven ***prepared painting and/or printing surface*** … that the primed/coated side of the fabric ***is receptive to artist materials, consistent with our prior scope rulings*** … . APPX00472 (emphasis added). *See also* the CIT mistaken reasoning at APPX00018. Clearly Commerce shifts the language away (unlawfully *expands* the Oder) from the language of the *Order* and that of the intent of the Tara. Commerce goes on to admit this shifting in the following:

> "the focus is notably on ***preparing the fabric 'to accept'*** paints or inks and on ***creating 'a surface for the graphic presentation of painted or printed images.'*** " APPX00473 (emphasis added).

> "Commerce has determined that priming/coating (*i.e.*, gessoing) ***a fabric to accept*** artist materials is "understood to be synonymous with the priming/coating material or the application thereof, which promotes the adherence of artist materials" APPX00474 (emphasis added).

> "Commerce further explained that gesso '***improves the receptivity of canvas*** to paint or other artistic materials, which helps clarify the scope's reference to priming or coating with a solution 'designed to promote the adherence of artist materials' " *Id*. (emphasis added).

"In the Impact Images PFCPU Scope Ruling, Commerce found the merchandise out of scope because "the polyurethane and flame retardants **coating** of PFCPU makes the product flame/heat, water, milder, and rot resistant, and ***is not applied to prime the product to be receptive to the application*** of paint or other artistic medium' " *Id*. (emphasis added).

"Commerce further stated that because 'Impact Images provides sufficient information to demonstrate that no priming or coating is applied to PFCPU that ***increases the canvas' receptivity*** to paint, ink or other artistic materials (**i.e., any graphics are applied to the canopy material regardless of coating**, and the coating applied to PFCPU is applied for non-graphical purposes), it is distinguishable from in-scope material that is ***necessarily primed/coated to allow for acceptance*** of artistic materials' " *Id*. (emphasis added).

"Therefore, the 19 CFR 351.225(k)(1) materials demonstrate that Commerce and the ITC have defined 'promote the adherence' of artist materials ***to mean 'allow for acceptance of,' 'improve{} the receptivity of canvas to,' or 'increase{} the canvas' receptivity to' artist materials***" *Id*. (emphasis added).

> *See also* the same CIT mistaken reasoning at APPX00018-0019 concerning misapplying (k)(1) sources. The CIT stated, "In the Final Scope Ruling, Commerce found, with respect to Canvas Banner Matisse, that 'the record evidence indicates that the primed/coated side of the fabric is *receptive* to artist materials, consistent with our prior scope rulings.' *Id.* at 15 (emphasis added). As Commerce recognized in the Final Scope Ruling, Printing Textiles did not contend, and declined to state, that users of Canvas Banner Matisse use only the uncoated side of the fabric for the printing of images. *Id*. at 18. Commerce concluded that materials identified in 19 C.F.R. § 351.225(k)(1) 'demonstrate that Commerce and the ITC have defined 'promote the adherence' of artist materials to mean 'allow for the acceptance of,' 'improve{ } the receptivity of canvas to,' or 'increase{ } the canvas' receptivity to' artist materials.' *Id*. at 17. Noting that Berger Textiles submitted results of third-party testing in an effort to show that the priming/coating did not promote the adherence of ink, Commerce reasonably concluded that "the ITC and our prior scope rulings have not interpreted 'adherence' so

16

narrowly." *Id*. at 16 (citing *ITC Report* at 3; Final Scope Ruling: RV Print Factory LLC's Coated Fabrics (Sept. 29, 2022) at 14)." However, in addition to the faulty reasoning, Berger has shown throughout its *Scope Request* that CBM's priming/coating does not "promote the adherence of artist materials".

"we note that the ITC and our prior scope rulings have not interpreted '*adherence*' *so narrowly*. The ITC stated that '{a}rtists' canvas is a surface for the graphic presentation of painted or printed images. It is made from woven fabric that is primed and coated ('gessoed') *to accept* paints or inks and is sold in a variety of shapes, sizes, textures, and formats.' Although the ITC used primed/coated and 'gessoed' interchangeably, the focus is notably on **preparing the fabric 'to accept' paints or inks** and on **creating 'a surface for the graphic presentation of painted or printed images**' " APPX00473 (emphasis added)

Berger pointed out Commerce's ITC reliance flaws in its *56.2 Brief*, stating, "Commerce unlawfully relied on a single sentence in the U.S. International Trade Commission's ("ITC") final publication in the Views of the Commission section to justify its scope creep. Like Commerce, the ITC too cannot expand the scope of an Order. The ITC only ' 'determines that a domestic industry will be harmed 'by reason of imports of that merchandise, or by reason of sales (or the likelihood of sales) of that merchandise for importation.' 19 U.S.C. § 1673 (emphasis added); *see also Viraj Group v. United States*, 476 F.3d 1349, 1351 (Fed.Cir.2007)." *Ad Hoc Shrimp Trade Action Committee v. U.S.*, 515 F.3d 1372, 1375 (Fed. Cir. 2008)." APPX00497. "[W]hile the ITC determines whether there is material injury or the threat of material injury, it is Commerce's investigation that defines the scope of the ITC's analysis." *USEC Inc. v. United States,* 34 Fed.Appx. 725, 730 (Fed.Cir.2002). In making its injury determination, the ITC can determine that certain merchandise subject to the investigation does not materially injure a domestic industry and should not be subject to antidumping or countervailing duties, but "the ITC has no independent authority to expand the scope of an ... investigation." *Ad Hoc Shrimp,* 515 F.3d at 1384.

In its related finding that Commerce properly considered (k)(1) sources, the CIT too pointed to the ITC publication as one of two "primary interpretive sources". APPX00015. However, the source is not substantial evidence because of the ITC unlawful interpretation/expansion of the *Order*.

"In light of ambiguous scope language, Commerce should give consideration to petitioners' intended meaning when examining a petition's description of the subject merchandise. *See* [*Mid Continent Nail*, 770 F.Supp.2d at 1379] ('Commerce failed to address the Petitioners' Scope Letter which made clear the Petitioners' intention that their proposed scope language would include subject goods packaged with non-subject items. This failure alone renders the Final Scope Ruling unsupported by substantial evidence."); see also *Fedmet*, 755 F.3d at 921 ('[T]he reason why the (k)(1) sources are afforded primacy in the scope analysis is because interpretation of the language used in the orders must be based on the meaning given to that language during the underlying investigations.'). *Mitsubishi Polyester*, 228 F. Supp. 3d at 1378.

Moreover, while Berger is thankful that Commerce stated the above, it also made unlawful interpretations in numerous and similar instances in previous ruling as pointed out in its *Scope Request*. Importantly, neither Tara, nor the agencies discussed the meaning of neither "promote" nor "adherence" as it

pertains to the scope of the *Order*. According to Merriam-Webster's dictionary, promote means the below.

1     a: to advance in station, rank, or honor: RAISE
b: to change (a pawn) into a piece in chess by moving to the eighth rank
c: to advance (a student) from one grade to the next higher grade

2     a: to contribute to the growth or prosperity of: FURTHER
promote international understanding
b: to help bring (something, such as an enterprise) into being : LAUNCH
c: to present (merchandise) for buyer acceptance through advertising,
publicity, or discounting

3     slang: to get possession of by doubtful means or by ingenuity

According to Merriam-Webster's dictionary, "adherence" means "the act, action, or quality of adhering" and adhere is "to hold fast or stick by or as if by gluing, suction, grasping, or fusing". Antidumping duty orders "should not be interpreted in a vacuum devoid of any consideration of the way the language of the order is used in the relevant industry." *Fedmet*, 755 F.3d at 921 (quoting *ArcelorMittal*, 694 F.3d at 88). Accordingly, "[b]ecause the primary purpose of an antidumping order is to place foreign exporters on notice of what merchandise is subject to duties, the terms of an order should be consistent, to the extent possible, with trade usage." *ArcelorMittal*, 694 F.3d at 88. According to third-party expert, Dr. Ray Work, there "no standardized tests are available to measure 'adherence' ". APPX00043, APPX00148, Appx80019, Appx80124.

In the *Impact Images* final ruling decision, Commerce began to expand the scope of the *Order* and added confusion (open-ended interpretation) to the "adherence" term by interchanging it with receptive/receptivity terms as physical characteristics. Commerce also introduced "allow for acceptance" to physical characteristics requirements. Below are the unlawful Commerce statements made in *Impact Images* (APPX00044-00045, APPX00211-00214, Appx80020-80021, Appx80187-80190):

> "Gesso is a coating which allows the canvas to be **receptive** to the application of paint or other materials." (emphasis added).

> "Impact Images asserts that the PFCPU product in question is therefore not covered by the scope of the *Order* because it is demonstrably not coated in gesso, or any other material which allows the canvas to be **receptive** to the application of paint or other materials, but, rather, coated with flame-retardant and polyurethane for the purpose of water/weather/fire-proofing and which does not aid in the application of any print medium." (emphasis added).

> "Moreover, the (k)(1) materials highlight the way in which "gesso" improves the **receptivity** of canvas to paint or other artistic materials, which helps clarify the scope's reference to priming or coating with a solution "designed to promote the adherence of artist materials." (emphasis added).

> "By contrast to "gesso," the polyurethane and flame retardants coating of PFCPU makes the product flame/heat, water, mildew, and rot resistant, and is not applied to prime the product to be **receptive** to the application of paint or other artistic medium." (emphasis added).

> "Impact Images thus highlights, and we agree, that the language from the ITC reports and the *Tara – Print Canvas* scope ruling demonstrates that priming/coating (i.e., gessoing) is a requisite component of subject

20

merchandise that allows it to accept artistic materials for a surface application (or a subsequent ink-**receptive** top coat, in the case of print canvas)." (emphasis added).

"Therefore, as Impact Images provides sufficient information to demonstrate that no priming or coating is applied to PFCPU that increases the canvas' **receptivity** to paint, ink or other artistic materials (i.e., any graphics are applied to the canopy material regardless of coating, and the coating applied to PFCPU is applied for non-graphical purposes), it is distinguishable from in-scope material that is necessarily primed/coated to **allow for acceptance** of artistic materials." (emphasis added).

"In this way, the coating applied to PFCPU is demonstrated to have no specific bearing on the adherence/**reception** of artistic paint, ink, or other materials to the surface of the product (but, rather, applied for the sole purpose of imparted other, nonartistic qualities)." (emphasis added).

In the *Global Textile* final ruling decision, Commerce continued to expand the scope of the *Order* and caused confusion (open-ended interpretation) to the "adherence" term by interchanging it with receptive / receptivity terms and using the allow for acceptance language. Commerce yet again muddied the waters by bringing in "add application" as additional physical characteristics. Below are the unlawful Commerce statements made in *Global Textile* (APPX00045-00046, APPX00221-00223, Appx80021-80022, Appx80197-80199):

"Gesso is a coating which allows the canvas to be **receptive** to the application of paint or other materials." (emphasis added).

"Commerce thus found that Impact Images provided sufficient information to demonstrate that no priming or coating was applied to PFCPU that increased the canvas' **receptivity** to paint, ink or other artistic materials (i.e., any graphics are applied to the canopy material regardless of coating, and the coating applied to PFCPU is applied for non-graphical purposes),

and it was distinguishable from in-scope material that was necessarily primed/coated to **allow for acceptance** of artistic materials." (emphasis added).

"The Tara Print Canvas Scope Ruling further establishes that subject print canvas necessarily contains a chemical coating which serves as a paint or ink-**receptive** primer." (emphasis added).

"Global Textile highlights, and we agree, that the Impact Images PFCPU Scope Ruling language (itself relying on the plain language of the scope, ITC reports, and the Tara Print Canvas Scope Ruling) establishes that priming/coating (i.e., gessoing) is a requisite component of subject merchandise that allows it to accept artistic materials for a surface application (or a subsequent ink-**receptive** top coat, in the case of print canvas)." (emphasis added).

