No. 2025-1213

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

————————————

PRINTING TEXTILES, LLC, dba Berger Textiles,

Plaintiff-Appellant,

v.

UNITED STATES, ECKER TEXTILES, LLC,

Defendants-Appellees.

————————————

On Appeal from the United States Court of International Trade in case no. 23-00192,
Judge Timothy C. Stanceu

————————————

## DEFENDANT-APPELLEE UNITED STATES' BRIEF

————————————

YAAKOV M. ROTH
  *Principal Deputy Assistant Attorney General*

PATRICIA M. MᶜCARTHY
  *Director*

*Of Counsel:*

JOSEPH GROSSMAN-TRAWICK
  *Office of the Chief Counsel for Trade
    Enforcement and Compliance
  U.S. Department of Commerce*

FRANKLIN E. WHITE, JR.
CHRISTOPHER A. BERRIDGE
  *Attorneys, Commercial Litigation Branch
  Civil Division, U.S. Department of Justice
  P.O. Box 480, Ben Franklin Station
  Washington, DC 20044
  (202) 598-7392*

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

STATEMENT OF JURISDICTION ..................................................................... 1

STATEMENT OF THE ISSUES ........................................................................... 1

STATEMENT OF THE CASE .............................................................................. 2

   I.   Statutory and Regulatory Background................................................... 2

   II.   Factual Background ................................................................................ 4

   III.   Prior Proceedings.................................................................................. 6

SUMMARY OF ARGUMENT ............................................................................. 8

ARGUMENT ........................................................................................................ 9

   I.   Standard of Review................................................................................ 9

   II.   Commerce's Scope Determination is Supported by Substantial Evidence
      and is in Accordance With Law .......................................................... 11

      A.  Commerce Correctly Determined that CBM is Subject to the *Order*
          Based on the 19 C.F.R. § 351.225(k)(1) Sources ............................. 11

          1.  Commerce Reasonably Interpreted the Priming/Coating
              Requirement of the Scope Language.......................................... 16

          2.  Commerce Reasonably Determined that CBM's Priming/Coating
              is Covered by the Scope of the *Order* ........................................ 21

      B.  Commerce Was Not Required to Conduct an Analysis Under
          19 C.F.R. § 351.225(k)(2) ................................................................ 29

   III.   Commerce Not Unlawfully Expand the Scope of the *Order*............................ 32

IV.    The *Order* is Not Void-For-Vagueness, Nor Did the *Order* Deny
       Berger Adequate Notice or Otherwise Deprive Berger of Due Process......... 39

CONCLUSION ............................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
    802 F.3d 1339 (Fed. Cir. 2015) ............................................................. 10

*Adams Thermal Sys., Inc. v. United States,*
    279 F. Supp. 3d 1195 (Ct. Int'l Trade 2017) .................................................37, 44

*Allegheny Bradford Corp. v. United States,*
    342 F. Supp. 2d 1172 (Ct. Int'l Trade 2004) ........................................................ 43

*ArcelorMittal Stainless Belg. N.V. v. United States,*
    694 F.3d 82 (Fed. Cir. 2012) .................................................................... 44

*Axiom Res. Mgmt., Inc. v. United States,*
    564 F.3d 1374 Fed. Cir. 2009).................................................................... 37

*Consolo v. Fed. Maritime Comm'n,*
    383 U.S. 607 (1996) ........................................................................10, 28

*Christopher v. SmithKline Beecham Corp.,*
    567 U.S. 142 (2012) ............................................................................. 42

*Duferco Steel, Inc. v. United States,*
    296 F.3d 1087 (Fed. Cir. 2002) ..............................................................33, 39, 42

*Dupont Teijin Films USA, LP v. United States,*
    407 F.3d 1211 (Fed. Cir. 2005) ................................................................... 9

*Eckstrom Indus., Inc. v. United States,*
    254 F.3d 1068 (Fed. Cir. 2001) .................................................................. 39

*Fedmet Resources Corp. v. United States,*
    755 F.3d 912 (Fed. Cir. 2014) .................................................................4, 11

*King Supply Co. LLC v. United States,*
    674 F.3d 1343 (Fed. Cir. 2012) ................................................................... 3

*Mid Continent Nail Corp. v. United States,*
    725 F.3d 1295 (Fed. Cir. 2013) ....................................................... 27, 42

*Meridian Prod., LLC v. United States,*
    851 F.3d 1375 (Fed. Cir. 2017) ........................................................... 2, 4

*Nippon Steel Corp. v. United States,*
    337 F.3d 1373 (Fed. Cir. 2003) .............................................................. 10

*Nippon Steel Corp. v. United States,*
    458 F.3d 1345 (Fed. Cir. 2006) ........................................................ 10, 28

*Saha Thai Steel Pipe Pub. Co. Ltd. v. United States,*
    101 F.4th 1310 (Fed. Cir. 2024) ....................................................... 3, 30

*Sango Int'l L.P. v. United States,*
    484 F.3d 1371 (Fed. Cir. 2007) ................................................................ 4

*Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States,*
    776 F.3d 1351 (Fed. Cir. 2015) ....................................... 2, 20, 21, 30

*Suramerica de Aleaciones Laminadas, C.A. v. United States,*
    44 F.3d 978 (Fed. Cir. 1994) .................................................................. 10

*Tai-Ao Aluminum (Taishan) Co. v. United States,*
    983 F.3d 487 (Fed. Cir. 2020) ....................................................... 43, 44

*Tak Fat Trading Co. v. United States,*
    396 F.3d 1378 (Fed. Cir. 2005) ............................................................... 4

*Union Steel v. United States,*
    713 F.3d 1101 (Fed. Cir. 2013) ............................................................... 9

*United States v. Eurodif,*
    555 U.S. 305 (2009) ................................................................................... 10

*United Steel & Fasteners, Inc. v. United States,*
    6947 F.3d 794 (Fed. Cir. 2020) ............................................................... 4

*Vandewater Int'l Inc. v. United States,*
    130 F.4th 981 (Fed. Cir. 2025) ............................................................... 4

*Whirlpool Corp. v. United States,*
144 F. Supp. 3d 1296 (Ct. Int'l Trade 2016) .......................................................... 25

*Zhejiang DunAn Hetian Metal Co., Ltd. v. United States,*
652 F.3d 1333 (Fed. Cir. 2011) ................................................................................ 10

**Statutes**

19 U.S.C. § 1516a(a)(2)(B) ..................................................................................... 5

19 U.S.C. § 1561a(b)(1)(B) ..................................................................................... 10

19 U.S.C. § 1673e(a)(2) ........................................................................................... 2

28 U.S.C. § 1295(a)(5) ............................................................................................. 1

**Regulations**

19 C.F.R. § 351.225 ................................................................................. 2, 25, 30, 40

19 C.F.R. § 351.225(a) ............................................................................................. 2

19 C.F.R. § 351.225(c) ............................................................................................. 6

19 C.F.R. § 351.225(e) ............................................................................................. 2

19 C.F.R. § 351.225(d)(1)(ii) ................................................................................... 6

19 C.F.R. § 351.225(k)(1) ................................................................................. *passim*

19 C.F.R. § 351.225(k)(2) ................................................................................. *passim*

**Administrative Determinations**

*Notice of Antidumping Duty Order: Certain Artist Canvas from the People's Republic of China,*
71 Fed. Reg. 31,154 (Dep't of Commerce June 1, 2006) ................................ *passim*

*Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws,* 86 Fed. Reg. 52,300 (Dep't of Commerce Sept. 20, 2021) ......................... 3, 33

## STATEMENT OF RELATED CASES

No other appeal in or from the present civil action has previously been before this or any other appellate court.  The government is not aware of any related cases within the meaning of Federal Circuit Rule 47.5(b).

# INTRODUCTION

After plaintiff-appellant Printing Textiles, LLC (Berger) requested that the Department of Commerce review whether Berger's "canvas banner matisse" (CBM) was covered by the scope of an antidumping duty order on "artist canvas," Commerce dutifully considered and applied the plain language of the order and the "primary interpretive sources" identified in Commerce's regulations governing scope inquiries, in the manner prescribed by the regulations. Utilizing its specialized expertise in making such determinations, Commerce found that Berger's CBM was within the scope of the applicable antidumping duty order. Commerce's reasonable scope ruling is supported by ample record evidence and is in accordance with law. Accordingly, the Court should affirm the decision of the Court of International Trade (CIT or trial court) that sustained it.

# STATEMENT OF JURISDICTION

The United States agrees with Berger that this Court possesses appellate jurisdiction to review a final decision of the Court of International Trade pursuant to 28 U.S.C. § 1295(a)(5). We also agree that Berger filed a timely notice of appeal within 60 days of the CIT's entry of final judgment.

# STATEMENT OF THE ISSUES

1. Whether Commerce's determination that canvas banner matisse (CBM) is

subject to the antidumping duty order on certain artist canvas from the People's Republic of China is supported by substantial evidence and is otherwise in accordance with law.