"Therefore, as Global Textile provides sufficient information to demonstrate that no priming or coating is applied to blockout and backlit fabric that increases the canvas's **receptivity** to paint, ink or other artistic materials (i.e., any graphics are applied to the fabric regardless of coating, and the coating applied to both backlit and blockout fabric is applied for non-graphical purposes), such materials are distinguishable from in-scope material that is necessarily primed/coated to **allow for acceptance** of artistic materials." (emphasis added).

"Therefore, nothing on the record suggests that such coatings **aid application** of graphical media to the fabrics, nor contradicts Global Textile's statements that such coatings do not promote adherence of artist materials, such as paint or ink, to the blockout or backlit fabric." (emphasis added).

In the *Permalite* final ruling decision, Commerce yet again continued to

expand the scope of the *Order* and caused confusion (open-ended interpretation)

to the adherence term by interchanging it with receptive/receptivity terms and

using the allow for acceptance language. Below are the unlawful Commerce

statements made in *Permalite* (APPX00046-00047, APPX00229-00233, Appx80022-80023, Appx80205-80209):

> "Gesso is a coating which allows the canvas to be **receptive** to the application of paint or other materials." (emphasis added).

> "Commerce thus found that Impact Images provided sufficient information to demonstrate that no priming or coating was applied to PFCPU that increased the canvas' **receptivity** to paint, ink or other artistic materials (i.e., any graphics are applied to the canopy material regardless of coating, and the coating applied to PFCPU is applied for non-graphical purposes), and it was distinguishable from in-scope material that was necessarily primed/coated to **allow for acceptance** of artistic materials." (emphasis added).

> "The Tara Print Canvas Scope Ruling further establishes that subject print canvas must necessarily contain a chemical coating which serves as a paint or ink-**receptive** primer." (emphasis added).

> "Impact Images thus highlights, and we agree, that the language from the ITC reports and the Tara – Print Canvas scope ruling demonstrates that priming/coating (i.e., gessoing) is a requisite component of subject merchandise that allows it to accept artistic materials for a surface application (or a subsequent ink-**receptive** top coat, in the case of print canvas)."

> "As we have found that a downstream coated canvas product on which artistic media may be applied which is fully manufactured in China was out of scope simply by virtue of not having an ink or paint **receptive** gesso/coating layer, it follows that an uncoated woven polyester input product is not subject to the scope of the order." (emphasis added).

In the *RV Print* final ruling decision, Commerce yet again continued to expand the scope of the *Order* with its greatest leap yet. Most, if not all of language the "Commerce's Position" is unlawful and further causing confusion

(open-ended interpretation) to the absolute requirement that "Priming/coating includes the application of a solution, designed to **promote the adherence** of artist materials, such as paint or ink, to the fabric". Instead, Commerce focused on "canvas" wording / being canvas alone causing merchandise to be under the *Order*, a new nongraphical purpose requirement, and a new uniform surface requirement, all not listed in the *Order* or the *Order's* history. Below are the unlawful Commerce statements made in *RV Print* (APPX00047-00049, APPX00245-00248, Appx80023-80025, Appx80221-80224):

> "The record evidence demonstrates that EVACPET is an artist canvas, as defined by the language of the scope. Specifically, EVACPET is primed/coated "**for the purpose of converting a fabric into a canvas**." The priming/coating "**is required to stiffen the fabric…giving it the stiffness properties of a canvas**" and "**provides whiteness and higher opacity to the translucent polyester fabric**." … Moreover, RV Print **repeatedly refers to EVACPET as a canvas in its Scope Request**. We, therefore, find, based on the record evidence, that EVACPET is a canvas roll and/or printable canvas that is primed/coated and **is a prepared painting and/or printing surface**. Accordingly, we determine that the language of the scope of the *Order* demonstrates that EVACPET is subject to the *Order*." (emphasis added).

> "Moreover, language from the ITC and our prior scope rulings have not interpreted "adherence" so narrowly. The ITC stated that "**{a}rtists' canvas is a surface for the graphic presentation of painted or printed images**. It is made from woven fabric that is primed and coated ('gessoed') *to accept* **paints or inks and is sold in a variety of shapes, sizes, textures, and formats**." Although the ITC used primed/coated and "gessoed" interchangeably, the focus is notably on preparing the fabric "**to accept**" paints or inks and on creating "a surface for the graphic presentation of painted or printed images." In the Impact Images PFCPU Scope Ruling, we found the merchandise out of scope because "the

polyurethane and flame retardants coating of PFCPU makes the product flame/heat, water, milder, and rot resistant, and is not applied to prime the product **to be receptive** to the application of paint or other artistic medium." Commerce further stated that "Impact Images provides sufficient information to demonstrate that no priming or coating is applied to PFCPU that **increases the canvas' receptivity to paint, ink or other artistic materials (*i.e.*, any graphics are applied to the canopy material regardless of coating, and the coating applied to PFCPU is applied for non-graphical purposes)**, it is distinguishable from in-scope material that is necessarily primed/coated **to allow for acceptance of artistic materials.**' " (emphasis added).

"Here, by contrast, **RV Print has not demonstrated that its EVACPET coating is applied for nongraphical purposes or that it does not increase the canvas' receptivity to paint, ink, or other artistic materials**. … Notably, RV Print never defined the characteristics imparted by its EVACPET coating or **clarified whether it creates a uniform surface for the application of graphical media**. … Instead, record evidence suggests that RV Print's EVACPET coating is **for a graphical purpose and prepares the canvas to receive ink.** … Thus, we find that the record evidence suggests that the **EVACPET primer/coating's purpose is to prepare the canvas to receive ink printing**." (emphasis added).

"Moreover, RV Print repeatedly refers to EVACPET **as a canvas** in its Scope Request. The Tara Print Canvas Scope Ruling previously held that "printable canvases" are subject merchandise because they are specifically cited as an example of subject merchandise in the scope. Because the record evidence demonstrates that EVACPET is a **canvas roll and/or printing canvas**, both of which the scope cites as examples of subject merchandise, we find that EVACPET is in scope, in accordance with the Tara Print Canvas Scope Ruling." (emphasis added).

"The Impact Images PFCPU Scope Ruling and Global Textile's Blockout Fabric and Backlit Fabric Scope Ruling also affirm that **priming/coating a fabric to make it receptive to ink makes the fabric an artist canvas subject to the *Order***. Importantly, the requesting parties in the Impact Images PFCPU Scope Ruling and Global Textile's Blockout Fabric and Backlit Fabric Scope Ruling **demonstrated that the products in question**

**were not primed/coated to accept, or be receptive to, artist materials**. Here, RV Print, as discussed above, does not demonstrate that EVACPET **is not primed/coated to accept, or be receptive to, artist materials**. Rather, the record contains evidence that EVACPET **is indeed primed/coated to accept, or be receptive to, artist materials**." (emphasis added).

"In Mitsubishi III, this Court held Commerce's 1991 scope ruling unlawfully expanded the coverage of the CMT Order by requiring importers to prove their CMT subassemblies were actually employed in the production of non-CMT devices in the United States to avoid having the subassemblies deemed "dedicated exclusively for use" in CMT transceivers or control units. [*Mitsubishi Elec. Corp. v. United States,* 16 CIT 730, 737-38, 802 F.Supp. 455, 461 (1992) (*Mitsubishi III*), *aff'd,* 11 F.3d 1070 (1993)]. The Court found no language in the CMT Order requiring such a showing and therefore held this new standard was not sustainable as a mere clarification of the CMT Order. *Id*. The CAFC affirmed." *Ericsson Ge Mobile*, 955 F.Supp. 1510, 1532 (1997).

It seems that Tara contributed to the scope creep with its own scope ruling in 2015. When describing the description of merchandise, Tara stated, "All artist Canvas is produced using raw canvas, which may be composed of cotton, cotton and polyester, 100% polyester or linen. **Bulk rolls of canvas are coated with a chemical compound, which serves as a paint or ink-receptive primer.** This chemical coating permits the canvas to better receive and hold paint or ink and

prevent those materials from bleeding through to the other side. **Print canvas may be treated with an ink-receptive chemical topcoat**; this process was followed in 2005, when the petition was filed but, as a result of subsequent advances in canvas production technology and printer capabilities, not all print canvas undergoes such treatment." (APPX00049, APPX00253, APPX00275, Appx80025, Appx80229, Appx80251) (emphasis added). Here, Tara did not distinguish the acrylic latex "gesso" bottom "adherence" priming/coating from that of the ink receptive top coat as described in the *Order*. In summarizing its argument, Tara went on to state that the *Order* "explicitly includes 'artist canvases . . . that have been primed/coated . . . whether or not containing an ink receptive top coat', states that the reason for priming/coating is 'to promote the adherence of artist materials, such as paint or ink, to the fabric', identifies 'printable canvases' among the examples of Artist Canvas and notes that all the subject products 'are tightly woven prepared painting and/or printing surfaces.' " (APPX00049, APPX00253-00254, APPX00276, Appx80025, Appx80229-80230, Appx80252). Parsing out of the scope language likely caused confusion for Commerce in distinguishing between the acrylic latex "gesso" bottom "adherence" priming/coating from that of the ink receptive top coat as described in the *Order*. Tara then contradicted itself in stating that, "Print Canvas is identical in all respects to other Artist Canvas, **except for the additional priming**

**with an ink-receptive topcoat** that some print canvas still undergoes, and is produced by the same process on the same machinery." APPX00049-00050, APPX00276, Appx80025-80026, Appx80252 (emphasis added). Tara certainly added to the scope creep when it stated, "This language leaves no doubt or ambiguity about inclusion of Print Canvas, a product that has the features identified above: '**an ink receptive topcoat,' 'a solution, designed to promote the adherence of artist materials, such as . . . ink**, to the fabric' and 'tightly woven prepared . . . printing surfaces.' " APPX00050, APPX00279, Appx80026, AAppx80255 (emphasis added). Again, according to the history and the scope of the *Order*, there are two distinct coating types (bottom versus top) with distinct physical characteristics ("gesso" "adherence" versus "receptive"). Indeed, it is quite perplexing when Tara later stated that, "Print Canvas has the same physical characteristics as all other Artist Canvas. All Artist Canvas is composed of fabric with a chemical coating. Print Canvas may have an **additional topcoat**, **to permit reception of ink**, but otherwise is identical to other forms of Artist Canvas … There are a number of converters that purchase bulk rolls of chemically-coated canvas from domestic producers and undertake the final step of applying the **ink-receptive topcoat** themselves to produce Print Canvas." APPX00050, APPX00281, Appx80026, Appx80257 (emphasis added). In its answer to Commerce's supplemental questionnaire, Tara seemed to temporarily

clear-up the distinction in stating, "Tara's scope request covers all print canvas, whether or not with an ink-receptive Topcoat, i.e., print canvas may be prepared in either configuration." APPX00050, APPX00190, Appx80026, Appx80166. And again as outlined above, "The top coat, when used, is applied to canvas that already meets the definition of "artist canvas" because it previously has been coated with gesso." APPX00050, APPX00190, Appx80026, Appx80166.

If Commerce expands the scope of the *Order* by basing its scope analysis on additional characteristics concerning the acrylic latex "gesso" bottom "adherence" priming/coating, then legitimately produced coated fabric products face the inevitable "scope creep." For these reasons, Commerce's scope analysis must begin and end with the plain language of the *Order*, which defines the physical characteristics of subject merchandise. It is very clear that Tara's "gesso" bottom "adherence" priming/coating solution concerns those "designed to promote the adherence of artist materials". In its efforts to avoid a nullity in the language of the *Order*, Commerce has instead unlawfully created totally new physical characteristic requirements in which every conceivable coated fabric is within the scope of the *Order which has created absurd results*. Importantly, the internet is replete with examples similar to Tara's acrylic coated fabric. Artist canvas ADD would apply to the examples below if imported into the U.S. with absurd results. *See* Acrylic-coated Cotton Fabric

(for table coverings and outdoor uses) https://www.french-nc.com/shop/Fabrics/French-Fabrics/Acryliccoated-Cotton-Fabric.htm (last visited January 24, 25).