2. Whether Commerce unlawfully expanded the scope of the antidumping duty order through its interpretation of the 19 C.F.R. § 351.225(k)(1) sources.

3. Whether the antidumping duty order is void-for-vagueness, denies parties adequate notice, or is otherwise unconstitutional.

## STATEMENT OF THE CASE

## I. Statutory and Regulatory Background

When Commerce publishes an antidumping (AD) or countervailing duty (CVD) order, it defines the scope and "includes a description of the subject merchandise, in such detail as [Commerce] deems necessary." 19 U.S.C. § 1673e(a)(2). Commerce is often called upon to determine whether a certain product is included within the scope of an AD or CVD order because it must write scope language in general terms. 19 C.F.R. § 351.225(a); *see also Meridian Prod., LLC v. United States*, 851 F.3d 1375, 1379 (Fed. Cir. 2017). When Commerce confronts such a question, it follows the analytical framework and procedures set forth in its regulations. 19 C.F.R. § 351.225; *see also Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 776 F.3d 1351, 1354 (Fed. Cir. 2015) ("There is no specific statutory provision governing the interpretation of the scope of [AD] or [CVD] orders."). The process of analyzing whether a product falls within the scope of an order "is 'highly

fact-intensive and case-specific.'" *Saha Thai Steel Pipe Pub. Co. Ltd. v. United States*, 101 F.4th 1310, 1325 (Fed. Cir. 2024), *cert. denied sub nom. Saha Thai Steel Pipe Pub. Co. Ltd. v. Wheatland Tube Co.*, No. 24-696, 2025 WL 663702 (U.S. Mar. 3, 2025) (quoting *King Supply Co., LLC v. United States*, 674 F.3d 1343, 1345 (Fed. Cir. 2012)).

In 2021, Commerce amended its regulation for answering scope questions. *See Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws,* 86 Fed. Reg. 52,300, 52,322-23 (Dep't of Commerce Sept. 20, 2021); 19 C.F.R. § 351.225(k) (2022). Pursuant to the amended regulation, to determine if a product is covered by the scope of an order, Commerce "*may* make its determination" on the basis of the language of the scope alone. 19 C.F.R. § 351.225(k)(1) (emphasis added). However, in making this determination, Commerce has discretion to consider the (k)(1) sources, including the primary interpretive sources under (k)(1)(i), such as the petition and initial investigation pertaining to the order at issue, previous determinations by Commerce (including prior scope rulings), and ITC reports pertaining to the order at issue. *See id.* Commerce may also consider the secondary interpretive sources under (k)(1)(ii) such as "any other determinations of [Commerce] or the [ITC] not identified above, Customs rulings or determinations, industry usage, dictionaries, and any other relevant record evidence." *See* 19 C.F.R. § 351.225(k)(1)(ii). To the extent such secondary sources conflict with the primary sources, however, the primary sources "will normally govern." *Id.*

If Commerce determines that descriptions of the merchandise contained in the (k)(1) sources are dispositive, Commerce issues a final scope ruling regarding whether the product falls within the order's scope. *See* 19 C.F.R. § 351.225(e); *see also Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1382 (Fed. Cir. 2005). The (k)(1) sources are "dispositive" when they "definitively answer the scope question." *Sango Int'l L.P. v. United States*, 484 F.3d 1371, 1379 (Fed. Cir. 2007). This Court reviews "Commerce's analysis of the (k)(1) sources against the product in question" as an issue of fact under the substantial evidence standard. *United Steel & Fasteners, Inc. v. United States*, 947 F.3d 794, 799 (Fed. Cir. 2020); *see also Meridian Prod.*, 851 F.3d at 1382 (citing *Fedmet Res. Corp. v. United States*, 755 F.3d 912, 919-22 (Fed. Cir. 2014)).

Only when the (k)(1) sources are not dispositive will Commerce consider the five criteria set forth in § 351.225(k)(2). *See* 19 C.F.R. § 351.225(k)(2); *Fedmet Res. Corp.*, 755 F.3d at 918; *see also Vandewater Int'l Inc. v. United States*, 130 F.4th 981, 985 (Fed. Cir. 2025). These factors include: "(A) the physical characteristics of the merchandise; (B) expectations of the ultimate purchasers; (C) the ultimate use of the product; (D) the channels of trade in which the product is sold; and (E) the manner in which the product is advertised and displayed." 19 C.F.R. § 351.225(k)(2)(i).

## II.     Factual Background

On June 1, 2006, Commerce published the *Order* at issue in this case. *Notice*

*of Antidumping Duty Order: Certain Artist Canvas from the People's Republic of China*, 71 Fed. Reg. 31,154 (Dep't of Commerce June 1, 2006).  Commerce defined the scope of the *Order*, in relevant part, as follows:

> The products covered by the Order are artist canvases regardless of dimension and/or size, whether assembled or unassembled, *that have been primed/coated*, whether or not made from cotton, whether or not archival, whether bleached or unbleached, and whether or not containing an ink receptive top coat.
>
> *Priming/coating includes the application of a solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric. Artist canvases (i.e., pre-stretched canvases, canvas panels, canvas pads, canvas rolls* (including *bulk rolls* that have been primed), *printable canvases*, floor cloths, and placemats) *are tightly woven prepared painting and/or printing surfaces.*

*Id.* (emphasis added).

The product covered by Commerce's scope ruling is CBM, which is 600 denier 100 percent polyester fabric woven filament fiber that is coated on one side with polyvinyl acetate/acrylate-type polymers.  APPX00460.  CBM fabric has a visible coating which contains hydrophobic sealing and fireproof agents.  *Id.*  CBM is packaged as rolls of coated fabric of various lengths which Berger distributes to its customers.  *Id.*  In its scope ruling application, Berger stated that there are "several uses of CBM, including as canvas (art reproduction/stretched), wall covering, and décor applications."  APPX00039, APPX00064, APPX00067, APPX00069-APPX00070; **APPX00461**.

On December 15, 2022, Berger filed a scope ruling application pursuant to 19

C.F.R. § 351.225(c) requesting that Commerce determine that CBM is not covered by the scope of the *Order*. APPX00029.

On January 19, 2023, Commerce informed interested parties that the scope inquiry was deemed initiated pursuant to 19 C.F.R. § 351.225(d)(1)(ii) on January 18, 2023. APPX00348. On February 17, 2023, Charta Group, Inc. dba Permalite, Inc. (Permalite) and Ecker Textiles, LLC (Ecker), submitted comments to Commerce arguing that CBM is within the scope of the *Order*. APPX351. On March 10, 2023, Berger responded to the comments submitted by Ecker and Permalite. APPX00383.

On August 16, 2023, Commerce issued its Final Scope Ruling. APPX0458. Commerce considered the scope language coupled with interpretive sources under 19 C.F.R. § 351.225(k)(1), including a prior International Trade Commission (ITC) determination and Commerce's prior scope rulings pertaining to the artist canvas *Order*, and determined that CBM imported by Berger was covered by the scope of the *Order*. APPX00471-APPX00477. Because Commerce considered that the (k)(1) sources were dispositive in determining that CBM is covered by the scope of the *Order*, Commerce found it unnecessary to consider the additional factors specified in 19 C.F.R. § 351.225(k)(2). APPX00471.

## III. Prior Proceedings

Berger challenged several aspects of Commerce's decision before the CIT Berger argued that the CBM it imports lacks the priming/coating layer identified in the scope language and thus Commerce's Final Scope Ruling is not supported by

substantial evidence and in accordance with law. APPX00008. Berger also argued that Commerce misapplied the regulatory framework under 19 C.F.R. § 351.225(k), misinterpreted the scope language, and unlawfully expanded the scope of the *Order* in finding CBM in-scope. *Id.*

On October 8, 2024, the trial court sustained Commerce's Final Scope Ruling as supported by substantial evidence and in accordance with law. APPX00004. The trial court held first that Commerce's interpretation of the priming/coating language in the scope and related finding that CBM is primed/coated for purposes of the *Order* was not *per se* unreasonable. APPX00009-APPX00013. The trial court next determined that Commerce did not misapply the framework under 19 C.F.R. § 351.225(k)(1) because it appropriately considered (k)(1) sources such as prior scope rulings and the ITC Report, as required by the regulations. APPX00013-APPX00019. The trial court then found that substantial evidence, including evidence in Berger's own Scope Ruling Application, supported Commerce's finding that CBM is primed/coated for purposes such as art reproduction and use as an "artist canvas" as it relates to the *Order*. APPX00019-APPX00020. The trial court finally found that the Final Scope Ruling was not unreasonable, arbitrary, or capricious because Commerce based its determination on a reasonable interpretation of the scope language and findings supported by substantial evidence, consistent with (k)(1) sources it analyzed and that Commerce was not required to address the factors in 19 C.F.R. § 351.225(k)(2) because its analysis under (k)(1) was dispositive. APPX00020-

APPX00022.