Acrylic Coated Abstract Circle on Mustard Yellow Fabric #762

*See* Marimekko Coated Cotton Fabrics (for placemats, tablecloths, or anything kept outdoors) https://www.finnstyle.com/mapvccofa.html (last visited January 24, 2025).

See Acrylic-coated / Wipe off (for table cloths) https://lacigale-usa.com/product-category/tablecloths/acrylic-coated/ (last visited February January 24, 2025).



Marimekko Pieni Unikko White / Off White Acrylic-Coated Cotton Fabric

See Acrylic Coated Polyester Camouflage Fabric (meant to be used outdoors for boat covers, blinds, ATV covers; anywhere you want a tough, water repellent camouflage fabric) https://rockywoods.com/products/acrylic-coated-polyester-camouflage-fabric-realtree-ap-grey (last visited January 24, 2025).



"[T]he court concludes that the Department's interpretation of the scope

language is flawed for the reasons the court has identified, one of which is that, as so interpreted, the scope language becomes indefinite in a way that Commerce could not have intended." *Trade Assocs.,* 961 F.Supp.2d at 1317 (Ct. Int'l Trade 2014). This cannot have been Commerce's intent when drafting the *Order* or the intent of Tara. Commerce unlawfully expanded the scope of the *Order*. Commerce's unlawful interpretations render the language, "[p]riming/coating includes the application of a solution, designed to promote the adherence of artist materials", to mere surplusage. Commerce unlawfully ignored the intentions of Tara and other (k)(1) materials which instead has led to vague and open-ended interpretations. "Past rulings and reliance upon § 351.225(k)(1) cannot save a scope determination that is based on an unreasonable interpretation of the scope language." *Whirlpool Corp. v. United States*, 144 F.Supp.3d 1296, 1303 (Ct. Int'l Trade 2016). Commerce's determination that the scope contains language that includes, or "may be reasonably interpreted to include" CBM is unlawful. Simply put, Commerce unlawfully expanded the scope of the *Order* and Commerce's scope interpretation exceeded the limits of a (k)(1) analysis and is unsupported by substantial evidence. Importantly, in its related finding that Commerce properly considered (k)(1) sources, the CIT too pointed to Commerce's flawed prior

scope rulings as one of two "primary interpretive sources". APPX00015, APPX00018.

In its reasoning that Commerce properly considered (k)(1) sources, the CIT stated that "Commerce was not required by its regulation to consider *all* (k)(1) sources specified in the regulation: the primary interpretive sources are to be considered 'at the discretion of the Secretary.' 19 C.F.R. § 351.225(k)(1)(i)." APPX00015. However, Commerce was required to consider evidence that detracts detract from the ultimate conclusion. The CIT pointed to only a few sources that are on the record that demonstrate the intent of Tara Materials. APPX00015-00017. Others are listed below under Section H from the original petition (Tara Materials marketing materials), the ITC hearing (Tara Materials testimony), and the Tara Materials scope request, all from the horse's mouth. Tara Materials specificity make it very clear that CBM is excluded from the *Order*. However, Commerce failed to recognize these facts. As noted in Section H, this golden silence/failure renders Commerce's determination unsupported by substantial evidence.

Because Commerce's *Final Scope Ruling* redefines key terms contrary to the plain language of the *Order*, it is not in accordance with law; because it's unreasonable interpretation exceeded the limits of a (k)(1) analysis and the

evidence that weighs against the agency's determination, it is unsupported by substantial evidence; because it expanded the scope, it is arbitrary and capricious.

### G. The *Order* and Commerce's Impermissibly Unlawful Interpretation Denied Berger Adequate Notice And Commerce Failed To Address Due Process Concerns Of Vague Language In The Scope Of The *Order*

At the outset, the CIT held that it "has identified an ambiguous sentence in the scope language of the *Order*, but that sentence, when considered in light of the scope language on the whole, is insufficient to render the entire scope language unconstitutionally vague and, on that ground, a denial of due process. While the sentence could have been drafted to be more precise, the scope language on the whole is sufficiently detailed and descriptive that anyone importing Canvas Banner Matisse, or a similar product, was on notice that such a product reasonably could be considered to be subject merchandise" APPX00023. The CIT seems to believe that Berger availing itself to a scope ruling procedure somehow cured vagueness concerns. *Id*. The CIT also believes that various judicial decisions put forth by Berger, "none of which establishes a rule of law upon which the court could invalidate the decision contested in this litigation." APPX000022.

The CAFC certainly recognizes a rule of law regarding the void-for-vagueness doctrine. "A law that purports to define the lawfulness or unlawfulness

of conduct ' 'is void for vagueness if its *prohibitions* are not clearly defined.' ' *Nyeholt v. Sec'y of Veterans Affairs*, 298 F.3d 1350, 1356 (Fed. Cir. 2002) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) ). The void-for-vagueness doctrine explains that a law that regulates conduct is arbitrary if it does not provide the public with "a reasonable opportunity to know what is prohibited' and 'provide explicit standards for those who apply them.' [*Grayned*, 408 U.S. at 108-09, 92 S.Ct. 2294, 33 L.Ed.2d 222]." *Milecrest Corp. v. United States*, 264 F.Supp.3d 1353, 1374 (Ct. Int'l Trade 2017). "It is properly within the jurisdictional province of the court to declare ultra vires and void, agency action that is beyond the scope of its defined statutory authority." *Pac Fung Feather Co., Ltd. v. United States,* 19 CIT 1451, 1456, 911 F.Supp. 529 (1995), *aff'd,* 111 F.3d 114 (Fed.Cir.1997).

"Commerce will provide 'adequate notice of what conduct is regulated by the order.' See *Fuji Photo Film Co. v. Int'l Trade Comm'n*, 474 F.3d 1281, 1292 (Fed. Cir. 2007)". *Mid Continent Nail Corp. v. United States*, 2012-1682, 2012-1683, * 8 (Fed. Cir. Jul 18, 2013). "The notice requirement reflects 'the broader due-process principle that before an agency may enforce an order or regulation by means of a penalty or monetary sanction, it must 'provide regulated parties fair warning of the conduct [the order or regulation] prohibits or requires.' ' *Mid Continent Nail*, 725 F.3d at 1300–01 (quoting *Christopher v. SmithKline*

*Beecham Corp.*, 567 U.S. 142, 156, 132 S.Ct. 2156, 183 L.Ed.2d 153 (2012))
(alteration in original).” *Tai-Ao Aluminum (Taishan) Co. v. United States*, 983
F.3d 487, 495 (Fed. Cir. 2020); *see also* id. at 1298 (Commerce must write its
orders with sufficient detail so as to provide "{ }adequate notice to regulated
parties") (citing 19 U.S.C. § 1673e(a)(2)).” *Star Pipe Products v. United States*,
393 F.Supp.3d 1200, 1208 (CIT. 2019). Commerce’s “rationale must not be
arbitrary, capricious, or an abuse of discretion. *Wheatland Tube*[, 161 F.3d at
1369].” *Diamond Sawblades Manufacturers’ Coalition v. United States*, 405
F.Supp.3d 1345, 1351 (CIT. 2019). *See also Star Pipe*, 393 F.Supp.3d at 1208.
"In reviewing a business regulation for facial vagueness ... the principal inquiry is
whether the law affords fair warning of what is proscribed regulation for facial
vagueness ... the principal inquiry is whether the law affords fair warning of what
is proscribed." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 102
S.Ct. 1186, 1194-95 (1982).

 “Our practice of deferring to an agency's interpretation of its own
ambiguous regulations undoubtedly has important advantages, but this practice
also creates a risk that agencies will promulgate vague and open-ended
regulations that they can later interpret as they see fit, thereby frustrat{ing} the
notice and predictability purposes of rulemaking. It is one thing to expect
regulated parties to conform their conduct to an agency's interpretations once the

36

agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding and demands deference." *Christopher,* 132 S.Ct. 2156 at 2167. *See also Mid Continent Nail,* 725 F.3d at 1306.

This Court should reject Commerce's vague and open-ended interpretation of the *Order.* In *Allegheny Bradford Corp. v. United States,* this Court addressed a similar situation in a case involving stainless steel butt-weld pipe fittings. 28 CIT 830, 342 F. Supp. 2d 1172 (2004). The scope language stated that "{t}he edges of finished pipe fittings are beveled." *Id.* at 844, 342 F. Supp. 2d at 1184. Commerce claimed beveling is "not an essential physical characteristic for a product to fall within the scope of this order." *Id.* at 849, 342 F. Supp. 2d at 1189. The Court rejected Commerce's interpretation, explaining that "{t}o allow for unsubstantiated distinctions between a scope's 'requirements' and other, supposedly non-essential language is to invite arbitrariness and uncertainty into the process by which Commerce administers antidumping duty orders." *Id.* at 850, 342 F. Supp. 2d at 1190. The Court added that "Commerce's approach also constitutes an improper heightening of the standard faced by a plaintiff seeking to exclude its product." *Id.* at 851, 342 F. Supp. 2d at 1190. The Court thus disapproved

of a "different, more exacting exclusionary standard" in which "Commerce uses a selective reading to nullify portions of an order's scope language which would otherwise exclude a plaintiffs product." *Id.*

As stated above in Section F, Commerce's interpretations of the *Order* raise serious due process concerns because such vague and open-ended language has caused absurd results in antidumping being imposed on importers without adequate notice. Clearly vagueness concerns were not cured by the scope ruling procedure. Commerce's unlawful expansion/unreasonable interpretation of the *Order* that exceeded the limits of a (k)(1) analysis, frustrates fair/reasonable notice/warning, resulting in an *Order* that is void-for-vagueness and a Commerce decision unsupported by substantial evidence.

## H. Commerce's Plain Language And K(1) Factor Analysis Of *Order* Scope Language Is Unreasonable, Arbitrary, And Not Supported By Substantial Evidence

At the outset, the CIT held that Commerce's interpretation of the scope language was not *per se* unreasonable. APPX00009-00010. The court pointed to language in the *Final Scope Ruling* ("Priming/coating includes the application of a solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric.") (APPX00010) and proposes that "[b]ecause 'includes,' particularly in the context of other scope language, also may be interpreted to mean "includes, but is not limited to . . . ,' the word 'includes' introduces

38

ambiguity as to whether 'priming/coating' must be designed to promote the adherence of artist materials for a canvas to be included within the scope as an 'artist canvas.' The use of the word 'includes' makes it uncertain whether the sentence is intended as a definition of the term 'primed/coated' as used in the previous sentence." APPX00011. The CIT also states that "[t]he scope language requires for inclusion in the Order that the material 'have been primed/coated' but does not rigidly or unambiguously require that the priming/coating function to 'promote' adherence of artist materials by increasing the 'adherence' to a level beyond that of untreated material". *Id*. The CIT held that Commerce's "interpretation of the scope language, one sentence of which is ambiguous and otherwise susceptible to more than one interpretation, was not *per se* unreasonable. … Commerce resolved ambiguity by interpreting sources of information identified in 19 C.F.R. § 351.225(k)(1)." APPX00013. *See also* CIT's related "mere surplusage" flawed reasoning at APPX00017-00018.