In addition to sustaining Commerce's Final Scope Ruling, the trial court rejected Berger's argument that the *Order* itself was void-for-vagueness and deprived Berger of due process. APPX00022-APPX00023. The trial court found that the scope language was detailed and descriptive enough to provide notice to a party that CBM or a similar product could reasonably be considered subject to the *Order*. APPX00023. Thus, the trial court held that the *Order* is not unconstitutionally vague nor was Berger deprived of due process. *Id.* For those reasons, the trial court sustained Commerce's Final Scope Ruling and entered judgment in favor of the United States. APPX0001-0002. This appeal followed.

## SUMMARY OF ARGUMENT

The Court should affirm the trial court's judgment because Commerce's Final Scope Ruling is in accordance with the law and supported by substantial record evidence. Commerce's regulations provide it with the discretion to use the interpretive sources under 19 C.F.R. § 351.225(k)(1) in its analysis of an order's scope language. Consistent with the regulations, Commerce was entitled to rely on the (k)(1) sources such as prior scope rulings, the ITC Final Report, and the language of the *Order*, to determine that CBM is within the scope of the *Order*. Contrary to Berger's arguments, the trial court correctly held that Commerce reasonably interpreted the *Order* using (k)(1) sources, and thus Commerce acted in accordance with the law when it declined to consider 19 C.F.R. § 351.225(k)(2) sources.

Additionally, the trial court's judgment should be affirmed because Commerce's interpretation of the scope language did not unlawfully expand the scope of the *Order*. Commerce properly considered the record evidence under 19 C.F.R. § 351.225(k)(1) and did not interpret the scope of the *Order* contrary to its language nor in a manner that changed or expanded the scope of the *Order*. Rather, Commerce interpreted the scope consistent with the scope language, and that interpretation is consistent with prior scope rulings and the ITC Final Report.

Finally, as the trial court correctly held, Commerce found that the *Order* is not impermissibly vague, nor does it otherwise raise due process concerns. The scope language reasonably notifies parties as to what merchandise is subject to the *Order*. Berger fails to demonstrate how the *Order* is unconstitutional, and thus does not meet its burden in showing that it was somehow deprived of due process. For these reasons, the Court should affirm the trial court's judgment sustaining Commerce's Final Scope Ruling.

## ARGUMENT

## I.      Standard of Review

When reviewing the Court of International Trade's judgment concerning a final determination of Commerce, this Court reapplies the trial court's standard of review. *Dupont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005). Accordingly, this Court upholds Commerce's determination unless it is unsupported by substantial record evidence, or otherwise unlawful. *Union Steel v. United States*, 713

F.3d 1101, 1106 (Fed. Cir. 2013) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)); *see also United States v. Eurodif*, 555 U.S. 305, 316 n.6 (2009) ("The specific factual findings on which [Commerce] relies . . . are conclusive unless unsupported by substantial evidence."). Although this amounts to repeating the trial court's work, this Court has declared that it "will not ignore the informed opinion of the [trial court]." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015) (quoting *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 983 (Fed. Cir. 1994)).

"Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*, 652 F.3d 1333, 1340 (Fed. Cir. 2011) (citing *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003)).

The Court must affirm the agency's determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusion. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006). Even if it is possible to draw two inconsistent conclusions from the evidence contained in the record, this does not mean that Commerce's findings are not supported by substantial evidence. *Id.*; *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620 (1966).

## II. Commerce's Scope Determination is Supported by Substantial Evidence and is in Accordance With Law

The trial court correctly found that Commerce's Final Scope Ruling was supported by substantial evidence and is otherwise in accordance with law. Berger argues that Commerce incorrectly applied the regulatory framework, but this is refuted by ample record evidence that was analyzed pursuant to 19 C.F.R. § 351.225(k)(1). Tracking the regulation, Commerce considered both the plain language of the *Order* and the (k)(1) sources in making its determination, and substantial record evidence supports that determination. Because Commerce found the scope language and the 19 C.F.R. § 351.225(k)(1) sources to be dispositive, an additional analysis under 19 C.F.R. § 351.225(k)(2) was not necessary. *See, e.g.*, *Fedmet Res. Corp.*, 755 F.3d at 918. Commerce's consideration of Berger's statements about CBM's uses as part of its analysis of (k)(1) sources does not constitute a (k)(2) analysis, nor did Commerce impermissibly impart an end-use requirement into the scope in so doing.

### A. Commerce Correctly Determined that CBM is Subject to the *Order* Based on the 19 C.F.R. § 351.225(k)(1) Sources

Berger contends that Commerce improperly analyzed the (k)(1) sources, alleging that (k)(1) sources demonstrate that CBM is not subject to the *Order* because CBM does not have the kind of priming/coating layer required by the *Order*. *See generally* Berger. Br. at 38-57. But, as the trial court found, Commerce examined the CBM described in Berger's Scope Request in the context of the language of the scope

of the *Order* and reasonably determined that the description of the CBM, coupled with the sources described in 19 C.F.R. § 351.225(k)(1), were dispositive as to whether CBM is ultimately covered by the scope. APPX00012-APPX00013; APPX00471.

In accordance with 19 C.F.R. § 351.225(k), Commerce began its analysis with the scope language. APPX00471. The scope of the *Order* covers artist canvases that have been primed/coated, which "includes the application of a solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric." *See Order*;;APPX00059; APPX00471. The *Order* defines artists canvases as "'pre-stretched canvases, canvas panels, canvas pads, canvas rolls (including bulk rolls that have been primed), printable canvases, floor cloths, and placements' that 'are tightly woven prepared painting and/or printing surfaces.'" APPX00471.

Record evidence submitted by Berger demonstrated that CBM is both primed/coated and also meets the definition of an artist canvas. *Id.* In making its scope ruling, Commerce pointed to Berger's own statements about the CBM, where it described CBM as "'polyester fabric woven (*i.e.*, wrap and weft) filament fiber…that has been coated with polyvinyl acetate/acrylate type polymers'" and "is primed/coated 'for the purpose of converting a fabric into a canvas.'" APPX00038; APPX00147-APPX00152; APPX00471-APPX00472. And again using Berger's own description, Commerce found that the "priming/coating 'is required to stiffen the fabric[,] giving it the stiffness properties of a canvas' and 'provides whiteness and higher opacity to the translucent polyester fabric.'" APPX00147-APPX00152;

APPX00472. Commerce also noted that CBM "enters the United States 'as rolls of coated fabric,'" according to Berger. *Id.*

Berger's scope ruling application also lists "several '[w]idely, publicly known uses[]' [for CBM] including 'canvas (art reproduction/stretching), roll-up display system, banner product, display x-kite system, wall covering, décor applications, and tenting.'" APPX00039, APPX00064, APPX00067, APPX00069-APPX00070; APPX00171-APPX00174; APPX00472. Commerce points out that Berger "repeatedly refers to CBM as a canvas in its Scope Request," describes CBM as the "'top-seller for' latex, UV, and solvent ink application to canvas," "markets CBM for use as 'canvas frames' and 'stretched canvas,'" and relayed that it "sold [CBM] to companies that print onto the canvas." APPX00472; APPX00147-APPX00152; APPX00168-APPX00174. Berger acknowledged that "[i]t is common sense that 'art reproduction' can occur on' the coated side of the fabric." APPX00067; APPX00472. As the trial court confirmed, Commerce reasonably found that this evidence submitted by Berger, when read together, indicates that CBM is in fact "canvas roll and/or printable canvas that is primed/coated and is a woven prepared painting and/or printing surface." APPX00013; APPX00472.

Using other (k)(1) sources, Commerce also found that the Tara Print Canvas Scope Ruling, in which Commerce determined that the print canvas at issue was subject to the *Order* because "print canvases are specifically cited in the scope language as an example of subject merchandise," further reinforced Commerce's interpretation.

APPX00251-APPX002255; APPX00475.  In this case, Berger "imports CBM as rolls

of coated fabric that it distributes to customers for such uses as canvas (art

reproduction/stretching), roll-up display system, banner product, display x-kite

system, wall covering, décor applications, tenting, and canvas frames" and "repeatedly

refers to CBM as a canvas." *Id.*  Accordingly, Commerce reasonably found that

"record evidence demonstrates that CBM is a canvas roll and/or printing canvas"

consistent with the Tara Print Canvas Scope Ruling. *Id.*

In order to interpret the "priming/coating" scope requirement, Commerce

considered the primary interpretive sources set forth in 19 C.F.R. § 351.225(k)(1)(i).

To start, Commerce considered the ITC Final Report, which states "'[a]rtists' canvas

is a surface for the graphic presentation of painted or printed images.  It is made from

woven fabric that is primed and coated ('gessoed') *to accept* paints or inks and is sold in

a variety of shapes, sizes, textures, and formats.'"  APPX00473 (emphasis in original).