When scope language does not mention a term and the authors of the order are knowledgeable of the term, they intentionally omitted the term as such. *Maquilacero S.A. De C.V. v. United States*, 256 F.Supp.3d 1294, 1311 (2017) "[W]here Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotation marks

and citations omitted." *Id*. at 1314 & N. 9 (quoting *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) ). *See* Norman J. Singer & Shambie Singer, Statutes and Statutory Construction § 47.23 (7th ed. 2014) (Sutherland) (explaining that "[t]he maxim *expressio unius est exclusio alterius* " instructs that "where a statute designates ... the persons and things to which it refers, courts should infer that all omissions were intentional exclusions" (footnotes omitted) ); *see also DWA Holdings LLC v. United States* , 889 F.3d 1361, 1371 (Fed. Cir. 2018) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *Brown v. Gardner*, 513 U.S. 115, 120, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994) ). *Russ Berrie & Co. v. United States*, 329 F.Supp.3d 1345, 1359 (2018). The Commerce record is replete with "includes, but is not limited to" scope language examples. *See Elysium Tiles, Inc. v. United States*, 719 F.Supp.3d 1289, 1293 (2024): *Dong-A Steel Co. v. United States*, 475 F.Supp.3d 1317, 1349 & n.1 (2020): *Full Member Subgroup of the Am. Inst. of Steel Constr., LLC v. United States*, 547 F.Supp.3d 1211, 1216 (2021): *Perfectus Aluminum, Inc. v. United States*, 391 F.Supp.3d 1341, 1353 (2019). It is clear the authors intended to omit the "but is not limited to" language. Thus, when read in the entirety, the plain meaning and context of the reference "designed to promote

the adherence of artist materials" in the scope language compels a narrow interpretation of the words "priming/coating". As discussed above, certainly Commerce resolved no ambiguity by relying on its scope creep rulings and on the ITC's unlawful expansion of the scope of the *Order*.

The CIT goes on to state that "the words 'designed to promote the adherence of artist materials,' if not ambiguous, are also susceptible to varied interpretations." APPX00011. Importantly, Ecker Textiles, in its CIT response brief, stated "[t]he [scope] language is explicit and unambiguous." APPX00577.

Additionally, the CIT stated that "[Berger] does not demonstrate that the stiffening, whitening, and opacity do not relate to the use of the product as a surface designed for, and suitable for, the printing of images using paint or ink, and the Work Declaration provided substantial evidence to support the Department's findings." APPX00012. To the contrary, Dr. Work stated that "[t]he bottom priming/coating function is to stiffen the fabric and add opacity. It is a very thin layer and contributes only slightly to absorption of ink. It does not nor is it intended to provide adherence, adhesion of the ink." APPX00151, APPX00386, Appx80127. Dr. Work also stated the "testing shows clearly that the bottom priming/coating does not contribute to adherence" and that the "[c]oatings do not promote the adherence of ink jet inks." APPX00054, APPX00152, Appx80128. Appx80030.

Although Berger asserts that CBM is excluded based on the plain scope language, the Commerce (k)(1) analysis is unlawful. In its *Scope Request*, Berger provided Commerce (k)(1) sources that clearly place CBM outside the scope of the *Order*, even considering that Tara's intention is no way in conflict with the express language in the scope. But, it seems that Commerce's not so golden silence shows that it did not consider the sources as required. APPX00458-00478. As provided by Berger, Tara stated that its "gesso" is a "***specific*** coating formula" with "compounds utilized in making ***specialized latex paint***". APPX00052, APPX00257, Appx80028, Appx80233 (emphasis added). Attached to its petition Tara further explained its acrylic latex gesso as "pigment (titanium dioxide) and calcium carbonate mixed with acrylic polymer emulsion". APPX00052, APPX00261, Appx80028, Appx80237. Importantly, Tara stated, when compared to oil-based ground, that its long term, "***generations to come***" gesso, ***resists yellowing***, ***preserves the canvas***, and has ***greater adhesion***. APPX00052, APPX00260-00261, Appx80028, Appx80236-80237 (emphasis added). Indeed, concerning priming protection qualities, "All of our coatings are specially formulated to ***complement and enhance the unique inherent characteristics of the natural fibers as well as to protect the canvas fibers against acidic deterioration with a buffered neutral PH sizing***." APPX00052, APPX00260, Appx80028, Appx80236 (emphasis added).

In the 2006 ITC public hearing, Tara stated, "In essence, it is a woven fabric primed or **gessoed** to accept paints and/or inks. You can't bake a cake with it, and you can't build a house with it. It gets painted or printed on and transformed from artists' canvas into simply art . . . The unique modification to these fabrics lies in the artists' coating or the gesso. Once the gesso is applied, that fabric will now find its final home in some capacity as artists' canvas . . . And finally, print canvas. This is artists' canvas that is intended for art reproduction. It's critical to recognize that in order to manufacture print canvas the exact same fabric, gesso and manufacturing process is employed." APPX00053, APPX00268-00269, Appx80029, Appx80244-80245 (emphasis added).

It its print canvas scope ruling, Tara described the merchandise as, "Print Canvas … manufactured in the **same way**, using the same equipment and **same materials**, as other forms of Artist Canvas." APPX00053, APPX00275, Appx80029, Appx80251 (emphasis added.) In its argument it went on to state, "Print Canvas is **identical in all respects** to other Artist Canvas, **except for the additional priming with in ink receptive topcoat** that some print canvas still undergoes, and is produced by the same process on the same machinery." APPX00053, APPX00276, Appx80029, Appx80252 (emphasis added). Tara went on to point to Commerce's original language as listed above. " 'Made from woven fabric that is primed and coated ('**gessoed**') to accept paints or inks, it is

sold in a variety of shapes, sizes, textures, and formats.' USTIC Pub. 3853, supra, at 3." APPX00053, APPX00279, Appx80029, Appx80255 (emphasis added). As part of the scope ruling request, Commerce required additional information. As stated above, the following is an answer in the Tara Supplemental Response confirming that gesso is a requirement of artist canvas and in turn, print canvas. "The top coat, when used, is applied to canvas that *already meets the definition of "artist canvas" because it previously has been coated with gesso*. Without top coat, products denominated as "print canvas" are identical to artist canvas for painting. There is no difference, and the same product can be used interchangeably for printing and painting." APPX00053, APPX00190, Appx80029, Appx80166 (emphasis added). In the same letter Tara stated that, "Tara Materials' gesso *is* composed of Latex, titanium dioxide (Ti02), calcium carbonate (CaCo3) and water. Tara Materials believes that *all artist canvas gesso uses these materials*." APPX00053-00054, APPX00191, Appx80029-00030, Appx80167 (emphasis added). Compare Berger's CBM priming/coating that is made up of polyvinyl acetate / acrylate type polymers, completely different chemicals. Thus, scope of the *Order* entails covers artist canvases … that have been primed/coated … whether or not containing an ink receptive top coat … [with a] [p]riming/coating [that] includes the application of a solution, designed to promote the adherence of artist materials. As Tara intended, and as the ITC and

44

Commerce have recognized, it is unequivocally clear that Tara's specific acrylic latex "gesso" bottom "adherence" priming/coating formula is a prerequisite to artist canvas under the *Order*. Commerce only stated that "[i]ndeed, Tara previously acknowledged uncertainty regarding the 'processes and materials' that Chinese manufacturers use to produce print canvas." APPX00246. Indeed, Commerce's golden silence/failure to consider/discuss the evidence that obviously detracts, provides significant support for an alternative conclusion that renders Commerce's determination unsupported by substantial evidence. Commerce interpreted the *Order* contrary to its terms and its rationale was arbitrary, capricious, or an abuse of discretion (the decision was based on an erroneous interpretation of the law, on factual findings that are unsupported by substantial evidence, or represents an unreasonable based on Commerce's erroneous interpretation of the law, on its factual findings that are unsupported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors). Thus, the CIT's *Final Scope Ruling* finding (is not unreasonable, arbitrary, or capricious) is misplaced. APPX00020.

Instead of considering the (k)(1) facts as required, Commerce cherry picked facts and did not consider the regulatory history/record evidence. Commerce stated it relied on a Berger Textiles' submission, that CBM is a "polyester fabric woven (*i.e.*, wrap and weft) filament fiber…that has been coated

with polyvinyl acetate/acrylate type polymers." APPX00471. As explained in Berger's *Scope Request*, the CBM coating is manufactured differently, is of a different material than the Tara's coating, and CBM does not "promote the adherence of artist materials". Commerce relied on that CBM is primed/coated "for the purpose of converting a fabric into a canvas" APPX00471-00472. However, the express language of the *Order* clearly supports that being a canvas alone would not place CBM under the scope of the *Order*. Commerce relied on that CBM's priming/coating "is required to stiffen the fabric{,} giving it the stiffness properties of a canvas" and "provides whiteness and higher opacity to the translucent polyester fabric" APPX00472. As explained in Berger's *Scope Request*, these priming/coating characteristics do not "promote the adherence of artist materials" and would not be under the scope of the *Order* as such. Commerce goes on to significantly rely on "use" as a consideration. Commerce also relies on that "Berger Textiles states that CBM enters the United States 'as rolls of coated fabric' and identifies several '{w}idely, publicly known uses,' including "canvas (art reproduction/stretching), roll-up display system, banner product, display x-kite system, wall covering, décor applications, and tenting.' Additionally, Berger Textiles markets CBM for use as 'canvas frames' and 'stretched canvas.' In fact, Berger Textiles identifies CBM as the 'top-seller for' latex, UV, and solvent ink application to canvas. While Berger Textiles contends

46

that 'art reproduction' is merely a marketing term, it fails to distinguish canvas used for art reproduction from artist canvas. Additionally, Berger Textiles states that '{i}t is common sense that 'art reproduction' can occur on' the coated side of the fabric. Moreover, Berger Textiles fails to distinguish CBM's other potential uses, including 'wall covering' and 'décor applications,' from artist canvas." *Id*. Commerce seems to be confusing (k)(1) factors with the (k)(2) factors that it did not reach as part of its supposed analysis. The CIT also hones in on the same claiming that the record with "use" equates to the *Final Scope Ruling* being supported by substantial evidence. APPX00019-00020. The CIT also claims "that the priming/coating contributes to characteristics of the product allowing it to be used as artist canvas (by providing, for example, stiffness, whiteness, and opacity)." APPX00020.

Clearly there is no "use" requirement expressly stated in the scope. Importantly, "[e]nd-use restrictions in AD orders, while appropriately utilized in certain cases, are disfavored because they can be difficult to enforce. This is because the physical characteristics of an imported product are more readily identifiable than the product's end use, which may be unclear at the time of importation. Accordingly, when Commerce intends to impose end-use restrictions, Commerce consistently uses express terms such as "only" or "solely" to indicate restrictions on end uses for certain products. *See, e.g.*, *Live Swine from*

*Canada*, 70 Fed.Reg. 12,181, 12,182 (Mar. 11, 2005) (Countervailing Duty

Order) (excluding swine "being used for breeding stock only"); *Certain Softwood*

*Lumber Products from Canada*, 67 Fed.Reg. 36,070, 36,071 (May 22, 2002)

(Countervailing Duty Order) (excluding softwood lumber products that are "used

solely" for certain single family home construction); *Engineered Process Gas*

*Turbo–Compressor Systems, Whether Assembled or Unassembled, and Whether*

*Complete or Incomplete, from Japan*, 62 Fed.Reg. 32,584 (June 16, 1997) (AD

order) (covering "only those [turbocompressor systems] used in the petrochemical

and fertilizer industries"). In its opinion, the Trade Court acknowledged that "

'Commerce has apparently described usage with more precision and specificity in

other contexts when including or excluding products from the scope of an

antidumping duty order.' CIT Op. at *3, 2010 Ct. Int'l Trade LEXIS 112 at *8."