Commerce acknowledged that although the ITC "used primed/coated and 'gessoed'

interchangeably, the focus is notably on *preparing the fabric 'to accept' paints or inks* and on

creating 'a surface for the graphic presentation of painted or printed images.'"  *Id.*

(emphasis added).

In addition to the ITC Final Report, Commerce found that its prior scope

rulings under the *Order* supported its interpretation of priming/coating, noting that

"Commerce has determined that priming/coating (*i.e.*, gessoing) a fabric to accept

artist materials is 'understood to be synonymous with the priming/coating material or

14

the application thereof, which promotes the adherence of artist materials.'"
APPX00207-APPX00215; APPX00474. As Commerce explained in the Impact
Images Scope Ruling, "gesso 'improves the receptivity of canvas to paint or other
artistic materials, which helps clarify the scope's reference to priming or coating with a
solution designed to promote the adherence of artist materials.'" *Id.* It was
reasonable, therefore, for Commerce to conclude that "the [(k)(1)] materials
demonstrate that Commerce and the ITC have defined 'promote the adherence' of
artist materials to mean 'allow for acceptance of,' 'improve[] the receptivity of canvas
to,' or 'increase[] the canvas' receptivity to' artist materials." *Id.*

Using this framework, Commerce determined that CBM imported by Berger is
primed/coated to promote the adherence of artist materials. *Id.* Specifically,
Commerce examined the record and contrasted CBM to out-of-scope merchandise
from prior scope rulings in which parties sufficiently demonstrated the merchandise
was not primed/coated to increase the receptivity of artist materials such as, for
example, because any such materials were applied directly to the fibers of the canvas'
fabric, not to the canvas' surface coating. APPX00207-APPX00224; APPX00474-
APPX00476. Commerce likewise found its CBM scope determination was in
harmony with a prior scope ruling in which Commerce found merchandise that was
primed/coated for a graphical purpose and prepared the canvas to receive ink was
covered by the scope language. APPX00476. After considering the scope language,
primary interpretive sources, and Berger's description of CBM, in accordance with 19

C.F.R. § 351.225(k)(1) as discussed above, Commerce reasonably determined that CBM is subject to the *Order*.

### 1. Commerce Reasonably Interpreted the Priming/Coating Requirement of the Scope Language

Berger asserts, without merit, that Commerce's determination is unsupported by substantial evidence because it misapplied the (k)(1) sources and interpreted the priming/coating language in the scope too broadly. Berger Br. at 38-47. First, Berger argues that Commerce ignored Tara's (the petitioner in the underlying investigation) alleged intent and that "as the ITC and Commerce have recognized, it is unequivocally clear that Tara's specific acrylic latex 'gesso' bottom 'adherence' priming/coating formula is a prerequisite to artist canvas under the *Order*." Berger Br. at 45. But as Commerce explained, the scope language does not refer to "gesso" nor does it "specify any limitations to the scope based on the particular formula of the priming/coating solution." APPX00473.

Although Commerce determined in a prior scope ruling that Ecker's (who purchased Tara's artist canvas production assets subsequent to the underlying investigation) gesso formula was "synonymous with priming/coating a canvas, the interchangeable use of the words 'gesso' and 'priming/coating' does not mean that Ecker['s] specific gesso formula is the *exclusive* priming/coating solution *required* of subject artist canvas." *Id.* (emphasis added). Commerce noted that, during Commerce's scope inquiry on print canvas, Tara even acknowledged uncertainty as to

what "processes and materials" foreign producers use to produce print canvas. APPX00187-APPX00192; APPX00473 (citing Scope Ruling Application at Attachment 14). This directly refutes Berger's claim that Commerce's determination ignores the petitioner's intent or that the priming/coating layer exclusively applies to a specific formula. *Id.*

Accordingly, Commerce correctly found unconvincing Berger's argument that a specific gesso formula is required by the scope pursuant to Commerce's analysis of the primary interpretive sources under 19 C.F.R. § 351.225(k)(1). *Id.* As the trial court concluded, "[t]he scope language Commerce developed during the investigation and chose to include in the Order does not impose a specific formulation by which a canvas must be 'primed/coated' and further provides that a canvas is included within the Order 'whether or not containing an ink receptive top coat.'" APPX00017.

Second, Commerce and the trial court rejected Berger's additional argument that the scope language compels a narrow reading of the priming/coating requirement, to the exclusion of CBM. APPX00018. Berger argues that the bottom layer of priming/coating must promote adhesion of artistic materials for the canvas to be in-scope. Berger Br. at 51-54. But Commerce considered and soundly rejected this argument during the scope proceeding. Commerce found that Berger's adherence testing did not, in fact, demonstrate that CBM is not primed/coated to promote the adhesion of artist materials. Commerce explained that "there is no requirement in the scope that the priming/coating be located on a specific portion of

the artist canvas" and that the "distinction that [Berger] draws between 'bottom' and 'top' priming/coating is not supported by the record or the scope language." APPX00475. Further, Commerce noted that while Berger asserted CBM has two priming/coating layers (*i.e.*, bottom and top), "the patent indicates that the substrate has only one." *Id.*

The trial court similarly rejected plaintiff's argument, finding Commerce's interpretation of the scope language not *per se* unreasonable and holding that while one sentence of the scope is ambiguous and "otherwise susceptible to more than one interpretation," Commerce properly resolved that ambiguity through its analysis of the (k)(1) sources. APPX00013. Specifically, the trial court stated:

> The gist of plaintiff's "scope language" argument is that "CBM has a priming/coating and a top coating, neither of which 'promote[s] the adherence of artist materials.'"…The court does not agree with plaintiff's argument that Commerce unreasonably interpreted the scope language. This argument rests on a single sentence in that language: "Priming/coating *includes* the application of a solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric." *Order*, 71 Fed. Reg. at 31,155 (emphasis added).

APPX00010 (emphasis in original). The trial court continued, reasoning:

> While this sentence can be interpreted as limiting the scope to canvases with priming/coating designed to promote the adherence of artist materials, it uses the term "includes." Because "includes," particularly in the context of other scope language, also may be interpreted to mean "includes, but is not limited to . . . ," the word "includes" introduces ambiguity as to whether "priming/coating" *must* be designed to promote the adherence of artist materials for a canvas to be included within the scope as an "artist canvas." The use of the word "includes" makes it

18

> uncertain whether the sentence is intended as a definition of the term "primed/coated" as used in the previous sentence. Moreover, the words "designed to promote the adherence of artist materials," if not ambiguous, are also susceptible to varied interpretations.

APPX00010-APPX00011 (emphasis in original).  The trial court correctly rejected Berger's argument that the language "designed to promote the adherence of artist materials" compels a narrow interpretation of the "priming/coating requirement," necessitating the exclusion of CBM from the scope.  *Id.*  Rather, as the court held, "[t]he scope language requires for inclusion in the Order that the material 'have been primed/coated' but does not rigidly or unambiguously require that the priming/coating function to 'promote' adherence of artist materials by increasing the 'adherence' to a level beyond that of untreated material."  *Id.*

Berger asserts that, like Commerce, the trial court also misapplied the scope requirement that the priming/coating layer "includes the application of a solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric."  Berger Br. at 38-39.  According to Berger, the scope language "includes" was misinterpreted by the trial court as "includes, but is not limited to."  Specifically, Berger asserts that because Commerce has used language ("includes, but is not limited to") in the scope of entirely unrelated orders, the "authors" of this *Order* must have intended to omit the "but not limited to" language from the scope of this *Order*, compelling a narrow interpretation of the priming/coating requirement.  Berger Br. at 39-41.  To support this proposition, Berger cites authorities stating "[w]here Congress

19

includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Id.* (internal quotation and citation omitted). This argument is without merit.

As an initial matter, regardless of how the word "includes" is interpreted, Commerce found that the (k)(1) sources "demonstrate that Commerce and the ITC have defined 'promote the adherence' of artist materials to mean 'allow for acceptance of,' 'improve{} the receptivity of canvas to,' or 'increase{} the canvas' receptivity to' artist materials." APPX00474. Commerce found that "the record contains evidence that CBM has a priming/coating layer that increases the canvas' receptivity to artist materials." *Id.* Thus, Berger's argument that "includes" should be read as "exclusively includes" rather than "includes but is not limited to" has no bearing on Commerce's finding that CBM is primed/coated artist canvas subject to the *Order.* Moreover, Berger cites no authority for the proposition that because Commerce has used the "includes, but not limited to language" in other, unrelated orders, it intentionally omitted that language here. While principles of statutory construction may be relevant when construing the scope of a *single* order, *see Shenyang Yuanda Alum. Indus. Eng'g Co.*, 776 F.3d at 1075, Berger fails to explain how such principles are relevant to this Court's review of language in *different* orders. Berger offers no support for its position that Commerce's case-by-case decisions regarding scope are analogous to

congressional authors' inclusion of language in one section of a statute but not in another section of that same statute.