*King Supply*, 674 F.3d 1343, 1348 (Fed. Cir. 2012). Commerce continued its

missteps in relying on that "Berger Textiles repeatedly refers to CBM as a canvas

in its *Scope Request*". APPX00472. Nowhere in the scope language does it state

that canvas alone would cause CBM to be under the scope of the *Order*. *See also*

related arguments where Berger argues that Commerce unlawfully expanded the

scope of the *Order*. Commerce also places reliance stating, "Berger Textiles

states that CBM is sold to companies that print onto the canvas." *Id*. In addition to

the no end-use and (k)(2) arguments directly above, Berger has shown throughout

48

its *Scope Request* that CBM's priming/coating does not "promote the adherence of artist materials". Commerce shows its own confusion relying on "the record evidence indicates that the primed/coated side of the fabric is receptive to artist materials, consistent with our prior scope rulings". *Id*. As discussed in more detail below, the scope of the *Order* does not concern a "primed/coated side of the fabric [that is] is receptive to artist materials" but rather if a priming/coating includes the application of a solution, designed to promote the adherence of artist materials. Berger has shown throughout its *Scope Request* that CBM's priming/coating does not "promote the adherence of artist materials". Simply put, *Final Scope Ruling* is not supported by substantial evidence and the CIT was incorrect to find that evidence considered on the whole is sufficient to support the various critical findings, and the ultimate determination, by Commerce that CBM is described by the term "artist canvases" as used in the *Order*. APPX00020. *See also* related arguments where Berger argues that Commerce unlawfully expanded the scope of the *Order* and that the *Order* is void-for-vagueness.

Where referring to end-uses, Commerce continues to argue that, "We note that, while Berger Textiles impugns CBM's ability to produce quality art reproduction, the product's quality does not determine whether it is subject to the *Order*. Based on the above factors, we find that the record contains substantial evidence that Berger Textiles and the producer market CBM for use in art

49

reproduction." APPX00472-00473. Commerce clearly confuses its "quality" finding with Berger's argument that its CBM coating is manufactured differently, is of a different material than the Tara's coating, and CBM does not "promote the adherence of artist materials".

Commerce found "that Berger Textiles has not distinguished its priming/coating solution from solutions that cause a fabric to become subject artist canvas." APPX00473. Commerce again clearly did not consider (k)(1) facts properly where Berger clearly showed that its CBM is not under the scope of the *Order*. Commerce discarded Berger's CBM as chemically different (and that it does not consequently "promote the adherence of artist materials" as a result) while Tara, as discussed herein, stated in the investigation and a follow up scope ruling that its "gesso" was a specific formula for the purpose of promoting the adherence of artistic materials. Commerce does gloss over "adherence" testing performed by Berger's third-party experts, Dr. Ray Work and 20 | 10 Labs. *Id*. Importantly, both experts found that CBM's priming/coating does not "promote the adherence of artist materials" as detailed in Berger's *Scope Request*. APPX00039, APPX00149-00152, Appx80015, Appx80125-80128. "Berger contracted Dr. Work and 20 | 10 Labs to perform 'adherence' testing. In all of the tests, Dr. Work found that the bottom priming/coating had the ***same or worse*** results when compared to the uncoated side. [] Dr. Work stated, '***All*** tests of the

unprimed/uncoated side appeared to adhere better than or no different than the primed (coated) side.' [] 'In general, applications to the coated side *perform the same or worse than to the uncoated side concerning adherence*.' [] The 'bottom priming/coating function' '*does not nor is it intended to provide adherence*, adhesion of the ink.' [] 'My testing shows clearly that the *bottom priming/coating does not contribute to adherence*.' 'Coatings *do not promote the adherence* of ink jet inks.' Dr. Work plainly stated that CBM '*does not have greater adhesion*.' Concerning dye sublimation transfer inks testing, '*No test showed the possibility of promoting the adherence* of the ink by the primer (bottom coating) and top coat of the primed (bottom coated) side versus the unprimed/uncoated side. … The primer (bottom coating) with top coat *is not designed to promote the 'adherence'* of ink or to accept the sublimation dye on transfer. … Per testing, adherence was worse 25% where applied to the coated side." [] Concerning eco solvent pigmented inks testing, 'The adherence was the same or worse if primed (bottom coated) with top coat. … The primer (bottom coating) with top coat *is not designed to promote the 'adherence'* of ink. Ink can be applied to either side of the fabric. However, ink can be applied to either side of the fabric. Per testing, *adherence was worse 50% where applied to the coated side*.' [] Concerning latex pigmented inks testing, 'The primer (bottom coating) with top coat *is not designed to promote the 'adherence'* of ink. However, ink can be applied to

51

either side of the fabric. Per testing, ***adherence was worse 75% where applied to the coated side***. [] Concerning UV light curable pigmented inks testing, 'The ***adherence appeared be the same whether or not coated***. The primer (bottom coating) with top coat ***is not designed to promote the 'adherence' of ink and did not do so***. … Per testing, adherence is same (***does not promote***) where applied to the coated side." Concerning water based pigment inks, 'the ***adherence is poorer not better on the coated side***. The primer (bottom coating) ***is not designed to promote the 'adherence'*** of ink and ***did not do so***. … Per testing, ***adherence was worse 75% where applied to the coated side***.' APPX00054-00055, APPX00149-00152, Appx80030-80031, Appx80125-80128 (emphasis added).

"20 | 10 Labs had similar findings in stating, 'This material showed poor adhesion when used for Latex printing on the uncoated side, and ***even worse adhesion performance on the coated side***. Sublimation transfer on the coated side exhibited adhesion performance under what is expected for a reasonable baseline on material suited for or tailored for this method. This, coupled with significant ink migration with transfer sublimation on the coating side, leads us to the logical conclusion that this material is ***best suited for printing via transfer sublimation to the uncoated side of the material***'.[] (emphasis added)." APPX00055, APPX00146, Appx80031, Appx80122.

Interestingly Commerce asked for no sample of CBM and did not test whether the CBM's priming/coating "promote[s] the adherence of artist materials". It is worth noting that CBP, during its review process of the related entry, tested CBM but did not test whether it "promote[s] the adherence of artist materials". APPX00107, Appx80083. On May 9, 2019, CBP stated only that CBM is "The woven fabric is composed wholly of polyester and is coated on one surface with an acrylate type polymer. The sample is composed of 75% fabric and 25% coating (average of two tests)." APPX00107, Appx80085. Apparently CBP had not resolved its testing shortcoming from its meeting with the Tara in 2016 where CBP discussed "Specific discussions between Tara lab chemists and CBP focused on testing procedures for determining country of origin." *See* CBP Antidumping and Countervailing Duties (AD/CVD) Update August/September 2016 https://www.cbp.gov/sites/default/files/assets/documents/2016-Oct/Final%20August%20-%20September%202016%20ADCVD%20Update%2010042016.pdf (last visited January 23, 2025). While Berger tested physical characteristics with its experts, when coupled with the fact that Commerce does not recognize the testing, when also coupled with the fact that no chemical testing is available to test priming/coating whether the priming/coating "promote[s] the adherence of artist materials", then the *Order* is unenforceable and void-for-vagueness.

In its justification, Commerce states that "the record contains evidence that CBM has a priming/coating layer that increases the canvas' receptivity to artist materials. Specifically, Berger Textiles submitted a patent for 'CBM technology,' which described 'a receiving medium comprising a substrate and an ink receiving layer.' The patent states that an 'ink receptive coating' is 'applied to a substrate such as…canvas,' creating a medium 'which yields a U.V. and water resistant ink jet print.' Although Berger Textiles argues that the 'bottom priming/coating does not promote the adherence of artistic materials,' there is no requirement in the scope that the priming/coating be located on a specific portion of the artist canvas. Additionally, the patent indicates that the substrate has only one priming/coating layer (*i.e.*, the ink receptive coating), notwithstanding Berger Textile's assertion that there are two (*i.e.*, bottom and top) priming/coating layers." APPX00474. Commerce is again simply incorrect in terms of interpreting the scope language of the *Order*, in terms of the *Scope Request*. The facts are consistent that CBM's priming/coating does not "promote the adherence of artist materials" and does not concern "receptivity". Berger has shown through its testing and third-party experts that CBM has a priming/coating and a top coating, neither of which "promote[s] the adherence of artist materials".

It is evident that Commerce overreached its authority (and expanded the

*Order*) by relying on the following:

- "Berger Textiles has not demonstrated that the producer does not apply CBM's priming/coating layer ***for graphical purposes*** or that the priming/coating layer does not ***increase the canvas' receptivity*** to paint, ink, or other artistic materials" *Id*. (emphasis added).

- "whether CBM is primarily ***used for the application*** of print or artistic materials" APPX00475 (emphasis added).

- "whether CBM's priming/coating layer ***aids the receptivity*** of latex, UV, and solvent inks" *Id*. (emphasis added).

- "The record, therefore, contains several instances in which Berger Textiles declines to affirmatively state that CBM lacks a priming/coating layer that ***is applied for graphical purposes*** and instead focuses exclusively on the adherence of the "bottom" priming/coating layer" *Id*. (emphasis added).

- "the distinction that Berger Textiles draws between 'bottom' and 'top' priming/coating is not supported by the record or the scope language" *Id*.

- "the expert report that Berger Textiles relies on to show that the bottom priming/coating does not promote adhesion assumes an overly narrow definition of adhesion, and is at times conflicting because the expert also concludes that the bottom priming/coating layer contributes 'slightly to absorption of ink,' which is an artist material identified in the scope" *Id*.
  - See the cherry-picked phrase in context of the entire expert comment of "The bottom priming/coating function is to stiffen the fabric and add opacity. It is a very thin layer and contributes only slightly to absorption of ink. It does not nor is it intended to provide adherence, adhesion of the ink. The fabric provides a smooth surface and it does not function to smooth the surface of 100% polyester fabric. On the other hand, for cotton and cotton/polyester blends, it can function to smooth the cotton fiber since the cotton is not uniform in thickness like polyester. Cotton and cotton/polyester canvas is regularly used as artistic canvas. 100% polyester canvas is commercial production canvas and is not suitable as artistic canvas. My testing shows clearly that the bottom priming/coating does not

55

contribute to adherence." APPX00151-00152, Appx80127-80128.

- "Berger Textiles *fails to distinguish CBM's potential uses, including "art reproduction," "wall covering," and "décor applications," from artist canvas*" APPX00475 (emphasis added).

- "Tara Print Canvas Scope Ruling determined that print canvases are specifically cited in the scope language as *an example of subject merchandise*" *Id*. (emphasis added).
  - However, as discussed herein, the *Order* language expressly limits "artist canvas" to priming/coating "promote[s] the adherence of artist materials.

- "Berger Textiles imports CBM as rolls of coated fabric that it distributes to customers for such *uses* as canvas (*art reproduction/stretching*), roll-up display system, banner product, display x-kite system, wall covering, décor applications, tenting, and canvas frames" *Id*. (emphasis added).

- "As discussed above, Berger Textiles *repeatedly refers to CBM as a canvas* in its Scope Request" *Id*. (emphasis added).

- "In the Impact Images PFCPU Scope Ruling, Commerce found Impact Images provided sufficient information *demonstrating that 'any image/graphic/coloring of the PFCPU* is achieved primarily through a process of dye sublimation applied directly to the fabric, effectively dying the fibers of the fabric itself, *and not through the application of a material to the surface of the fabric*' " APPX00476 (emphasis added).

- "that the coating on the CBM has hydrophobic sealing and fireproof properties does not render the coating incapable of promoting the adherence of artist materials per se, and Berger Textiles *does not provide evidence that such agents prevent promoting the adhesion of artist materials*" APPX00476-00477 (emphasis added).

Commerce abandoned the interpretive framework and unlawfully ignored

substantial evidence submitted by Tara from the original investigation, including

56

the descriptions of the merchandise contained in the petition, the initial investigation, and the Commission's injury determinations that certain canvases were not subject to the underlying investigation. Commerce also unlawfully ignored substantial evidence submitted by Tara in its *Scope Ruling*. Commerce was required to address the (k)(1) factors and its failure to address these factors renders the *Final Scope Ruling* unlawful, and the decision was unreasonable, arbitrary, capricious, and not supported by law with substantial evidence. Commerce's consideration of Berger's *Scope Request* and determination that the scope contains language that includes, or "may be reasonably interpreted to include" CBM is unlawful. Lastly, in its *Scope Request*, Berger demonstrated that the factors that Commerce is supposed to consider pursuant to the "(k)(2) factors" would cause Berger's CBM to be outside the scope of the *Order*. APPX00068-00070, Appx80044-80046. In its *Final Scope Ruling*, Commerce did not examine any of the (k)(2) factors. APPX00471. Commerce's failure to examine the (k)(2) factors renders its *Final Scope Ruling* as unsupported by substantial evidence. Because Commerce's *Final Scope Ruling* did not consider (k)(1) sources that detract from a reasonable interpretation, when coupled with other (k)(1) analysis failures with evidence that weighs against the agency's determination, it is unsupported by substantial evidence; it is arbitrary and capricious.