As this Court has held, "[t]here is no specific statutory provision governing the interpretation of the scope of [AD] or [CVD] orders." *See Shenyang Yuanda Aluminum Indus. Eng'g Co.*, 776 F.3d at 1354. When Commerce confronts a question as to whether a product is covered by the scope of an order, it follows the analytical framework and procedures set forth in its regulations. 19 C.F.R. § 351.225. The trial court found that Commerce's interpretation was not *per se* unreasonable and "Commerce resolved ambiguity by interpreting sources of information identified in [its regulations]." APPX00013. Berger's comparison to congressional drafters is inapposite, and this Court should affirm Commerce's interpretation of the priming/coating requirement as supported by its analysis of the (k)(1) sources.

### 2. Commerce Reasonably Determined that CBM's Priming/Coating is Covered by the Scope of the *Order*

Berger next argues that "[t]he facts are consistent that CBM's priming/coating does not 'promote the adherence of artist materials' and does not concern 'receptivity.'" Berger Br. at 49-54. Specifically, Berger asserts that Commerce "gloss[ed] over 'adherence' testing performed by Berger's third-party experts." *Id.* at 50. This is incorrect. Berger ignores that Commerce *specifically considered* this evidence in making its determination and still found that the priming/coating layer on the CBM promoted the adherence of artist materials. APPX00473-APPX00475. Commerce

explained that while Berger pointed to adherence tests of CBM's priming/coating by a laboratory and an individual examiner, "the individual examiner stated that 'no chemical analysis can characterize 'adherence' and no standardized tests are available to measure 'adherence.'" *Id.* Further, the examiner admitted "that the testing results reflect 'subjective qualitative judgement' based 'on whether the adherence of the ink was worse, the same, or better.'" *Id.* Commerce also explained that the report "is at times conflicting because the expert also concludes that the bottom priming/coating layer contributes 'slightly to absorption of ink,' which is an artist material identified in the scope." APPX00147-APPX00152; APPX00473-APPX00475.

Commerce acknowledged that "the third-party adherence testing results conclude that the CBM priming/coating solution does not promote the adherence of ink," but Commerce also noted that Berger's testing relied on a third party's "subjective qualitative judgment" of "whether the adherence of the ink was worse, the same or better" with application of the CBM priming/coating solution. APPX00473. According to Commerce, Berger's proffered interpretation of the scope and the expert report "assumes an overly narrow definition of adhesion," and thus was of limited value when compared to other record evidence indicating that CBM's priming/coating layer *does* increase the canvas' receptivity to artist materials. APPX00475. Commerce explained that the ITC Final Report and Commerce's prior scope rulings "have not interpreted 'adherence' so narrowly" and instead look to whether the priming/coating layer "improves the receptivity of canvas to" or

"increases the canvas' receptivity to artist materials." *Id.* The trial court recognized Commerce's consideration of Berger's third-party testing results, and held that Commerce's rejection of Berger's narrow interpretation of "adhesion" was reasonable. APPX00018-APPX00019.

When considering whether CBM's priming/coating layer promotes adherence, Commerce looked to the ITC Final Report, which stated that artist canvas "'is primed and coated ('gessoed') *to accept* paints or inks and is sold in a variety of shapes, sizes, textures, and formats.'" APPX00473 (emphasis in original). The ITC further noted that "the focus is notably on preparing the fabric 'to accept' paints or inks and on creating 'a surface for the graphic presentation of painted or printed images.'" *Id.* This was in sync with Commerce's prior scope rulings, such as the Impact Images Scope Ruling, where Commerce "determined that priming/coating (*i.e.*, gessoing) a fabric to accept artist materials is 'understood to be synonymous with the priming/coating material or the application thereof, which promotes the adherence of artist materials.'" APPX00207-APPX00215; APPX00474.

Berger's claim that CBM's priming/coating does not promote adherence, Berger Br. at 49-54, is directly refuted by Berger's own words. Commerce found Berger's description of its CBM particularly useful, explaining that "[Berger] submitted a patent for 'CBM technology,' which described 'a receiving medium comprising a substrate and an ink receiving layer.'" APPX00176, APPX00180; APPX00474. The CBM patent "states that an '*ink receptive coating*' is 'applied to a

substrate such as . . . canvas,' creating a medium 'which yields a U.V. and water resistant ink jet print.'" *Id.* (emphasis added). With all of this record evidence, Commerce properly concluded that "the 19 CFR 351.225(k)(1) materials demonstrate that Commerce and the ITC have defined 'promote the adherence' of artist materials to mean 'allow for acceptance of,' 'improve[] the receptivity of canvas to,' or 'increase[] the canvas' receptivity to' artist materials." APPX00474.

Likewise, the trial court found that Berger "does not demonstrate that the stiffening, whitening, and opacity [applied to CBM] do not relate to the use of the product as a surface designed for, and suitable for, the printing of images using paint or ink, and the [submitted] Declaration provided substantial evidence to support the Department's findings." APPX00012. Moreover, the trial court held that "[Berger] fails to confront the significance of the evidence in its own Scope Ruling Application that [CBM] is suitable for use, and is used, as a canvas to which printed images, including 'art reproduction,' are applied." APPX00020.

Commerce compared CBM to the inquiry merchandise in the Impact Images Scope Ruling, where Commerce found polyester fabric coated with flame-retardant and polyurethane (PFCPU) outside of the scope of the *Order* because Impact Images sufficiently demonstrated "that no priming or coating is applied to PFCPU that increases the canvas' receptivity to paint, ink or other artistic materials (*i.e.,* any graphics are applied to the canopy material regardless of coating, and the coating applied to PFCPU is applied for non-graphical purposes), it is distinguishable from in-

24

scope material that is necessarily primed/coated to allow for acceptance of artistic materials." APPX00474. Unlike CBM, "Commerce found Impact Images provided sufficient information demonstrating that 'any image/graphic/coloring of the PFCPU is achieved primarily through a process of dye sublimation applied directly to the fabric, effectively dying the fibers of the fabric itself, and *not through the application of a material to the surface of the fabric.*'" APPX00476 (emphasis added).

Commerce determined that two other scope rulings were instructive on this issue. In the Global Textile Blockout Fabric and Backlit Fabric Scope Ruling, Commerce found the inquiry merchandise outside of the scope because "'nothing on the record suggests that such coatings aid application of graphical media to the fabrics, nor contradicts Global Textile's statements that such coatings do not promote adherence of artist materials,'" and further that "Global Textile provided 'sufficient information to demonstrate that no priming or coating is applied to blockout and backlit fabric that increases the canvas's receptivity to paint, ink or other artistic materials.'" APPX00223; APPX00476. Meanwhile, here, Berger did "not demonstrate that CBM is not primed/coated to accept, or be receptive to, artist materials and in fact the available record evidence indicates otherwise." APPX00476.

Likewise, the RV Print Scope Ruling on certain polyester fabrics coated with ethylene-vinyl acetate supports the finding that CBM is subject to the *Order*. APPX00476. Commerce found that Berger's interpretation of adherence, just like RV Print's, "[was] inconsistent with the history of the *Order* and the original

25

investigation." *Id.* Commerce explained that "RV Print (like [Berger]) did not demonstrate that its product's coating was applied for non-graphical purposes or that it does not increase the underlying canvas' receptivity to paint, ink, or other materials despite record evidence to the contrary." *Id.* Berger also "fail[ed] to demonstrate that [CBM]'s coating was applied for non-graphical purposes or that it does not increase the underlying canvas' receptivity to paint, ink, or other materials." *Id.* And though Berger continues to argue that Commerce expanded the scope of the *Order* in the RV Print Ruling, it has not disproven Commerce's finding in the Final Scope Ruling that Berger "[did] not identify any differences that render the RV Print Scope Ruling inapplicable" nor did it identify or explain why any such differences "are meaningful to a scope analysis." *See id.*; *see also* Berger Br. at 18-20.

Despite several opportunities to do so, Berger never argued before Commerce "that CBM lacks a priming/coating layer that is applied for graphical purposes." APPX00475. Commerce asked Berger whether its CBM coating "increases receptivity to any artist materials." APPX00062. Rather than engaging with the question, Berger responded that "top coat in [*sic*] receptivity is not a requirement of the *Order*. In terms of [the] 'promoting the adherence' requirement . . . the bottom priming/coating does not 'promote the adherence' of the inks." APPX00062-APPX00063. Thus, Berger failed to answer Commerce's question and instead simply distinguished between CBM's priming/coating layer and top coat – a distinction which, as discussed above, is irrelevant to the proper interpretation of the *Order*. APPX00475.