# CONCLUSION

Commerce's determination that Berger's imported CBM from China is within the scope of the *Order* cannot be sustained because CBP committed fatal legal and factual errors with respect to elements required to make a substantial evidence determination. Specifically, Commerce unlawfully expanded the scope of the *Order*, the *Order* is void-for-vagueness and unconstitutional, and Berger's CBM falls outside the scope of the *Order*. The *Final Scope Ruling* unsupported by substantial evidence, arbitrary and capricious, and contrary to law. For the foregoing reasons, Berger respectfully requests that this Court reverse the judgment entered below and Commerce's *Scope Final Ruling* determination.

Respectfully submitted,

/s/ Kyl J. Kirby
Kyl J. Kirby
Kyl J. Kirby, Attorney and Counselor at
Law, P.C.
1400 Lipscomb Street
Fort Worth Texas, 78104
Telephone: (214) 632-0841
E-mail: kyl@kirbyfedlaw.com
*Counsel for Plaintiff-Appellant*
PRINTING TEXTILES, LLC DBA
BERGER TEXTILES

Dated: January 24, 2025

**ADDENDUM**

Judgment (October 8, 2024) …….......................................................... Appx00001

Slip Opinion Granting Defendant's MSJ (October 8, 2024) ............... Appx00003

UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| **PRINTING TEXTILES, LLC DBA BERGER TEXTILES,**<br><br>      Plaintiff,<br><br>  v.<br><br>**UNITED STATES,**<br><br>      Defendant,<br><br>  and<br><br>**ECKER TEXTILES, LLC,**<br><br>      Defendant-Intervenor. |

**Before:  Timothy C. Stanceu, Judge**

**Court No. 23-00192**

**JUDGMENT**

Upon consideration of Plaintiff's Motion for Judgment Upon the Agency Record Pursuant to Rule 56.2 (Feb. 26, 2024), ECF No. 19 ("Plaintiff's Motion"), and all other papers and proceedings had herein, in conformance with the Opinion issued this day, and upon due deliberation, it is hereby

  **ORDERED** that Plaintiff's Motion be, and hereby is, denied; it is further

  **ORDERED** that judgment be, and hereby is, entered in favor of defendant pursuant to USCIT Rule 56.2(b); and it is further

**Court No. 23-00192**                                                          **Page 2**

     **ORDERED** that the entries of merchandise that are at issue in this litigation shall be liquidated in accordance with the final court decision in this action.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated: October 8, 2024
     New York, New York

Slip Op. 24-110

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **PRINTING TEXTILES, LLC DBA BERGER TEXTILES,** | |
| Plaintiff, | |
| v. | **Before:  Timothy C. Stanceu, Judge** |
| **UNITED STATES,** | |
| Defendant, | **Court No. 23-00192** |
| and | |
| **ECKER TEXTILES, LLC,** | |
| Defendant-Intervenor. | |

OPINION

Dated: October 8, 2024

[Denying plaintiff's motion for judgment on the agency record in an action contesting a ruling that a product is within the scope of an antidumping duty order]

*Kyl J. Kirby*, Kyl J. Kirby, Attorney and Counselor at Law, P.C., of Fort Worth, Texas, for plaintiff Printing Textiles, LLC d/b/a Berger Textiles.

*Christopher A. Berridge*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant.  With him on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, *Franklin E. White, Jr.*, Assistant Director, and *Joseph Grossman-Trawick*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

*George W. Thompson*, Thompson & Associates, PLLC, of Washington, D.C., for defendant-intervenor Ecker Textiles, LLC.

Stanceu, Judge:  Plaintiff Printing Textiles, LLC, d/b/a Berger Textiles ("Printing

Textiles" or "Berger Textiles"), contests a determination by the International Trade

Administration, U.S. Department of Commerce ("Commerce" or the "Department"),

that plaintiff's imports of "Canvas Banner Matisse" ("CBM") are within the scope of an

antidumping duty order on certain artist canvas from the People's Republic of China

("China").

Before the court is plaintiff's motion for judgment on the agency record under

USCIT Rule 56.2 (Feb. 26, 2024), ECF No. 19 ("Pl.'s Mot.").  The court will deny

plaintiff's motion and enter judgment in favor of defendant.

## I. Background

### A.  The Contested Determination

Following an administrative proceeding (the "scope inquiry"), Commerce issued

the contested determination as "Final Scope Ruling on the Antidumping Duty Order on

Certain Artist Canvas from the People's Republic of China: Berger Textiles' Canvas

Banner Matisse" (Aug. 15, 2023), P.R. 23 ("*Final Scope Ruling*").[1]  Commerce issued the

Final Scope Ruling in response to a "Scope Ruling Application" (or "Scope Request")

(Dec. 15, 2022) (P.R. 1–3) submitted by Printing Textiles ("*Scope Ruling Application*").

---

[1] Documents in the Joint Appendix (July 8, 2024), ECF Nos. 23 (public), 26 (conf.) are cited herein as "P.R. Doc. __."  All citations to record documents are to the public versions.

### B.  The Antidumping Duty Order

Commerce published the antidumping duty order involved in this litigation (the "Order") as *Notice of Antidumping Duty Order: Certain Artist Canvas from the People's Republic of China*, 71 Fed. Reg. 31,154 (Int'l Trade Admin. June 1, 2006) (the "*Order*").

### C.  Proceedings in the Court of International Trade

Plaintiff commenced this action in September 2023.  Summons (Sept. 14, 2023), ECF No. 1; Compl. (Sept. 15, 2023), ECF No. 5.  Plaintiff filed its Rule 56.2 motion on Feb. 26, 2024.  Pl.'s Mot.  Defendant opposed plaintiff's motion (Apr. 25, 2024), ECF No. 20, as did defendant-intervenor (Apr. 25, 2024), ECF No. 21, and plaintiff filed a reply (June 24, 2024), ECF No. 22.

The court asked the parties whether a document—the petition in response to which Commerce initiated the antidumping duty investigation culminating in the Order—had been placed on the administrative record that is now before the court.  Court's Inquiry (Sept. 12, 2024), ECF No. 28.  Defendant responded, informing the court that only two pages of the petition (pages 1 and 8), submitted by plaintiff as an attachment to the Scope Ruling Application, were on the administrative record and that no party had requested that any other portions of the petition be included.  Def.'s Resp. to the Court's Sept. 12, 2024 Letter (Sept. 20, 2024), ECF No. 29 ("*Def.'s Response to Court's Inquiry*"); Ecker Textiles, LLC's Resp. to the Court's Sept. 12, 2024 Letter

(Sept. 20, 2024), ECF No. 30 (concurring that only pages 1 and 8 of the petition were on

the record).

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

The court exercises subject matter jurisdiction under section 201 of the Customs

Courts Act of 1980, 28 U.S.C. § 1581(c), which grants jurisdiction over civil actions

brought under section 516A of the Tariff Act of 1930 ("Tariff Act"), 19 U.S.C. § 1516a.[2]

Among the decisions that may be contested according to Section 516A is a

determination of "whether a particular type of merchandise is within the class or kind

of merchandise described in an . . . antidumping or countervailing duty order." *Id*.

§ 1516a(a)(2)(B)(vi).

In reviewing the Scope Ruling, the court must set aside "any determination,

finding, or conclusion found . . . to be unsupported by substantial evidence on the

record, or otherwise not in accordance with law." *Id*. § 1516a(b)(1)(B)(i).

### B. Scope Language in the Order

In pertinent part, the scope language in the Order reads as follows:

> The products covered by this order are artist canvases regardless of
> dimensions and/or size, whether assembled or unassembled, that have
> been primed/coated, whether or not made from cotton, whether or not
> archival, whether bleached or unbleached, and whether or not containing
> an ink receptive top coat.  Priming/coating includes the application of a

---

[2] Citations to the United States Code are to the 2018 edition.  Citations to the
Code of Federal Regulations are to the 2023 edition.

> solution, designed to promote the adherence of artist materials, such as
> paint or ink, to the fabric.  Artist canvases (*i.e.,* pre-stretched canvases,
> canvas panels, canvas pads, canvas rolls (including bulk rolls that have
> been primed), printable canvases, floor cloths, and placemats) are tightly
> woven prepared painting and/or printing surfaces.

*Order*, 71 Fed. Reg. at 31,155.

### C.  Description of the Merchandise at Issue in this Proceeding

The Scope Ruling Application provided this general description of the

merchandise for which Printing Textiles sought a scope ruling:

> The Canvas Banner Matisse ("CBM") of the scope ruling request is 600
> denier 100% polyester fabric woven (i.e., warp and weft) filament fiber,
> weighing approximately 270 GSM [grams per square meter], that has been
> coated with polyvinyl acetate / acrylate type polymers.  One side of the
> fabric has been coated and is visible to the naked eye.  The coated side has
> hydrophobic sealing and fireproof agents.  The bottom priming/coating
> does not promote the adherence of artistic materials.  The fabrics are
> imported as rolls in various lengths with no designs.

*Scope Ruling Application* at Cover Sheet.  The Scope Ruling Application stated that the

product is produced in and exported from China, *id*. at 3, and that "[w]idely, publicly

known uses include, canvas (art reproduction/stretched), roll-up display system, banner

product, display x-kite system, wall covering, décor applications, and tenting," *id*. at 4.

### D.  The Final Scope Ruling

Commerce concluded in the Final Scope Ruling that the Canvas Banner Matisse

at issue "is within the scope of the *Order*."  *Final Scope Ruling* at 20.  Commerce

summarized its reasoning as follows:

> [W]e began by examining the CBM described in Berger Textiles' Scope
> Request in the context of the language of the scope of the *Order* and find
> that the description of the subject merchandise in the scope of the *Order*,
> coupled with the sources listed under 19 CFR 351.225(k)(1), are dispositive
> as to whether Berger Textiles' CBM products are within the scope of the
> *Order*.  In particular, we find that the CBM products are within the scope
> of the *Order* and, thus, no further analysis under 19 CFR 351.225(k)(2) is
> necessary.

*Id*. at 14.

### E.  Plaintiff's Claims

In its Rule 56.2 motion, Printing Textiles raises, essentially, two claims.  In one

claim, plaintiff attacks the Final Scope Ruling as unlawful on various grounds.  It argues

that in the Final Scope Ruling Commerce: (1) "fail[ed] to consider" and "misapplied"

the "(k)(1)" criteria of 19 C.F.R. § 351.225(k)(1), "thereby expanding the scope of the

*Order*," Pl.'s Mot. 7–25; (2) reached a result that is unsupported by substantial evidence,

*id*. at 30–35, 38, as well as "unreasonable, arbitrary," and "capricious," *id*. at 38;

(3) wrongly determined that the scope language "includes, or 'may be reasonably

interpreted to include'" Canvas Banner Matisse, *id*.; and (4) failed to apply the "(k)(2)"

factors of 19 C.F.R. § 351.225(k)(2), which, plaintiff argues, require that its product be

ruled to be outside the scope of the Order, *id*. at 38–39.

Plaintiff's second claim is directed not only at the Final Scope Ruling, *per se*, but

also at the Order itself.  According to Printing Textiles, the unconstitutional vagueness

of the Order, as applied to Printing Textiles by the Final Scope Ruling, denied it

"adequate notice" and "due process."  *Id*. at 25–28.