Commerce also asked whether CBM is primarily used for the application of print or artistic materials," to which [Berger] responded that it "cannot speculate what side is ultimately printed on by customers." APPX00064. Based on those answers, Commerce appropriately remarked that the record "contains several instances in which [Berger] declines to affirmatively state that CBM lacks a priming/coating layer that is applied for graphical purposes and instead focuses exclusively on the adherence of the 'bottom' priming/coating layer," a distinction which Commerce noted "is not supported by the record or the scope language." APPX00475.

The trial court credited this finding, stating "[a]s Commerce recognized in the Final Scope Ruling, [Berger] did not contend, and declined to state, that users of [CBM] use only the uncoated side of the fabric for the printing of images." APPX00018. In light of Commerce's analysis of various (k)(1) sources, the trial court found the record "contains substantial evidence that [CBM] is 'primed and coated' and that the priming/coating contributes to the characteristics of the product allowing it to be use used as artist canvas (by providing, for example, stiffness, whiteness, and opacity)." APPX00020.

This Court should likewise sustain Commerce's determination because the interpretation is not contrary to the *Order*'s terms, nor does it change the *Order*'s scope. *See Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1300 (Fed. Cir. 2013). But even if the Court were to find that Berger's arguments had some merit, Commerce provided a reasoned explanation based on record information as to why

CBM should properly be considered within the meaning of the scope. So, if it were possible to draw two inconsistent conclusions from the evidence contained in the record, Commerce's findings are still supported by substantial evidence. *See Consolo*, 383 U.S. at 620 (1996); *see also Nippon Steel Corp.*, 458 F.3d at 1352. Ultimately, Berger's arguments amount to a disagreement with Commerce, but those arguments fall well short of demonstrating that Commerce's determination was unreasonable.

For similar reasons, Berger's claim that Commerce's determination is arbitrary and capricious is unpersuasive. Berger Br. at 45, 57. As the trial court stated:

> [Berger] includes a make-weight argument that the Final Scope Ruling is "unreasonable," "arbitrary," and "capricious." [Berger] fails to explain how the court plausibly could apply such a standard to set aside the Final Scope Ruling. Commerce based this determination on an interpretation of the scope language of the Order that was not unreasonable, on findings grounded in the Scope Ruling Application itself that were supported by substantial record evidence, and on a consideration of the sources identified in 19 C.F.R. § 351.225(k)(1).

APPX00020. Berger also fails to demonstrate before this Court how Commerce's determination was unsupported by substantial evidence, let alone arbitrary and capricious. As discussed at length throughout this brief, Commerce conducted a comprehensive (k)(1) analysis of the record evidence and reasonably determined that CBM is subject to the *Order*. Accordingly, this Court should uphold Commerce's analysis under 19 C.F.R. § 351.225(k)(1) and sustain the trial court's judgment.

**B.      Commerce Was Not Required to Conduct an Analysis Under 19 C.F.R. § 351.225(k)(2)**

Berger argues that "Commerce did not examine any of the (k)(2) factors" and that the failure to do so "renders its *Scope Ruling* as unsupported by substantial evidence." Berger Br. at 57. But Commerce only moves to an analysis under 19 C.F.R. § 351.225(k)(2)(i), "[i]f [Commerce] determines that the sources under paragraph (k)(1) . . . are not dispositive." Here, as detailed above, Commerce found its analysis of the sources under paragraph (k)(1) dispositive as to whether CBM is covered by the scope of the *Order* and was therefore not required to conduct a (k)(2) analysis. APPX00471, APPX00477. Accordingly, Commerce properly limited its analysis to the (k)(1) sources once it found that those sources were dispositive. 19 C.F.R. § 351.225(k)(2)(i).

Despite this, Berger claims that "in its [scope ruling application], Berger demonstrated that the factors that Commerce is supposed to consider pursuant to the '(k)(2) factors' would cause Berger's CBM to be outside the scope of the *Order.*" Berger Br. at 57. But this argument misstates the law. Because Commerce found the sources under paragraph (k)(1) dispositive, that ended the inquiry, and Commerce did not need to consider the additional (k)(2) factors. 19 C.F.R. § 351.225(k)(2)(i). Indeed, as the trial court held, "[c]ontrary to plaintiff's interpretation, the regulation did not require Commerce to address the (k)(2) factors separately or individually." APPX00022.

Whether the (k)(2) factors support Berger's contention is ultimately irrelevant and does not detract from Commerce's determination that CBM is subject to the scope of the *Order*. Commerce properly followed the analytical framework and procedures set forth in its regulations. 19 C.F.R. § 351.225; *see also Shenyang Yuanda Aluminum Indus. Eng'g Co.*, 776 F.3d at 1359 (finding that when Commerce finds that (k)(1) factors are dispositive, it is proper to decline a (k)(2) analysis); *Saha Thai Steel*, 101 F.4th at 1325 (same). Accordingly, this Court, like the trial court, should reject Berger's argument that Commerce was required to conduct an analysis of the (k)(2) factors.

Finally, Berger argues that Commerce "seems to be confusing k(1) factors with the k(2) that it did not reach as part of its supposed analysis" and that "there is no 'use' requirement expressly stated in the scope." Berger Br. at 47. Berger further argues that "end-use restrictions" are disfavored, and discusses the specific language Commerce employs when it "intends to impose" such restrictions. *Id.* Berger's argument is erroneous, however, because Commerce did not find that the scope of the *Order* has end-use restrictions. Rather, as discussed at length above, Commerce considered whether CBM falls within the scope of the *Order* based on the plain language of the scope as well as other primary interpretive (k)(1) sources, and not end-use restrictions. APPX00471-APPX00477. Because these sources focus in-part on whether the artist canvas contains a priming/coating layer that increases the receptivity of the canvas to artist materials, Commerce appropriately considered

statements Berger made describing how CBM is used and marketed. *Id.* Commerce found that Berger's statements explaining that CBM is a canvas that is used for art reproduction, along with other record evidence, support a finding that CBM is a "canvas roll and/or printable canvas that is primed/coated and is a woven prepared painting and/or printing surface" within the scope of the *Order.* APPX00472.

Commerce appropriately considered Berger's statements as relevant record evidence in determining whether CBM is covered by the scope language coupled with the 19 C.F.R. § 351.225(k)(1) sources. In so doing, Commerce did not, as Berger argues, wrongly read an end-use restriction into the scope or otherwise confuse the (k)(1) and (k)(2) factors. Rather, as the trial court stated, "[t]he 'sources' identified in § 351.225(k)(1) and the 'factors' identified in § 351.225(k)(2) are not mutually exclusive." APPX00021. Commerce considered "information that [Berger] itself provided in seeking a scope ruling, considered 'physical characteristics,' 'ultimate' uses, and marketing material" which are "factors specifically identified in subsection (k)(2) *but also within the ambit of the 'sources' specified in subparagraph (k)(1).*" *Id.* (emphasis added). As the trial court concluded, "[n]othing in the regulation precluded Commerce from doing so." *Id.* On the contrary, 19 C.F.R. § 351.225(k)(1)(ii) authorizes Commerce to consider "any other relevant record evidence." Accordingly, here, as the trial court reasoned:

> Relevant record evidence necessarily would include the evidence
> provided in the Scope Ruling Application itself. In this instance,
> such evidence supported various critical findings, including

findings that [CBM] is a "canvas," that it has "priming/coating" that imparts stiffness, whiteness, and opacity, and that "art reproduction" is among the "[w]idely, publicly known uses" of the product. Based on the record evidence considered as a whole, which was obtained from "sources" described in § 351.225(k)(1) and which also pertained to "factors" described in § 351.225(k)(2), Commerce concluded that this product is a "printable" canvas and permissibly reached the ultimate conclusion that it is an artist canvas within the scope of the Order.

APPX00022 (emphasis in original). Thus, Commerce's analysis under 19 C.F.R. § 351.225(k)(1), including evidence also related to (k)(2) factors, was supported by substantial evidence and in accordance with law. This Court should therefore affirm the trial court's judgment that a (k)(2) analysis was not required.

## III. Commerce Did Not Unlawfully Expand the Scope of the *Order*

Berger argues that Commerce's determination is unlawful because "when read in the entirety, the plain meaning and context of the reference 'designed to promote the adherence of artist materials' in the scope language compels a narrow interpretation of the words 'priming/coating.'" Berger Br. at 13-14. With little explanation, Berger asserts that Commerce's interpretation renders the priming/coating clause in scope language "mere surplusage." *Id.* at 12, 32. However, Commerce did not interpret the scope in a manner that is contrary to its terms, change the scope of the *Order*, nor render any scope language nonessential. Rather, Commerce analyzed the scope language and prior scope rulings, and "carefully considered the information presented by [Berger] and [] determined that the scope contains language that includes, or 'may be reasonably interpreted to include,'

32

[CBM]." APPX00467 (quoting *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1089 (Fed. Cir. 2002)). Commerce's interpretation of the term "adherence" was also further "consistent with how Commerce and the ITC have interpreted this term throughout the history of this proceeding." APPP00466-APPX00467.