### F.  Claim Directed to the Final Scope Ruling

The court does not find merit in plaintiff's arguments that the Final Scope Ruling

must be set aside as an unreasonable interpretation of the scope language, as contrary to

the Department's regulation, as unsupported by substantial record evidence, or as

"unreasonable, arbitrary," and "capricious."

### 1.  The Department's Interpretation of the Scope Language Was Not *Per Se* Unreasonable

The court begins by considering the scope language of the Order.  The Order

applies to "artist canvases," a term for which the scope language contains a general

definition: "Artist canvases . . . are tightly woven prepared painting and/or printing

surfaces."  *Order*, 71 Fed. Reg. at 31,155.  By denoting that the term "artist canvases"

includes products in various forms, the parenthetical following the term "[a]rtist

canvases"—"(*i.e.*, pre-stretched canvases, canvas panels, canvas pads, canvas rolls

(including bulk rolls that have been primed), printable canvases, floor cloths, and

placemats)," *id.*—indicates that the term was intended to have a broad meaning.

Of particular relevance to this case is the mention of "prepared . . . *printing*

surfaces" in the definition of "artist canvases" and the express inclusion of "*printable*

canvases" within the scope of the Order.  *Id.* (emphases added).  Plaintiff described "art

reproduction" as one of the "[w]idely, publicly known uses" of Canvas Banner Matisse.

*Scope Ruling Application* at 4.  Using terms contained in the scope language, Commerce

stated as findings that Canvas Banner Matisse "is a woven prepared painting and/or

printing surface" and "is a canvas roll and/or printable canvas." *Final Scope Ruling*

at 15. Commerce summarized its conclusion as follows: "Information placed on the

record demonstrates that CBM is an artist canvas, as defined by the language of the

scope." *Id.* at 14.

      The Order states that it applies to "artist canvases . . . that have been

primed/coated." *Order*, 71 Fed. Reg. at 31,155. In the next sentence, the scope language

states that "[p]riming/coating includes the application of a solution, designed to

promote the adherence of artist materials, such as paint or ink, to the fabric." *Id*. The

gist of plaintiff's "scope language" argument is that "CBM has a priming/coating and a

top coating, neither of which 'promote[s] the adherence of artist materials.'" Pl.'s

Mot. 36. In support of this argument, Printing Textiles cites results of various

independent tests conducted on its product by "Dr. Ray Work and 20 | 10 Labs." *Id*.

at 33 ("Both experts found that CBM's priming/coating does not 'promote the adherence

of artist materials' as detailed in Berger's Scope Request.") (citations omitted). Plaintiff

argues that testing demonstrated that the coated side performed the same or worse than

the uncoated side with respect to adherence. *Id*. at 33–34 (citation omitted).

      The court does not agree with plaintiff's argument that Commerce unreasonably

interpreted the scope language. This argument rests on a single sentence in that

language: "Priming/coating *includes* the application of a solution, designed to promote

the adherence of artist materials, such as paint or ink, to the fabric." *Order*, 71 Fed. Reg.

at 31,155 (emphasis added).  While this sentence can be interpreted as limiting the scope

to canvases with priming/coating designed to promote the adherence of artist materials,

it uses the term "includes."  Because "includes," particularly in the context of other

scope language, also may be interpreted to mean "includes, but is not limited to . . . ,"

the word "includes" introduces ambiguity as to whether "priming/coating" *must* be

designed to promote the adherence of artist materials for a canvas to be included within

the scope as an "artist canvas."  The use of the word "includes" makes it uncertain

whether the sentence is intended as a definition of the term "primed/coated" as used in

the previous sentence.  Moreover, the words "designed to promote the adherence of

artist materials," if not ambiguous, are also susceptible to varied interpretations.

Plaintiff maintains that "the reference 'designed to promote the adherence of

artist materials' in the scope language compels a narrow interpretation of the words

'priming/coating'" that, in plaintiff's view, requires the exclusion of its product from the

scope of the Order.  Pl.'s Mot. 11, 24–25.  The scope language requires for inclusion in

the Order that the material "have been primed/coated" but does not rigidly or

unambiguously require that the priming/coating function to "promote" adherence of

artist materials by increasing the "adherence" to a level beyond that of untreated

material.  It was sufficient, in the Department's view, that the priming/coating applied

to Canvas Banner Matisse imparted characteristics to the fabric that brought it within

the definition the scope language set forth for an "artist canvas."  "Specifically, Berger

Textiles' submission states that CBM is a 'polyester fabric woven (*i.e.*, wrap [sic] and weft) filament fiber . . . that has been coated with polyvinyl acetate/acrylate type polymers.'" *Final Scope Ruling* at 14.  Relying on a declaration by Ray A. Work, III, Ph.D. ("Work Declaration"), which Printing Textiles provided in the Scope Ruling Application, Commerce found that "CBM is primed/coated 'for the purpose of converting a fabric into a canvas'" and that "[t]he priming/coating 'is required to stiffen the fabric{,} giving it the stiffness properties of a canvas' and 'provides whiteness and higher opacity to the translucent polyester fabric.'" *Id.* at 14–15 (citing *Scope Ruling Application* at Attachment 7 (Decl. of Ray A. Work, III, Ph.D. ("*Work Decl.*"))).  Plaintiff does not demonstrate that the stiffening, whitening, and opacity do not relate to the use of the product as a surface designed for, and suitable for, the printing of images using paint or ink, and the Work Declaration provided substantial evidence to support the Department's findings.[3]

---

[3] The Work Declaration provided, in relevant part:

> These canvases are made by first priming (bottom coat) for the purpose of converting a fabric into a canvas.  The priming (bottom coating) is required to stiffen the fabric giving it the stiffness properties of a canvas verses [sic] those of a flexible fabric.  In addition it provides whiteness and higher opacity to the translucent polyester fabric.  The priming layers (bottom coatings) also absorb the water and glycol which makes up 95% of the water based ink jet ink.  Ink jet printing deposits extremely small ink droplets on the surface of any material through the air.  It is received independent of coatings or the nature of the substrate (whatever material falls on).  This occurs whether printing on the coated

(continued . . .)

In summary, the Department's interpretation of the scope language, one sentence of which is ambiguous and otherwise susceptible to more than one interpretation, was not *per se* unreasonable.  As discussed below, Commerce resolved ambiguity by interpreting sources of information identified in 19 C.F.R. § 351.225(k)(1).

### 2.  Commerce Did Not Fail to Consider, or Misapply, the "(k)(1)" Sources to "Expand" the Scope of the Order

The Department's regulation provides that "[i]n determining whether a product is covered by the scope of the order at issue, the Secretary [of Commerce] will consider the language of the scope and may make its determination on this basis alone if the language of the scope, including the descriptions of merchandise expressly excluded from the scope, is dispositive."  19 C.F.R. § 351.225(k)(1).  The regulation provides, further, that:

> The following primary interpretive sources may be taken into account under paragraph (k)(1) introductory text of this section, at the discretion of the Secretary:
>
> (A) The descriptions of the merchandise contained in the petition pertaining to the order at issue;

---

side or the uncoated side.  The primer (bottom coat) remains on the surface of the fabric with very little or no penetration to the back (uncoated) side.  Aqueous ink jet inks are used widely today for printing directly onto fabrics without primers (bottom coatings) like T-shirt printers using aqueous pigmented inks.  The purpose of the top coat added to the primed (bottom coated) side is to hold the pigments up on the surface thereby optimizing print quality, color, and to enhance water resistance.

*Work Decl.* at 2–3.

     (B) The descriptions of the merchandise contained in the initial investigation pertaining to the order at issue;

     (C) Previous or concurrent determinations of the Secretary, including prior scope rulings, memoranda, or clarifications pertaining to both the order at issue, as well as other orders with same or similar language as that of the order at issue; and

     (D) Determinations of the [U.S. International Trade] Commission pertaining to the order at issue, including reports issued pursuant to the Commission's initial investigation.

*Id*. § 351.225(k)(1)(i)(A)–(D).  In addition to the above-described "primary interpretive sources," the regulation provides that "[t]he Secretary may also consider secondary interpretive sources under paragraph (k)(1) introductory text of this section, such as any other determinations of the Secretary or the Commission not identified above, Customs rulings or determinations, industry usage, dictionaries, and any other relevant record evidence."  *Id*. § 351.225(k)(1)(ii).

The regulation provides, further, that "[i]f the Secretary determines that the sources under paragraph (k)(1) of this section are not dispositive, the Secretary will then further consider the following factors: (A) The physical characteristics (including chemical, dimensional, and technical characteristics) of the product; (B) The expectations of the ultimate users; (C) The ultimate use of the product; (D) The channels of trade in which the product is sold; and (E) The manner in which the product is advertised and displayed."  *Id*. § 351.225(k)(2)(i).

According to Printing Textiles, Commerce "fail[ed] to consider" and "misapplied" the "(k)(1)" criteria of 19 C.F.R. § 351.225(k)(1), "thereby expanding the scope of the *Order*." Pl.'s Mot. 7–25. Plaintiff characterizes prior scope rulings with which it disagrees as evidence of its claimed expansion of the scope of the Order, *id*. at 15–25, which it describes as "scope creep," *id*. at 22.

The court sees no merit in plaintiff's argument that Commerce "failed to consider" (k)(1) sources in reaching its conclusion. In addition to the scope language itself, the Final Scope Ruling cited two "primary interpretive sources" identified in 19 C.F.R. § 351.225(k)(1): the report of the U.S. International Trade Commission ("ITC") from the antidumping duty investigation, *Artists' Canvas from China, Inv. No. 731-TA-1091 (Final)*, USITC Pub. 3853 (May 2006) ("*ITC Report*"), *id*. at 16, and its own prior scope rulings, *id*. at 16–20. Commerce was not required by its regulation to consider *all* (k)(1) sources specified in the regulation: the primary interpretive sources are to be considered "at the discretion of the Secretary." 19 C.F.R. § 351.225(k)(1)(i).

In making its argument, plaintiff alludes to the petition as a (k)(1) source, arguing that "'Commerce should give consideration to petitioners' intended meaning,'" Pl.'s Mot. 9 (quoting *Mitsubishi Polyester Film, Inc. v. United States*, 41 CIT __, 228 F. Supp. 3d 1359, 1378 (2017)), implying that Commerce failed to do so in the Final Scope Ruling. Plaintiff attached pages 1 and 8 of the petition to the Scope Ruling Application, but nothing on page 1 supports plaintiff's argument while page 8, under a heading

titled "Production Process," provides: "Artist canvas is produced as follows . . . The raw

canvas is coated with a specific coating formula on the coating line. These formulas are

mixed using various chemical compounds utilized in making specialized latex paint

that is receptive to specific artist paints or printing inks." *Scope Ruling Application* at

Attachment 20. Printing Textiles asserts the petitioner intended that a "specific acrylic

latex 'gesso' bottom 'adherence' priming/coating formula is a prerequisite to artist

canvas under the *Order*," arguing that Canvas Banner Matisse, which uses a different

formula, does not fit this description. Pl.'s Mot. 30.

In responding to the court's September 26, 2024 inquiry, defendant informed the

court as follows:

> After consulting with the U.S. Department of Commerce, defendant
> confirmed that, other than pages 1 and 8 of the petition which were
> included in plaintiff's scope ruling application, no other portions of the
> petition were placed on the administrative record. No party requested
> that the entire petition be placed on the record during the administrative
> process and Commerce did not place the petition on the record on its own.
> Beyond the two pages included in the scope ruling application, Commerce
> did not consider or rely on the petition in making its scope ruling in this
> case.

*Def.'s Response to Court's Inquiry* at 1–2.

It is not clear what effect the language on page 8 of the petition may have had on

the Department's determination in the Final Scope Ruling. Nevertheless, plaintiff has

not demonstrated that Commerce acted contrary to its regulation with respect to the

petition as a primary interpretive source identified in 19 C.F.R. § 351.225(k)(1)(i)(A).