Berger's scope expansion argument confuses both the record and the law. To the extent Berger argues that Commerce was required to rely on dictionary definitions to interpret the meaning of the words "promote" and "adherence," Berger is incorrect. *See* Berger Br. at 19. On the contrary, under the relevant regulation, Commerce "may" make its determination on scope language alone but is also empowered to consider primary interpretive sources at its discretion. *See* 19 C.F.R. § 351.225(k)(1)(i). As set forth in the 2021 update to the applicable regulations, the regulatory structure reflects "Commerce's understanding that the sources listed in current 19 C.F.R. § 351.225(k)(1) were always intended to be interpretive tools to understand the plain meaning of the scope, recognizing that terms that may have been plain at the time they were drafted and adopted upon the issuance of the order could be interpreted differently at some later point." *Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws,* 86 Fed. Reg. 52,300, 52,322-23 (Dep't of Commerce Sept. 20, 2021). Consequently, Commerce lawfully relied on the ITC Report and prior scope rulings in this case to interpret the plain meaning of the scope.

Commerce also correctly elevated primary interpretive sources above other secondary sources, like dictionary definitions. *See* 19 C.F.R. § 351.225(k)(1)(ii) (providing that "primary interpretive sources will normally govern in determining whether a product is covered by the scope of the order at issue"). Even though Berger cites dictionary definitions, Berger does not apply those definitions to this case, nor does it explain why Commerce's analysis in this case contravened those definitions. Moreover, Berger fails to convey why those dictionary definitions are more probative of industry usage than the (k)(1) sources that Commerce examined in this case. *See* Berger Br. at 18-20. Regardless, Commerce has never relied on such definitions to interpret the *Order*, and thus they are secondary interpretive sources that would give way to primary interpretive sources in the event of a conflict. *See* APPX00474.

Berger asserts that "Commerce stated that Berger's CBM is within the scope of the *Order* because the 'CBM is a canvas roll and/or printable canvas that is primed/coated and is a woven *prepared painting and/or printing surface ...* that the primed/coated side of the fabric *is receptive to artist materials, consistent with our prior scope rulings*" and that as a result "Commerce shifts the language away (unlawfully *expands* the Order) from the language of the Order and that of the intent of the Tara." Berger Br. at 15 (emphasis in original). This is incorrect. Commerce did not unlawfully expand the *Order* simply because it relied on (k)(1) sources to interpret the plain language of the scope as it relates to the priming/coating requirement. Instead,

Commerce followed the regulations and properly used these sources under 19 C.F.R. § 351.225(k)(1) to *interpret*, not *expand*, the *Order*.

To further support its expansion argument, Berger claims that Commerce exchanged the term "adherence" with "receptive/receptivity terms as physical characteristics" in the previous scope rulings, that is, the Impact Images Scope Ruling, the Global Textile Scope Ruling, the Permalite Scope Ruling, and the RV Print Scope Ruling. Berger Br. at 20-26. Berger also argues that "Tara contributed to the scope creep with its own scope ruling in 2015 . . . [because] Tara did not distinguish the acrylic latex 'gesso' bottom 'adherence' priming/coating from that of the ink receptive top coat as described in the *Order*." *Id.* at 26-27. Berger then claims that "according to the history and the scope of the Order, there are two distinct coating types (bottom versus top) with distinct physical characteristics ('gesso' 'adherence' versus 'receptive')" without further explanation or citation to record evidence. *Id.* at 28. However, Commerce did not impermissibly interchange the term adherence with any other terms. Instead, Commerce properly *interpreted* the term "adherence" using the relevant (k)(1) sources.

Furthermore, Berger's argument that Commerce's prior scope rulings are unlawful are unavailing. The question that was before the trial court and now before this Court is whether Commerce's determination that CBM is within the scope of the *Order* is supported by substantial evidence and the governing regulatory framework, not whether previous scope rulings were unlawful. And because the prior scope

rulings are primary interpretive sources under 19 C.F.R. § 351.225(k)(1), Commerce was entitled to rely on those scope rulings and other evidence such as the ITC Final Report to interpret the scope language. Importantly, Commerce noted that "[n]either [Berger] nor any other party challenged Commerce's findings in those [prior] scope rulings." APPX00474. The trial court also appropriately dismissed this argument when it held that "[Berger] does not make a prima facie case that the (k)(1) sources were somehow 'misapplied.'" APPX00018. Although "[Berger] disagrees with several of the prior scope rulings Commerce cited… its disagreement does not, by itself, invalidate those rulings as (k)(1) sources." *Id.*

Unconvincingly, Berger makes a slippery slope argument, positing that "[i]f Commerce expands the scope of the *Order* by basing its scope analysis on additional characteristics concerning the acrylic latex 'gesso' bottom 'adherence' priming/coating, then legitimately produced coated fabric products face the inevitable 'scope creep.'" *See* Berger Br. at 29. Berger argues that "past rulings and reliance upon § 351.225(k)(1) cannot save a scope determination that is based on an unreasonable interpretation of the scope language." *See id.* at 32 (quoting *Whirlpool Corp. v. United States*, 144 F. Supp. 3d 1296, 1303 (Ct. Int'l Trade 2016)). But as set forth above and as affirmed by the trial court, Berger's wrongly asserts that Commerce cannot rely on (k)(1) sources to interpret the *Order*'s plain language. As Commerce explained, "contrary to what [Berger] appears to argue in this case, past interpretive rulings on whether a product falls within the scope do not result in an

increasingly vague scope *but instead provide additional clarity* to any areas where the scope may not be sufficiently clear as it relates to certain merchandise." APPX00466 (emphasis added).

Berger asks instead that this Court infer that Commerce added new characteristics to the scope by referencing pictures of canvas "similar to Tara's acrylic coated fabric" that purportedly would be subject to the *Order*. *See* Berger Br. at 29-31. But as an initial matter, these pictures are not on the record. And because these pictures were not on the record before Commerce, this Court should decline to consider this extra-record evidence. *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009) (explaining that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court" (citation omitted)).

But even if the Court were to consider the pictures, Berger fails to explain the relevance of the pictures to the scope ruling. Commerce made no determination regarding whether products other than CBM would be subject to the scope of the *Order* and, therefore, Berger's speculation that other products would necessarily be covered is not supported in the record. In *Adams Thermal Sys., Inc. v. United States*, 279 F. Supp. 3d 1195 (Ct. Int'l Trade 2017), the CIT rejected a similar argument, holding that "[i]n the administrative proceeding giving rise to [that] case, the Department's responsibility was to decide whether the [inquiry merchandise] [was] within the scope of the Orders. Commerce was not required to announce an interpretation resolving

future questions as to that scope, and the Final Scope Ruling did not do so." *See id.* at 1207–08. This Court should likewise reject Berger's improper backdoor argument.

Finally, Berger claims that "neither Tara, nor the agencies discussed the meaning of neither 'promote' nor 'adherence' as it pertains to the scope of the *Order*." Berger Br. at 18-19. But this is not correct. In the Final Scope Ruling, Commerce stated:

> [W]e note that the ITC and our prior scope rulings have not interpreted "adherence" so narrowly. The ITC stated that "[a]rtists' canvas is a surface for the graphic presentation of painted or printed images. It is made from woven fabric that is primed and coated ('gessoed') *to accept* paints or inks and is sold in a variety of shapes, sizes, textures, and formats." Although the ITC used primed/coated and "gessoed" interchangeably, the focus is notably on preparing the fabric "to accept" paints or inks and on creating "a surface for the graphic presentation of painted or printed images."

APPX00473 (citations omitted). Further, Commerce explained that:

> While [Berger] presents a definition of adherence, it does not identify any segment of this proceeding in which Commerce adopted this definition. Rather, Commerce has determined that priming/coating (*i.e.*, gessoing) a fabric to accept artist materials is "understood to be synonymous with the priming/coating material or the application thereof, which promotes the adherence of artist materials." Commerce further explained that gesso "improves the receptivity of canvas to paint or other artistic materials, which helps clarify the scope's reference to priming or coating with a solution "designed to promote the adherence of artist materials." . . . Therefore, the 19 CFR 351.225(k)(1) materials demonstrate that Commerce and the ITC have defined "promote the adherence" of artist materials to mean "allow for acceptance of," "improve[] the receptivity of canvas to," or "increase[] the canvas' receptivity to" artist materials.

APPX00474 (citations omitted).  Thus, record evidence shows that Commerce explicitly discussed the meaning of "promote" and "adherence" as they pertain to the scope.  *Id.*

Contrary to Berger's claims, Commerce's interpretation did not change the scope of the *Order*, nor did Commerce interpret the scope contrary to its terms.  *See, e.g.*, *Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1072 (Fed. Cir. 2001).  Commerce found that the *Order*'s scope "contain[s] language that specifically includes the subject merchandise or may be reasonably interpreted to include it."  *See Duferco Steel*, 296 F.3d at 1094-95.  Consequently, this Court should uphold the trial court's judgment that Commerce's interpretation of the scope and its determination that CBM is covered by the language of the *Order* was reasonable and did not unlawfully expand the *Order*.