The scope language Commerce developed during the investigation and chose to include in the Order does not impose a specific formulation by which a canvas must be "primed/coated" and further provides that a canvas is included within the Order "whether or not containing an ink receptive top coat." *Order*, 71 Fed. Reg. at 31,155. Thus, Commerce ultimately adopted, and incorporated in the language of the Order, a scope broader than that which plaintiff advocates based on page 8 of the petition. Excerpts from the petition other than page 8 may have been relevant to a consideration of plaintiff's argument, but plaintiff chose not to place any such material on the record during the scope inquiry.

Nor can the court agree with plaintiff's argument that Commerce "misapplied" the (k)(1) sources. Plaintiff's "(k)(1)" arguments and its related "scope creep" arguments can be viewed as variations on its argument, rejected above, that the scope language has been unreasonably interpreted. The premise of these arguments is that in certain of its past scope rulings interpreting the scope of the Order, Commerce "unlawfully expanded the scope of the *Order*" such that "Commerce's unlawful interpretations render the language, priming/coating includes the application of a solution, designed to promote the adherence of artist materials, to mere surplusage." Pl.'s Mot. 24. But treating the ambiguous sentence as other than "mere surplusage" would not cure the defect in plaintiff's argument. As the court has explained, the sentence does not compel the exclusion of Canvas Banner Matisse from the scope of the

Order, either when read in isolation or, in particular, when read in context with other scope language. Commerce was not required to interpret this ambiguous sentence in the narrow way that Printing Textiles advocates and permissibly resorted to the (k)(1) sources in interpreting the scope language as a whole.

Beyond its unconvincing "unreasonable interpretation" argument directed to the scope language, *id.* at 24–25, Printing Textiles does not make a prima facie case that the (k)(1) sources were somehow "misapplied," *id.* at 7. Plaintiff disagrees with several of the prior scope rulings Commerce cited, *see Final Scope Ruling* at 4–7, but its disagreement does not, by itself, invalidate those rulings as (k)(1) sources. In the Final Scope Ruling, Commerce found, with respect to Canvas Banner Matisse, that "the record evidence indicates that the primed/coated side of the fabric is *receptive* to artist materials, consistent with our prior scope rulings." *Id.* at 15 (emphasis added).

As Commerce recognized in the Final Scope Ruling, Printing Textiles did not contend, and declined to state, that users of Canvas Banner Matisse use only the uncoated side of the fabric for the printing of images. *Id.* at 18. Commerce concluded that materials identified in 19 C.F.R. § 351.225(k)(1) "demonstrate that Commerce and the ITC have defined 'promote the adherence' of artist materials to mean 'allow for the acceptance of,' 'improve{ } the receptivity of canvas to,' or 'increase{ } the canvas' receptivity to' artist materials." *Id.* at 17. Noting that Berger Textiles submitted results of third-party testing in an effort to show that the priming/coating did not promote the

adherence of ink, Commerce reasonably concluded that "the ITC and our prior scope

rulings have not interpreted 'adherence' so narrowly."  *Id.* at 16 (citing *ITC Report* at 3;

Final Scope Ruling: RV Print Factory LLC's Coated Fabrics (Sept. 29, 2022) at 14).

In summary, Commerce did not fail to consider, or misapply, the (k)(1) sources

in interpreting "artist canvases," *Order*, 71 Fed. Reg. at 31,155, to include Canvas Banner

Matisse.

### 3.  The Final Scope Ruling Is Supported by Substantial Evidence

Printing Textiles argues that the court must invalidate the Final Scope Ruling on

the ground that it is unsupported by substantial evidence on the record of the

administrative proceeding.  Pl.'s Mot. 38–39.  The court disagrees.

Among the record information Commerce cited in support of its conclusion were

numerous disclosures in the Scope Ruling Application, including its attachments.

Commerce noted that "Berger Textiles states that CBM enters the United States 'as rolls

of coated fabric' and identifies several '{w}idely, publicly known uses,' including

'canvas (art reproduction/stretching), roll-up display system, banner product, display

x-kite system, wall covering, décor applications, and tenting.'" *Final Scope Ruling* at 15

& n.57 (citing *Scope Ruling Application* at 4, 29, 32, 34, and Attachment 10 ("Data Sheet

for Canvas Banner Matisse" ("Remarks: Topseller!  Matt economy canvas for art

reproduction, roll-ups, banners etc. / Important for Latex-print: glossy print with high

color brilliance, water- & scratch-resistance . . ."))).  Commerce mentioned that "[i]n fact,

Berger Textiles identifies CBM as the 'top-seller for' latex, UV, and solvent ink application to canvas." *Id*. (citing *Scope Ruling Application* at Attachment 10).

Plaintiff fails to confront the significance of the evidence in its own Scope Ruling Application that Canvas Banner Matisse is suitable for use, and is used, as a canvas to which printed images, including "art reproduction," are applied. The record also contains substantial evidence that Canvas Banner Matisse is "primed and coated" and that the priming/coating contributes to characteristics of the product allowing it to be used as artist canvas (by providing, for example, stiffness, whiteness, and opacity). *Id*.

In conclusion, the evidence considered on the whole is sufficient to support the various critical findings, and the ultimate determination, by Commerce that Canvas Banner Matisse is described by the term "artist canvases" as used in the Order.

**4. The Final Scope Ruling Is Not Unreasonable, Arbitrary, or Capricious**

In support of its motion, Printing Textiles includes a make-weight argument that the Final Scope Ruling is "unreasonable," "arbitrary," and "capricious." Pl.'s Mot. 28–39. Plaintiff fails to explain how the court plausibly could apply such a standard to set aside the Final Scope Ruling. Commerce based this determination on an interpretation of the scope language of the Order that was not unreasonable, on findings grounded in the Scope Ruling Application itself that were supported by substantial record evidence, and on a consideration of the sources identified in 19 C.F.R. § 351.225(k)(1).

**5. Commerce Was Not Required to Address the "(k)(2)" Factors Separately or Individually**

Plaintiff argues that Commerce erred in failing to consider the factors identified in 19 C.F.R. § 351.225(k)(2), under which, it maintains, Commerce would have been required to conclude that Canvas Banner Matisse is not subject to the Order.  Pl.'s Mot. 38–39.  Specifically, Printing Textiles argues that "Commerce did not examine any of the (k)(2) factors" and that its failure to do so "renders its *Scope Ruling* as unsupported by substantial evidence."  *Id*. at 39.  Plaintiff misinterprets the Department's regulation and fails to recognize that Commerce, when examining record evidence described in the (k)(1) sources, considered certain factors identified in § 351.225(k)(2).

The "sources" identified in § 351.225(k)(1) and the "factors" identified in § 351.225(k)(2) are not mutually exclusive.  In reaching a decision on Canvas Banner Matisse, Commerce, based on information that Printing Textiles itself provided in seeking a scope ruling, considered "physical characteristics," "ultimate" uses, and marketing material (*see* Data Sheet for Canvas Banner Matisse).  These are factors specifically identified in subsection (k)(2) but also within the ambit of the "sources" specified in subparagraph (k)(1).  Nothing in the regulation precluded Commerce from doing so.  The regulation provides that the Secretary, in applying subsection (k)(1), "may also consider secondary interpretive sources . . . such as any other determinations of the Secretary or the Commission not identified above, Customs rulings or

determinations, industry usage, dictionaries, and *any other relevant record evidence*."  *Id*.

§ 351.225(k)(1)(ii) (emphasis added).

Relevant record evidence necessarily would include the evidence provided in the

Scope Ruling Application itself.  In this instance, such evidence supported various

critical findings, including findings that Canvas Banner Matisse is a "canvas," that it has

"priming/coating" that imparts stiffness, whiteness, and opacity, and that "art

reproduction" is among the "[w]idely, publicly known uses" of the product.  Based on

the record evidence considered as a whole, which was obtained from "sources"

described in § 351.225(k)(1) and which also pertained to "factors" described in

§ 351.225(k)(2), Commerce concluded that this product is a "printable" canvas and

permissibly reached the ultimate conclusion that it is an artist canvas within the scope

of the Order.  Contrary to plaintiff's interpretation, the regulation did not require

Commerce to address the (k)(2) factors separately or individually.

### G.  Claim that the Order Is Unconstitutionally Vague and, as Applied to Plaintiff by the Final Scope Ruling, a Due Process Violation

Printing Textiles urges the court to set the Final Scope Ruling aside as unlawful

because, in its view, the Order is unconstitutionally vague and, as applied to plaintiff by

the Final Scope Ruling, "raise[s] serious due process concerns."  Pl.'s Mot. 25–28.

Plaintiff attempts to support its claim with citations to various judicial decisions, *id*. at

25–27, none of which establishes a rule of law upon which the court could invalidate the

decision contested in this litigation.

Viewed in light of the terms in the scope language, Canvas Banner Matisse is a "printable canvas" widely used for art reproduction, as the disclosures in plaintiff's own Scope Ruling Application aptly demonstrate.  The court has identified an ambiguous sentence in the scope language of the Order, but that sentence, when considered in light of the scope language on the whole, is insufficient to render the entire scope language unconstitutionally vague and, on that ground, a denial of due process.  While the sentence could have been drafted to be more precise, the scope language on the whole is sufficiently detailed and descriptive that anyone importing Canvas Banner Matisse, or a similar product, was on notice that such a product reasonably could be considered to be subject merchandise.

To the extent Printing Textiles, after considering the scope language, was still in doubt as to whether its product was within the scope of the Order, it had resort to the scope ruling procedure in Department's regulations, of which it availed itself.

In summary, the court finds no merit in plaintiff's due process claim.

### III.  Conclusion

For the reasons stated above, the court concludes that both of the claims Printing Textiles asserts in contesting the Final Scope Ruling are meritless.

The court will deny plaintiff's motion for judgment on the agency record and, in

accordance with USCIT Rule 56.2(b), enter judgment in favor of the United States.

> ____/s/ Timothy C. Stanceu____
> Timothy C. Stanceu
> Judge

Dated: October 8, 2024
        New York, New York

# CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a)(5) and (7)

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, undersigned counsel for Plaintiffs-Appellants certifies that this opening brief utilizes a proportionally spaced 14-point typeface, Times New Roman, in accordance with FRAP 32(a)(5)(A), and further certifies that this brief contains 13,705 words, including footnotes, in accordance with FRAP 32(a)(7)(B)(i). The word-count certification is made in reliance on the word-count feature contained in Microsoft Word Office software.

Respectfully submitted,

/s/ Kyl J. Kirby
Kyl J. Kirby
Kyl J. Kirby, Attorney and Counselor at Law, P.C.
1400 Lipscomb Street
Fort Worth Texas, 78104
Telephone: (214) 632-0841
E-mail: kyl@kirbyfedlaw.com
*Counsel for Plaintiff-Appellant*
PRINTING TEXTILES, LLC DBA
BERGER TEXTILES

Dated: January 24, 2025

# CERTIFICATE OF SERVICE

I hereby certify that on this twenty-fourth day of January, 2025, I caused Plaintiff-Appellant's Opening Brief to be filed electronically with the Clerk of the Court for the U.S. Court of Appeals for the Federal Circuit by using the CM/ECF System. Accordingly, all participants have consented to service by electronic mail and will receive notice of such above-described filing as registered CM/ECF users as follows:

Mr. Kyl John Kirby: kyl@kirbyfedlaw.com

Christopher Berridge, Trial Attorney: christopher.berridge@usdoj.gov, natcourts.dockets@usdoj.gov, national.courts@usdoj.gov

George W. Thompson: gwt@gwthompsonlaw.com

Respectfully submitted,

/s/ Kyl J. Kirby
Kyl J. Kirby
Kyl J. Kirby, Attorney and Counselor at Law, P.C.
1400 Lipscomb Street
Fort Worth Texas, 78104
Telephone: (214) 632-0841
E-mail: kyl@kirbyfedlaw.com
*Counsel for Plaintiff-Appellant*
PRINTING TEXTILES, LLC DBA BERGER TEXTILES

Dated: January 24, 2025