## IV.    The *Order* is Not Void-For-Vagueness, Nor Did the *Order* Deny Berger Adequate Notice or Otherwise Deprive Berger of Due Process

Finally, Berger claims that "Commerce's interpretations of the *Order* raise serious due process concerns because such vague and open-ended language has caused absurd results in antidumping duties being imposed on importers without adequate notice."  *See* Berger Br. at 33.  As the trial court held, this claim is wholly without merit.  As discussed throughout this brief, Commerce has consistently looked to the plain language of the scope, in conjunction with prior scope rulings and ITC determinations to clarify, interpret, and apply the plain language of the scope of the

*Order*. Berger cannot demonstrate, and the record does not support, that Berger was deprived of either adequate notice or due process.

To start, the *Order* is neither vague nor open-ended. The language of the *Order* clearly sets forth what merchandise is covered by the scope. Further, Berger does not substantiate its vagueness claim but instead simply concludes that, because Berger sought clarification as to whether CBM is covered by the *Order*, the language of the *Order* must, then, be vague. As support for this circular logic, Berger relies on hypothetical products that Berger purports *could* be subject to the *Order*, therefore leading to "absurd results." *See* Berger Br. at 29-31. But these hypothetical products are not relevant to this case and should not be considered.

As to the issue of adequate notice, Commerce's regulations specifically notify the public how to request a scope ruling when a question arises as to whether a specific product is covered by the *Order*. *See* 19 C.F.R. § 351.225. The Court need look no further than to the fact that Berger availed itself of this process. As Commerce explained, "while the scope of an order is always intended to be as clear and well defined as possible, over time, questions may arise about whether a specific product falls within the scope." APPX00466. Parties like Berger may use the scope inquiry mechanism, for the express purpose of determining whether their product is subject to the scope of an order. *Id*.

As the trial court stated, "to the extent [Berger], after considering the scope language, was still in doubt as to whether its product was within the scope of the

Order, it [could] resort to the scope ruling procedure…of which it availed itself."
APPX00023.  Berger wrongly asserts that "[t]he [trial court] seems to believe that
Berger availing itself to a scope ruling procedure somehow cured vagueness
concerns."  Berger Br. at 34.  Despite Berger's characterization, the trial court did not
conclude the *Order* was not vague merely because Commerce's regulations provide for
a scope inquiry process, but rather, even though there is an ambiguous sentence in the
scope language, the trial court found that "when considered in light of the scope
language on the whole, [that sentence] is insufficient to render the entire scope
language unconstitutionally vague and…a denial of due process."  APPX00023.  The
trial court held that "[w]hile the sentence could have been drafted to be more precise,
*the scope language on the whole* is sufficiently detailed and descriptive that anyone
importing [CBM], or a similar product, *was on notice* that such a product reasonably
could be considered to be subject merchandise."  *Id.* (emphasis added).

Commerce analyzed the scope language coupled with the 19 C.F.R.
§ 351.225(k)(1) sources in prior scope rulings pertaining to this *Order*.  APPX00461-
APPX-00464.  As Commerce explained, "[n]either Berger nor any other party
challenged Commerce's findings in those scope rulings."  APPX00466.  Therefore, in
accordance with 19 C.F.R. § 351.225(k)(1)(c), Commerce considered those rulings in
determining whether CBM is subject to the *Order*.  APPX00466.  Commerce properly
considered the interpretive sources under the regulation and "carefully considered the
information presented by [Berger] and . . . determined that the scope contains

41

language that includes, or 'may be reasonably interpreted to include,'" CBM. *Id.*

Commerce's determination as to the meaning of "adherence" was "consistent with how Commerce and the ITC have interpreted this term throughout the history of this proceeding." *Id.* Accordingly, Commerce's interpretation of adherence was neither arbitrary nor capricious, and all "interested parties [were] afforded 'fair warning of what is proscribed.'" *Id.*

Berger availed itself of the opportunity to request that Commerce determine whether its product is subject to the *Order*, and to present arguments and evidence supporting its position through filing its scope ruling application. Berger's application clearly demonstrates that it was on notice that its product could be subject to the *Order*. Commerce's Final Scope Ruling therefore did not deprive regulated parties of "fair warning of the conduct [that the order at issue] prohibits or requires," and is thus not the appropriate target for a due process claim. *See Mid Continent Nail*, 725 F.3d at 1300-1301 (citing *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012)). Commerce appropriately relied on the language of the *Order*, which it found covers CBM. APPX00471; *see also Duferco Steel*, 296 F.3d at 1094-95 (observing that courts grant Commerce substantial deference in interpreting its own orders, provided the orders "contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it").

Additionally, any argument that Commerce's determination raises due process concerns by depriving parties adequate notice is undermined by the fact that this

scope ruling is consistent with Commerce's interpretation in prior scope rulings, which Berger even argues advanced a similar (though allegedly "unlawful") interpretation of the scope. APPX00471-APPX00477; *see generally* Berger Br. at 20-33.

Berger fails to demonstrate that Commerce deprived Berger of due process in the scope proceedings. Berger relies on cases like *Allegheny Bradford Corp. v. United States*, 342 F. Supp. 2d 1172, 1190-1191 (Ct. Int'l Trade 2004), to support its position. Berger Br. at 37. In *Allegheny Bradford*, the trial court found that Commerce improperly interpreted the scope of an order contrary to its terms by finding merchandise subject to the order whose edges were not beveled but where the scope plainly applied to merchandise with beveled edges. 342 F. Supp. 2d at 1190-1191. Here, Commerce did not interpret the scope language contrary to its plain language nor did Commerce "nullify portions of an order's scope language which would otherwise exclude a plaintiff's product." *See id.* at 1190. Instead, Commerce properly found CBM subject to the *Order* by looking at the scope language which plainly covers "artist canvases . . . that have been primed/coated." APPX00459. Accordingly, Commerce's scope rulings and *Order* in this case are unlike *Allegheny Bradford*, and ultimately provided fair notice to parties as to the applicability of the *Order* to its product.

Berger also cites *Tai-Ao Aluminum (Taishan) Co. v. United States*, 983 F.3d 487, 495 (Fed. Cir. 2020), to stand for the proposition that an agency must "provide regulated parties fair warning of the conduct [the order or regulation] prohibits or

requires" to no avail. *See* Berger Br. at 35. This case is also inapplicable. *Tai-Ao* involved a circumvention inquiry in which the Court found that Commerce failed to properly notify a party in the initiation notice that it was subject to the inquiry and thus it was not until preliminary determination that Commerce could suspend liquidation based on its affirmative finding. 983 F.3d at 495. But here, Commerce properly placed all parties on notice of the *Order*'s applicability through its publication in the *Federal Register*, thereby clearly setting forth in the scope language what merchandise is subject to the *Order*. APPX00458; *see also Order*.

In *Adams Thermal Systems*, the CIT rejected a similar argument set forth by a party arguing that the *Order*, as a result of a scope ruling, was unlawful for vagueness and lack of notice or due process. 279 F. Supp. 3d at 1207-08. In that case, the trial court rejected the plaintiff's argument as unavailing because "Commerce did not base the Final Scope Ruling on an unreasonable or impermissibly broad interpretation of the scope language." *Adams Thermal Systems*, 279 F. Supp. 3d at 1208 (discussing *ArcelorMittal Stainless Belg. N.V. v. United States*, 694 F.3d 82 (Fed. Cir. 2012)). Berger advances the same argument here but fares no better. Commerce did not base its determination on an "unreasonable or impermissibly broad interpretation" of the language in the *Order*. *Id.* The trial court correctly held that the scope language is sufficiently detailed and descriptive that a party importing CBM was on notice it could be subject to the order. APPX00023. Accordingly, Commerce's application of the

scope language to CBM was reasonable, and, therefore, did not hinder Berger's due process.

## CONCLUSION

For these reasons, the judgment of the trial court should be affirmed.

Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney General*

PATRICIA M. McCARTHY
*Director*

/s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
*Assistant Director*

*Of Counsel:*

/s/ Christopher A. Berridge
JOSEPH GROSSMAN-TRAWICK          CHRISTOPHER A. BERRIDGE
*Office of the Chief Counsel for Trade*     *Trial Attorney*
*Enforcement and Compliance*         *Commercial Litigation Branch*
*U.S. Department of Commerce*        *Civil Division*
*U.S. Department of Justice*
*P.O. Box 480, Ben Franklin Station*
*Washington, DC 20044*
*(202) 598-7392*
May 5, 2025                      *Christopher.Berridge@usdoj.gov*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,857 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Christopher A. Berridge*
CHRISTOPHER A. BERRIDGE