NO. 25-1213

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

**PRINTING TEXTILES, LLC, dba Berger Textiles,**
Plaintiff-Appellant

v.

**UNITED STATES, ECKER TEXTILES, LLC,**
Defendants-Appellees

George W. Thompson
Thompson & Associates, PLLC
1638 R Street, NW
Suite 312
Washington, DC 20009
Telephone: 202-413-1564

Counsel for Defendant Appellee

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 25-1213 |
| **Short Case Caption** | Printing Textiles, LLC v. US |
| **Filing Party/Entity** | Ecker Textiles, LLC |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/05/2025

Signature: /s/ George W. Thompson

Name: George W. Thompson

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Ecker Textiles, LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable          ☐ Additional pages attached

|  |  |  |
|--|--|--|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below)    ☑ No    ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable          ☐ Additional pages attached

|  |  |  |
|--|--|--|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

Certificate of Interest ................................................................. i
Statement of the Issues ...........................................................1
Summary of the Argument ......................................................1
Argument .................................................................................3
A. Scope and Standard of Review ...........................................3
B. CBM Qualifies as Artist Canvas as Defined by the Order ................. 4
C. The Commerce Department Correctly Determined that CBM Is In-Scope Merchandise ……............................................... 10
D. CBM Is Coated with an Ink Receptive Solution Within the Order's Coverage ............................................... 17
E. The CBM Scope Ruling Is Supported by Substantial Evidence .......... 19
F. The Scope Does Not Require that Imported Artist Canvas Be Made with the Same Materials and Processes as those of the Domestic Industry ................................................... 28
G. Conclusion ..................................................................... 33

# TABLE OF AUTHORITIES

## Judicial Decisions

*Dupont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215
(Fed. Cir. 2005) .................................................................. 2

*Fedmet Res. Corp. v. United States*, 755 F.3d 912 (Fed. Cir. 2014) .................. 10

*Global Commodity Group LLC v. United States*, 709 F.3d 1134
(Fed. Cir. 2013)................................................................... 2

*Huaiyin Foreign Trade Corp. v. United States,* 322 F.3d 1369
(Fed. Cir. 2003)................................................................... 22

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927
(Fed. Cir. 1984) .................................................................. 24

*Saha Thai Steel Pipe Public Company Limited v. United States*,
101 F.4th 1310, 1322-23 (Fed. Cir. 2024) ....................................... 3, 20,
                                                                30

*Siemens Energy, Inc. v. United States*, 992 F. Supp. 2d 1315
(Ct. Int'l Trade 2014) ........................................................... 22-23

*Sunpreme Inc. v. United States*, 946 F.3d 1300, 1309 (Fed. Cir. 2020) ............ 4, 30

## Statutes/ Regulations

19 C.F.R. §§ 351.225(c)(2)(i) .................................................... 28
19 C.F.R. § 351.225(k)(1) ....................................................... 18-19
19 C.F.R. § 351.225(k)(2) ......................................... ..................18

## Administrative Decisions & Publications

*Certain Artist Canvas from the People's Republic of China: Continuation
of the Antidumping Duty Order*, 82 Fed. Reg. 14,502 (March 21, 2017) ........ 8

Final Scope Ruling on the Antidumping Duty Order on Certain Artist
Canvas from the People's Republic of China: Berger Textiles'
Canvas Banner Matisse ("CBM Scope Ruling") on August 15, 2023............... passim

This Response Brief is filed on behalf of Defendant-Appellee Ecker Textiles, LLC ("Ecker Textiles"). Ecker Textiles is a manufacturer of the domestic like product. It is the successor in interest to the petitioner in the antidumping investigation, Tara Materials, Inc., as it purchased the assets of that company. Ecker Textiles participated in the administrative proceedings which resulted in the challenged scope determination and in the Court of International Trade ("trial court") proceedings.

For the reasons set forth below, Ecker Textiles requests this Court to affirm the trial court's judgment.

## STATEMENT OF THE ISSUES

Ecker Textiles disagrees with the Statement of the Issues provided in Plaintiff-Appellant Printing Textiles, LLC, dba Berger Textiles ("Berger Textiles") brief, and instead provides the following issue statement.

1.      Whether the Commerce Department's determination in the Final Scope Ruling on the Antidumping Duty Order on Certain Artist Canvas from the People's Republic of China: Berger Textiles' Canvas Banner Matisse (Aug. 15, 2023) that Berger Textiles' product denominated as Canvas Banner Matisse ("CBM") is within the scope of the antidumping duty order on Certain Artist Canvas from the People's Republic of China ("the Order") is supported by substantial evidence and otherwise in accordance with law.

## SUMMARY OF ARGUMENT

1.      The scope of the Order describes "artist canvases regardless of dimension and/or size, whether assembled or unassembled, that have been primed/coated, whether or not

made from cotton, whether or not archival, whether bleached or unbleached, and whether or not containing an ink receptive top coat. Priming/coating includes the application of a solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric." CBM meets this description. It is a fabric which has been primed/coated with a solution designed to promote the adherence of artist materials. Information submitted with Berger Textiles' scope request establish that CBM is intended for use as printing canvas. The plain language of the Order thus applies to the product.

2.      Berger Textiles' argument that an ink receptive priming solution is a prerequisite for coverage is contradicted by the plain language of the Order. A product is covered if it is coated with "solution designed to promote the adherence of artist materials." CBM has such a coating, and consequently is within the order's scope.

3.      The scope language does not support Berger Textiles' argument that CBM must be made of the same materials, and with the same processes, as employed by the domestic industry in producing the domestic like product. As long as a product consists of canvas coated with "solution designed to promote the adherence of artist materials" it is covered.

4.      The Court of International Trade correctly concluded that the Commerce Department's Scope Ruling that Canvas Banner Matisse is within the scope of the order is supported by substantial evidence and otherwise in accordance with law.

# ARGUMENT

## A.    Scope and Standard of Review

This Court explained the scope and standard of review it applies to appeals of

Commerce scope determinations in *Saha Thai Steel Pipe Public Company Limited v.*

*United States*, 101 F.4th 1310, 1322-23 (Fed. Cir. 2024):

> We review the Court of International Trade's decisions de novo, applying the
> same standard of review used by the Court of International Trade in reviewing
> Commerce's scope rulings. Shenyang Yuanda Aluminum Indus. Eng'g Co. v.
> United States, 776 F.3d 1351, 1354 (Fed. Cir. 2015). We affirm Commerce's
> scope ruling unless it is "unsupported by substantial evidence on the record, or
> otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial
> evidence means such relevant evidence that a reasonable mind may accept as
> adequate to support a conclusion. Eckstrom Indus., Inc. v. United States, 254 F.3d
> 1068, 1071 (Fed. Cir. 2001).
>
> In our review, we accord deference to Commerce's own interpretation of its
> antidumping duty orders. King Supply Co. v. United States, 674 F.3d 1343, 1348
> (Fed. Cir. 2012). This deference is appropriate because determinations as to the
> meaning and scope of antidumping duty orders are matters "particularly within
> the expertise" of Commerce and its "special competence." *Id*. (quoting Sandvik
> Steel Co. v. United States, 164 F.3d 596, 600 (Fed. Cir. 1998)). Our caselaw has
> also recognized that in conducting our review, we pay due respect to and "will not
> ignore the informed opinion of the Court of International Trade." Suramerica de
> Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 983 (Fed. Cir. 1994);
> see Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006).
>
> Under the substantial evidence review standard, even if an inconsistent conclusion
> could be drawn from the record, "such a possibility does not prevent Commerce's
> determination from being supported by substantial evidence." Am. Silicon Techs.
> v. United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001). A party challenging
> Commerce's scope ruling under the substantial evidence standard "has chosen a
> course with a high barrier to reversal." King Supply, 674 F.3d at 1348 (quoting
> Nippon Steel, 458 F.3d at 1352).

This Court also has provided guidance regarding the protocols which apply for

Commerce determinations regarding the scope of antidumping and countervailing duty

orders. In *Sunpreme Inc. v. United States*, 946 F.3d 1300, 1309 (Fed. Cir. 2020), it

directed that:

> . . . the analysis for Commerce's scope rulings is governed by its regulations at 19 C.F.R. § 351.225. "Commerce must first examine the language of the final order." Mid Continent Nail Corp. v. United States, 725 F.3d 1295, 1302 (Fed. Cir. 2013). If the language is unclear, then Commerce must turn to available (k)(1) sources, including the petition, the initial investigation, and any earlier determinations by Commerce and the ITC. Id.; 19 C.F.R. § 351.225(k)(1). If the matter remains unresolved, Commerce must turn to available (k)(2) sources, including the product's physical characteristics, ultimate purchasers' expectations, the product's ultimate use, the channels of trade in which the product is sold, and the way the product is marketed. Mid Continent, 725 F.3d at 1302; 19 C.F.R. § 351.225(k)(2).

## B. CBM Qualifies as Artist Canvas as Defined by the Order

The Order, as amended, has the following coverage:

> The products covered by this order are artist canvases regardless of dimension and/or size, whether assembled or unassembled, that have been primed/coated, whether or not made from cotton, whether or not archival, whether bleached or unbleached, and whether or not containing an ink receptive top coat. Priming/coating includes the application of a solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric. Artist canvases (i.e., prestretched canvases, canvas panels, canvas pads, canvas rolls (including bulk rolls that have been primed), printable canvases, floor cloths, and placemats) are tightly woven prepared painting and/or printing surfaces. Artist canvas and stretcher strips (whether or not made of wood and whether or not assembled) included within a kit or set are covered by this proceeding.

> Artist canvases subject to this order are currently classifiable under subheadings 5901.90.20.00, 5901.90.40.00, 5903.90.2500, 5903.90.2000, 5903.90.1000, 5907 .00.8090, 5907.00.8010, and 5907 .00.6000 of the Harmonized Tariff Schedule of the United States ("HTSUS"). Specifically excluded from the scope of this order are tracing cloths, "paint by number" or "paint-it-yourself" artist canvases with a copyrighted preprinted outline, pattern, or design, whether or not included in a painting set or kit.[5] Also excluded are stretcher strips, whether or not made from wood, so long as they are not incorporated into artist canvases or sold as part of an

artist canvas kit or set. While the HTS US subheadings are provided for convenience and customs purposes, our written description of the scope of this proceeding is dispositive.

Additionally, we have determined that canvas woven and primed in India, *Sunset Review of the Antidumping Duty Order.* 82 FR 8723 January 30. 2017). *See Notice of Scope Rulings.* 75 FR 14138 (March 24, 2010).
[5].Artist canvases with a non-copyrighted preprinted outline, pattern, or design are included in the scope, whether or not included in a painting set or kit.

*Certain Artist Canvas from the People's Republic of China: Continuation of the*

*Antidumping Duty Order*, 82 Fed. Reg. 14,502 (March 21, 2017).

The requirements for a product's coverage are clearly specified. To qualify as a an "artist canvas," an article must "have been primed/coated." The use of the "/" symbol between the words "primed" and "coated" indicates the words are used in the disjunctive. See, e.g., https://www.grammarly.com/blog/slash/ (last visited April 30, 2025).[1] Such "Priming/coating includes the application of a solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric." The result is a "tightly woven prepared painting and/or printing surface[ ]." A qualifying article is

---

[1] The cited reference states:

Often, when a slash is used in a formal or informal text, it is meant to indicate the word *or*. The examples below illustrate this meaning of the forward slash:

Example     When leaving the classroom, the teacher noticed that a student had left his/her backpack.
Example     College freshmen should bring a mattress and/or cot to sleep on during orientation.
Example     If/when Mary ever shows up, we can all head out to the party together.
Example     Burgers or pizza for dinner? Yeah, either/or is fine with me.

covered whether or not it has an ink receptive topcoat.

The reference to "primed/coated" means that the "solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric," may be applied either as a primary coat ("primer") or subsequent coat.

CBM's status as subject merchandise, and resolution of this appeal, may readily be determined simply by comparing the descriptive language in the Order with Berger Textile's own product description in its scope application and subsequent submissions to Commerce.

The scope request included the following product description:

> The Canvas Banner Matisse ("CBM") of the scope ruling request is 600 denier 100% polyester fabric woven (i.e., warp and weft) filament fiber, weighing approximately 270 GSM, that has been coated with polyvinyl acetate / acrylate type polymers. One side of the fabric has been coated and is visible to the naked eye. The coated side has hydrophobic sealing and fireproof agents. The bottom priming/coating does not promote the adherence of artistic materials.

Appendix ("APPX") 00036. The request explained that "The production process uses numerous raw materials – polyester (poly ethylene terephthalate) fabric woven (i.e., warp and weft) filament fiber, polyvinyl acetate / acrylate type polymers. The process consists of applying multiple coatings to the polyester." APPX 00041. It also asserted that "CBM's technology" uses techniques "where the receiving medium (i.e., priming/coating) is meant for yielding 'a U.V. and water resistant ink jet print'" specified in U.S. Patent 5,853,899. APPX 00042.

The referenced patent explains that "an object of the present invention is to

6

provide a novel recording medium for ink jet recording which is particularly excellent in ink receptivity, sharpness and water resistance." APPX 180-181. Of particular note, it states that "The ink jet recording medium of the present invention comprises a receiving layer which is water resistant and offers long term durability of the printed image, which includes a blend of an ethylene vinylacetate copolymer and a hydrolyzed polyvinyl alcohol." APPX 181.

Commerce unsuccessfully sought additional information from Berger Textiles regarding the purpose of the coating. As explained in the CBM Scope Ruling:

> Commerce asked Berger Textiles, "whether the coating increases receptivity to any artist materials…." In response, Berger Textiles only stated that "top coat in {sic} receptivity is not a requirement of the *Order*. In terms of {the} 'promoting the adherence' requirement…the bottom priming/coating does not 'promote the adherence' of the inks." Additionally, when asked whether CBM is primarily used for the application of print or artistic materials, Berger Textiles answered that it "cannot speculate what side is ultimately printed on by customers." Furthermore, when asked whether CBM's priming/coating layer aids the receptivity of latex, UV, and solvent inks, Berger Textiles again stated that ink receptivity is not required by the *Order* and that ink applications are end-use dependent.

APPX 475.

The CBM Scope ruling request included the following additional information regarding the product's attributes and uses.

Berger Textiles' marketing materials described the product as a canvas for printing. For example, the data sheet in Attachment 10 of the CBM Scope Request stated:

> Applications:
> Roll up Display Systems

Display X-Kite Systems
banners
Textile wallpaper
art reproduction
stretched canvas
Topseller! Matt economy canvas for art
reproduction, roll-ups, banners etc. /
Important for Latex-print: glossy print with
high color brilliance, water- &
scratch-resistance better than with 4446-56

The "Product Data" document, also in Attachment 10, identified the product's

applications as:

canvas frames / art reproduction

roll up display systems
wall covering
banners

It also included this graphic:



APPX 000182-185. Berger Textiles' own documents thus establish that CBM is a coated

canvas with (in the patent's words) "a receiving layer" and "is excellent in ink

receptivity." The product is based on an invention for improved printing on ink jet

printers. It is marketed as print canvas. In light of these characteristics, which Berger

Textiles' own documents presented, the product meets with exactitude the terms for

coverage in the scope language: "artist canvases . . . that have been primed/coated" in

which the ... "Priming/coating includes the application of a solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric."

Rather than acknowledge CBM's perfect fit with the Order's terms, Berger Textiles presented Commerce with two tests purporting to show that the product provides inferior ink receptivity to that of uncoated canvas. The tests do no such thing. The statement of Ray A. Work discloses that the testing was performed on CBM's substrate (the so-called "bottom coat"), not its ink receiving layer.

Dr. Work describes the product he tested as "a primed (bottom coat) 100% polyester canvas." He conducted "testing to determine if the priming (bottom coating) promotes the 'adherence of ink, both the unprimed (uncoated) side and the primed (bottom coated) side of the canvases were printed and tested." Thus, contrary to the impression that Berger Textiles has sought to create, the testing was not performed on the finished product, but instead on the base layer "required to stiffen the fabric giving it the stiffness properties of a canvas verses (sic) those of a flexible fabric." APPX 149-150.

Dr. Work acknowledged that "The purpose of the top coat added to the primed (bottom coated) side is to hold the pigments up on the surface thereby optimizing print quality, color, and to enhance water resistance." Because Dr. Work did not test the ink receptive coating layer, his conclusions regarding ink adherence to the bottom coat have no bearing on the quality and performance characteristics of CBM, the top coated product.

The crux of Berger Textiles' argument is that because CBM's ink receptivity tested poorly, it does not qualify as print textile. The relevance of the test is nil, however, since it was limited to the substrate and failed to measure the top coat's efficacy. As Dr. Work observed, it is the top coat which improves CBM's quality, color, and water resistance.

The second test, conducted by 20|10 Labs, compared the coated and uncoated sides but provided no guidance on whether it reviewed the bottom coat or top coat, or both APPX 127. If its conclusion that the product showed "worse adhesion on the coated side" when used for latex printing referred to the top coat, it is at odds with both the claims of the patent and Dr. Works' description of the top coat's enhancement of print quality, color, and water resistance. If it refers to the bottom coated side, then it suffers from the same deficiency as Dr. Works' testing results.

Berger Textiles misrepresents that it "has shown through its testing and third-party experts that CBM has a priming/coating and a top coating, neither of which "promote[s] the adherence of artist materials." Dr. Works advised that the top coat "hold[s] the pigments up on the surface", i.e., provides ink adherence. Nowhere does Berger Textiles demonstrate that the top coat does not function as Dr. Works has stated.

## C.    The Commerce Department Correctly Determined that CBM Is In-Scope Merchandise

The CBM Scope Ruling determined that Berger Textiles' CBM is in-scope merchandise.

First, Commerce concluded, "based on the record evidence, that CBM is a canvas

roll and/or printable canvas that is primed/coated and is a woven prepared painting and/or printing surface. Additionally, the record evidence indicates that the primed/coated side of the fabric is receptive to artist materials, consistent with our prior scope rulings . . ." APPX 423. Citing Berger Textiles' own statements, it rejected contradictory assertions that CBM had purposes other than serving as a print medium:

> While Berger Textiles states that the polyester canvas underlying CBM is not for use in art reproduction, record evidence contradicts this argument. As noted above, Berger Textiles repeatedly states that art reproduction is a "{w}idely, publicly known use{}" of CBM. The producer of CBM markets the product for canvas applications, and Berger markets CBM "for art reproduction" and for use as "stretched canvas." Additionally, Berger Textiles identifies CBM as the "top-seller for" latex, UV, and solvent ink application to canvas. Furthermore, Berger Textiles markets CBM as "economy canvas for art reproduction" for use with, but not limited to, "glossy print with high color brilliance." We note that, while Berger Textiles impugns CBM's ability to produce quality art reproduction, the product's quality does not determine whether it is subject to the Order. Based on the above factors, we find that the record contains substantial evidence that Berger Textiles and the producer market CBM for use in art reproduction.

APPX 423-424 (footnotes omitted).

Commerce then determined that the priming/coating on CBM met the requirements for coverage:

> We disagree with Berger Textiles' argument that CBM lacks a priming/coating solution for the purposes of the scope of the *Order*. Specifically, Berger Textiles argues that, because its priming/coating solution is chemically different than that of Ecker Textiles' print canvas, CBM is outside the scope of the *Order*. Berger Textiles contends that Ecker Textiles' specific gesso formula is a requisite component of artist canvas. While Commerce has previously found that the application of gesso is synonymous with priming/coating a canvas, the interchangeable use of the words "gesso" and "priming/coating" does not mean that Ecker Textile's specific gesso formula is the exclusive priming/coating solution required of subject artist canvas. Notably, the scope language does not include the word "gesso" or specify any limitations to the scope based on the

11

particular formula of the priming/coating solution. Indeed, Tara previously acknowledged uncertainty regarding the "processes and materials" that Chinese manufacturers use to produce print canvas. Accordingly, we find that Berger Textiles has not distinguished its priming/coating solution from solutions that cause a fabric to become subject artist canvas.

APPX 424 (footnotes omitted).

Commerce thereafter rebutted the position that the CBM ruling was inconsistent with prior ones issued regarding the Artist Canvas from China order. In particular, Berger Textiles claimed previous rulings established "that gesso that promotes the adherence of artist materials is a requisite component of artist canvas." It submitted "third-party adherence testing results" which "conclude[d] that the CBM priming/coating solution does not promote the adherence of ink, an artist material identified in the scope of the *Order*."

Commerce dispensed with this argument by first noting "the individual examiner admits that the testing results reflect 'subjective qualitative judgement' based 'on whether the adherence of the ink was worse, the same, or better.'" Moreover, the agency had not given the term "adherence" as narrow a meaning as Berger Textiles and its third-party testers sought to, nor did the ruling request "identify any segment of this proceeding in which Commerce adopted this definition." APPX 424.

Surveying previous scope determinations, the ruling observed "Commerce has determined that priming/coating (*i.e.*, gessoing) a fabric to accept artist materials is 'understood to be synonymous with the priming/coating material or the application

thereof, which promotes the adherence of artist materials . . . gesso 'improves the receptivity of canvas to paint or other artistic materials,' which helps clarify the scope's reference to priming or coating with a solution 'designed to promote the adherence of artist materials.'" APPX 425.

In light of the scope language and its interpretation in earlier rulings, Commerce's conclusion was "the 19 CFR 351.225(k)(1) materials demonstrate that Commerce and the ITC have defined 'promote the adherence' of artist materials to mean 'allow for acceptance of,' 'improve{} the receptivity of canvas to,' or 'increase{} the canvas' receptivity to' artist materials." APPX 425 (footnotes omitted.)

Commerce then reviewed the attributes of CBM in light of the order's terms to find that Berger Textiles' product was within the scope.

> Here, record evidence indicates that CBM is marketed for art reproduction and that art reproduction is a "{w}idely, publicly known use{}" of CBM. In fact, the record contains evidence that CBM has a priming/coating layer that increases the canvas' receptivity to artist materials. Specifically, Berger Textiles submitted a patent for "CBM technology," which described "a receiving medium comprising a substrate and an ink receiving layer." The patent states that an "ink receptive coating" is "applied to a substrate such as…canvas," creating a medium "which yields a U.V. and water resistant ink jet print." Although Berger Textiles argues that the "bottom priming/coating does not promote the adherence of artistic materials," there is no requirement in the scope that the priming/coating be located on a specific portion of the artist canvas. Additionally, the patent indicates that the substrate has only one priming/coating layer (i.e., the ink receptive coating), notwithstanding Berger Textile's assertion that there are two (i.e., bottom and top) priming/coating layers. Berger Textiles has not demonstrated that the producer does not apply CBM's priming/coating layer for graphical purposes or that the priming/coating layer does not increase the canvas' receptivity to paint, ink, or other artistic materials. Commerce asked Berger Textiles, "whether the

13

coating increases receptivity to any artist materials…."  In response, Berger
Textiles only stated that "top coat in {sic} receptivity is not a requirement of the
*Order*. In terms of {the} 'promoting the adherence' requirement…the bottom
priming/coating does not 'promote the adherence' of the inks."

APPX 425. Berger Textiles thus failed to provide a factual response to Commerce

regarding the qualities of the top coat's ink receptivity.

Nor did the company address Commerce's inquiry "whether CBM is primarily

used for the application of print or artistic materials" or "whether CBM's

priming/coating layer aids the receptivity of latex, UV, and solvent inks application of

print or artistic materials." Due to this lack of responsiveness, Commerce found "Berger

Textiles has not demonstrated that the producer does not apply CBM's priming/coating

layer for graphical purposes or that the priming/coating layer does not increase the

canvas' receptivity to paint, ink, or other artistic materials."

The trial court determined that Commerce's interpretation was reasonable and

supported by the information of record:

> The court begins by considering the scope language of the Order. The Order
> applies to "artist canvases," a term for which the scope language contains a
> general definition: "Artist canvases . . . are tightly woven prepared painting and/or
> printing surfaces." *Order*, 71 Fed. Reg. at 31,155. By denoting that the term "artist
> canvases" includes products in various forms, the parenthetical following the term
> "[a]rtist canvases"—"(*i.e.*, pre-stretched canvases, canvas panels, canvas pads,
> canvas rolls (including bulk rolls that have been primed), printable canvases, floor
> cloths, and placemats)," *id*.—indicates that the term was intended to have a broad
> meaning.

> Of particular relevance to this case is the mention of "prepared . . . *printing*
> surfaces" in the definition of "artist canvases" and the express inclusion of
> "*printable* canvases" within the scope of the Order. *Id*. (emphases added). Plaintiff
> described "art reproduction" as one of the "[w]idely, publicly known uses" of

14

Canvas Banner Matisse. *Scope Ruling Application* at 4. Using terms contained in the scope language, Commerce stated as findings that Canvas Banner Matisse "is a woven prepared painting and/or printing surface" and "is a canvas roll and/or printable canvas." *Final Scope Ruling* at 15. Commerce summarized its conclusion as follows: "Information placed on the record demonstrates that CBM is an artist canvas, as defined by the language of the scope." *Id.* at 14 (emphasis added by the court).

The Order states that it applies to "artist canvases . . . that have been primed/coated." *Order*, 71 Fed. Reg. at 31,155. In the next sentence, the scope language states that "[p]riming/coating includes the application of a solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric." *Id.* The gist of plaintiff's "scope language" argument is that "CBM has a priming/coating and a top coating, neither of which 'promote[s] the adherence of artist materials.'" Pl.'s Mot. 36. In support of this argument, Printing Textiles cites results of various independent tests conducted on its product by "Dr. Ray Work and 20 | 10 Labs." *Id*. at 33 ("Both experts found that CBM's priming/coating does not 'promote the adherence of artist materials' as detailed in Berger's Scope Request.") (citations omitted). Plaintiff argues that testing demonstrated that the coated side performed the same or worse than the uncoated side with respect to adherence. *Id.* at 33–34 (citation omitted).

The court does not agree with plaintiff's argument that Commerce unreasonably interpreted the scope language. This argument rests on a single sentence in that language: "Priming/coating *includes* the application of a solution, designed to promotethe adherence of artist materials, such as paint or ink, to the fabric." *Order*, 71 Fed. Reg. at 31,155 (emphasis added by the court).

APPX 00009-00010.

In the trial court's view, use of the word "includes" introduced an element of ambiguity, in that it could be interpreted "as limiting the scope to canvases with priming/coating designed to promote the adherence of artist materials" or as "'includes, but is not limited to . . . ,'". Its use, the court stated, "introduces ambiguity as to whether "priming/coating" *must* be designed to promote the adherence of artist materials for a canvas to be included within the scope as an 'artist canvas.'"

Ecker Textiles respectfully disagrees there is any such ambiguity in the scope language. The court's statement apparently stemmed from a belief that CBM lacked a coating to promote adherence of ink.[2] However, as demonstrated in the test report of Dr. Work discussed above, the product does have an ink receptive top coat (which the test did not address.) Both the patent and Dr. Works' statement respectively establish that the top coat promotes adherence of ink, stating respectively that "the present invention relates to an ink jet receiving medium which yields a U.V. and water resistant ink jet print and a process for providing such a U.V. and water resistant ink jet print" and "The purpose of the top coat added to the primed (bottom coated) side is to hold the pigments up on the surface . . ."

In any event, the court upheld Commerce's determination. After quoting the scope ruling's discussion of the qualities imparted by the bottom coating,[3] it concluded that "Plaintiff does not demonstrate that the stiffening, whitening, and opacity do not relate to the use of the product as a surface designed for, and suitable for, the printing of

---

2      Ecker Textiles has based this observation on the court's statement that "The scope language requires for inclusion in the Order that the material 'have been primed/coated. but does not rigidly or unambiguously require that the priming/coating function to promote' adherence of artist materials by increasing the 'adherence' to a level beyond that of untreated material." As Berger Textiles' own supporting documents demonstrate, CBM has been coated with an ink receptive solution which promotes adherence of artist materials.

3      "'CBM is primed/coated 'for the purpose of converting a fabric into a canvas'" and "'[t]he priming/coating 'is required to stiffen the fabric{,} giving it the stiffness properties of a canvas' and 'provides whiteness and higher opacity to the translucent polyester fabric.'"

images using paint or ink, and the Work Declaration provided substantial evidence to support the Department's findings." APP 00012=00013.

**D.     CBM Is Coated with an Ink Receptive Solution within the Order's Coverage**

Instead of addressing the scope language, Berger Textiles' apparent argument is that CBM falls outside the order's coverage because the first chemical coating applied to it supposedly does not promote adherence of ink. Leaving aside that the scope request did not identify any coatings for CBM other than those identified in U.S. Patent 5,853,899, the argument simply ignores the scope's coverage of "artist canvases . . . that have been primed/coated . . . Priming/coating includes the application of a solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric."

Covered products may be primed with "a solution, designed to promote the adherence of artist materials," coated with such a solution, or both. It suffices for coverage that a fabric is coated with "a solution, designed to promote the adherence of artist materials." CBM is so coated.

Berger Textiles asserts that "'the reference 'designed to promote the adherence of artist materials' in the scope language compels a narrow interpretation of the words 'priming/coating.'" Plaintiff-Appellent's Brief ("App. Br.") 12-13. Next, it claims:

> "Commerce stated that Berger's CBM is within the scope of the *Order* because the 'CBM is a canvas roll and/or printable canvas that is primed/coated and is a woven *prepared painting and/or printing surface* ... that the primed/coated side of the fabric *is receptive to artist materials, consistent with our prior scope rulings* ... APPX00472 (emphasis added). *See also* the CIT mistaken reasoning at APPX00018. Clearly Commerce shifts the language away (unlawfully *expands* the Oder (sic)) from the language of the Order and that of the intent of the Tara."

(emphasis added by Berger Textiles.)

Id. 15. The argument concludes by claiming the scope language is ambiguous.

To accept Berger Textiles' argument would require rewriting the order's description, as well as ignoring CBM's physical attributes. Berger Textiles' brief nowhere explicates what it means by "a narrow interpretation of the words "priming/coating.'" This distinction is neither stated nor implied in the scope's text. A fabric is either primed/coated or it is not. CBM is coated with an ink receptive topcoat; indeed, Berger Textiles acknowledged that the production "process consists of applying multiple coatings to the polyester." As described in the patent which established the technology for CBM's production, the product includes "a substrate and an ink receiving layer." Berger Textiles' product is, therefore, coated with a "solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric."

Instead of addressing the plain terms of the Order, Berger Textiles reads into it a requirement that imported merchandise have the same composition as Ecker Textiles' domestically produced artist canvas. No such limitation appears in the Order.

Berger Textiles complains that Commerce failed to address the factors specified in 19 C.F.R. § 351.225(k)(1). The trial court dispelled that argument, APPX 00013-00019, citing numerous instances where the scope determination did so. The company's real argument is not that Commerce failed to take account of its previous scope determinations, however. Rather, Berger Textiles is asserting that those determinations, issued throughout the pendency of the Order, failed to adopt the novel interpretation of

18

"priming/coating" the company first presented in 2022.

The claim that Commerce erred by not addressing the factors specified in 19 C.F.R. § 351.225(k)(2) is equally spurious. Berger Textiles itself advised that "Since the plain language of the scope and the 19 C.F.R. § 351.225(k)(l) sources are dispositive in resolving this scope inquiry, Commerce should not have to resort to an analysis of the factors under 19 C.F.R. § 351.225(k)(2)." It should not be heard to take the opposite position on appeal, particularly since it provides no argumentation to back up its conclusory assertion of error by Commerce.

**E.    The CBM Scope Ruling Is Supported by Substantial Evidence**

The trial court correctly concluded that Commerce's scope determination is supported by substantial evidence. Its opinion summarizes the factual bases for the determination. These include Berger Textiles' own marketing materials touting CBM's use as "canvas (art/reproduction/stretching)" and that it is "the 'top-seller for' latex, UV, and solvent ink application to canvas." The court summarized that "Plaintiff fails to confront the significance of the evidence in its own Scope Ruling Application that Canvas Banner Matisse is suitable for use, and is used, as a canvas to which printed images, including 'art reproduction,' are applied. The record also contains substantial evidence that Canvas Banner Matisse is 'primed and coated' and that the priming/coating contributes to characteristics of the product allowing it to be used as artist canvas (by providing, for example, stiffness, whiteness, and opacity)."

In this appeal, too, Berger Textiles has not even attempted to explain why the

materials it provided to Commerce with its ruling application are so adverse to its position that CBM has inferior ink adherence properties. After all, a "'top seller for . . . ink application to canvas'" presumably would provide "ink application to canvas." Berger Textiles has simply ignored the inconsistency.

Commerce did not ignore this inconsistency, however. Its scope determination took account of all the evidence presented to it, and explained its treatment of the gaps due to Berger Textiles' refusals to respond. Presented with conflicting descriptions regarding CBM's attributes, it concluded that the product met the Order's descriptive language, cited the reasons therefor, and explained why. Its determination is thus supported by substantial evidence. As explained in *Saha Thai Steel Pipe Public Company Limited v. United States*, 101 F.4th 1310 (2024): "Under the substantial evidence review standard, even if an inconsistent conclusion could be drawn from the record, 'such a possibility does not prevent Commerce's determination from being supported by substantial evidence.' Am. Silicon Techs. v. United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001). A party challenging Commerce's scope ruling under the substantial evidence standard 'has chosen a course with a high barrier to reversal.' King Supply, 674 F.3d at 1348 (quoting Nippon Steel, 458 F.3d at 1352)."

Berger Textiles' brief simply glosses over the fact that Commerce sought additional information regarding CBM's properties from the company but did not receive a straight answer. As explained in the CBM Scope Ruling:

Commerce asked Berger Textiles, "whether the coating increases receptivity to any

artist materials….” In response, Berger Textiles only stated that “top coat in {sic} receptivity is not a requirement of the Order. In terms of {the} 'promoting the adherence' requirement…the bottom priming/coating does not 'promote the adherence' of the inks.”

\* \* \*

The record, therefore, contains several instances in which Berger Textiles declines to affirmatively state that CBM lacks a priming/coating layer that is applied for graphical purposes and instead focuses exclusively on the adherence of the “bottom” priming/coating layer.

APPX 425. The agency provided Berger Textiles with every opportunity to explain the attributes of CBM's coating. Berger Textiles refused to provide a factual answer. Commerce thereupon concluded “Berger Textiles has not demonstrated that the producer does not apply CBM's priming/coating layer for graphical purposes or that the priming/coating layer does not increase the canvas' receptivity to paint, ink, or other artistic materials.”

Particularly in light of its deliberate failure to cooperate with Commerce's inquiries, Berger Textiles cannot now be heard to challenge the agency's findings regarding CBM's attributes and uses or the properties imparted to it by the top coating. All of the information on which Commerce based its analysis was submitted by Berger Textiles. Thus, this case presents a somewhat unusual situation. Generally, Commerce must weigh information submitted by two or more parties to reach a determination. Here, Commerce relied on Berger Textiles' own submissions to do so. To the extent there are inconsistencies, they are entirely attributable to Berger Textiles. Commerce weighed the information before it to reach a conclusion. While the company disagrees with the agency's analysis, it has not met the “high barrier to reversal” under the substantial

evidence standard.

It is noteworthy that the Commerce analysis does not rely solely on Berger

Textiles' non-cooperation to inform its analysis. The CBM Scope Ruling notes:

> that CBM is marketed for art reproduction and that art reproduction is a "{w}idely, publicly known use{}" of CBM. In fact, the record contains evidence that CBM has a priming/coating layer that increases the canvas' receptivity to artist materials. Specifically, Berger Textiles submitted a patent for "CBM technology," which described "a receiving medium comprising a substrate and an ink receiving layer." The patent states that an "ink receptive coating" is "applied to a substrate such as…canvas," creating a medium "which yields a U.V. and water resistant ink jet print.
>
> * * *
>
> Moreover, the expert report that Berger Textiles relies on to show that the bottom priming/coating does not promote adhesion assumes an overly narrow definition of adhesion, and is at times conflicting because the expert also concludes that the bottom priming/coating layer contributes "slightly to absorption of ink," which is an artist material identified in the scope.    Furthermore, as discussed above, Berger Textiles fails to distinguish CBM's potential uses, including "art reproduction," "wall covering," and "décor applications," from artist canvas.

APPX 425, 426.

Addressing the fundamental factual issue raised in the scope proceeding,

Commerce has thus determined that CBM does qualify as print canvas. It explained its

analysis and conclusion with reference to the record evidence. The CBM Scope Ruling

accordingly satisfies the substantial evidence standard, in that it presents "'such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'

*Huaiyin Foreign Trade Corp. v. United States,* 322 F.3d 1369, 1374 (Fed. Cir. 2003)

(quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126

(1938))", quoted in *Siemens Energy, Inc. v. United States*, 992 F. Supp. 2d 1315 (Ct. Int'l

Trade 2014).

Berger Textiles' brief merely states that "Commerce is again simply incorrect in terms of interpreting the scope language of the *Order* in terms of the CBM Scope Request. The facts are consistent that CBM's priming/coating does not 'promote the adherence of artist materials' and does not concern 'receptivity'". App. Br. 54. Merely stating that "Commerce is . . . incorrect" is woefully insufficient under the substantial evidence standard. Commerce made point by point, record-based findings regarding CBM's attributes. Berger Textiles has shown no deficiencies in those findings.

Not only does Berger Textiles fail to demonstrate these findings are incorrect, it fails to address them at all. In particular, its claim to have shown that CBM's topcoat does not "promote the adherence of artist materials" is inconsistent with its refusal to respond to Commerce's factual questions on this very point, as well as with the terms of the patent and the statement of Dr. Work. Having explicitly declined to tell Commerce "whether the coating increases receptivity to any artist materials," Berger Textiles cannot now credibly assert that it does not. The opportunity to do so was presented during the Commerce administrative proceedings, and is now foreclosed.

Instead of responding to this highly relevant question posed by Commerce, Berger Textiles asserted during the administrative proceedings that an ink-receptive top coat "is not a requirement of the *Order*." While it is unclear whether it maintains this position before the Court, Ecker Textiles notes that the assertion is contrary on its face to the Order's terminology covering canvases "whether or not containing an ink receptive top

coat." Products having an ink receptive top coat categorically are covered. Commerce reasonably determined that CBM does have such a top coat. The "whether or not" wording indicates that not all articles covered by the order have an ink receptive top coat, but those that do are subject merchandise.

As it did before the trial court, Berger Textiles seemingly invites this Court to reweigh Commerce's fact findings about CBM, an invitation which the Court is precluded from accepting. *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 936 (Fed. Cir. 1984). In doing so, it ignores the substantial evidence standard and fails to address the above-quoted fact discussion in the ruling. While it provides pages of case citations, it does not apply the substantial evidence criteria discussed in those cases to the facts at hand in this appeal. Instead, in place of analysis, its brief repetitively intones that the ruling is unsupported by substantial evidence. For a court to overturn Commerce's fact findings requires much more than this, however. Commerce clearly and extensively laid out the grounds for its conclusion that CBM's qualities qualify it as artist canvas within the order's coverage.

Berger Textiles has shown no error in Commerce's analysis. In fact, it simply ignores its own descriptions of CBM's uses as "art reproduction," "stretched canvas," "Important for Latex-print: glossy print with high color brilliance, water- & scratch-resistance better than with 4446-56/" It ignores the patent's claimed coverage for "1. An ink jet receiving medium having an ink receptive coating on a substrate with the coating being comprised of a blend of an ethylene vinylacetate copolymer and a fully

hydrolyzed polyvinyl alcohol." The reference to a "receiving medium" belies Berger Textiles' claim before this Court that "CBM's priming/coating does not 'promote the adherence of artist materials' and does not concern 'receptivity'". To the contrary, claims 1 through 8 of the patent all relate the ink jet receiving mechanism. Berger Textiles' representation otherwise is contrary to the facts of record.

Moreover, claim 7 of the patent describes "[a] process for providing a water resistant ink jet print comprising attaching droplets of an aqueous recording ink containing a water soluble dye to a receiving medium comprising an ink receiving layer provided on a substrate, the ink receiving layer comprising a blend of ethylene vinylacetate copolymer and a fully hydrolyzed polyvinyl alcohol." The process of "attaching droplets of an aqueous recording ink . . . to a receiving medium comprising an ink receiving layer provided on a substrate" precisely fits the scope provision for "Priming/coating [which] includes the application of a solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric." By causing ink droplets to attach to the medium, the process makes them adhere. APP. 178.

Here, too, Berger Textiles' statement to this Court that "'CBM's priming/coating does not 'promote the adherence of artist materials'" is demonstrably at odds with the facts. There is no acknowledgement of the patent's claims, notwithstanding Berger Textiles' statement that CBM is produced in accordance therewith, much less any attempt to reconcile these inconsistencies.

The patent's claims also raise a fundamental question about CBM's production

process and the number and type of coatings applied to the product. The patent refers to "an ink receptive coating on a substrate with the coating being comprised of a blend of an ethylene vinylacetate copolymer and a fully hydrolyzed polyvinyl alcohol." This description comports with Berger Textiles' own description of the product as "polyester fabric woven (i.e., warp and weft) filament fiber, weighing approximately 270 GSM, that has been coated with polyvinyl acetate / acrylate type polymers." The CBM Scope Request refers to the same components, including "polyvinyl acetate / acrylate type polymers." These line up with the chemicals identified in the patent ("ethylene vinylacetate copolymer and a fully hydrolyzed polyvinyl alcohol.") There is no information regarding the substrate's composition.

However, Berger Textiles also states that "The process consists of applying multiple coatings to the polyester" but provided no further explanation; indeed, as discussed above, it refused to respond to Commerce's questions regarding the top coat's existence or properties. This obfuscation led Commerce to remark that "the patent indicates that the substrate has only one priming/coating layer (*i.e.*, the ink receptive coating), notwithstanding Berger Textile's assertion that there are two (*i.e.*, bottom and top) priming/coating layers." APPX 00425.

No other coating materials are mentioned in the scope request. Consequently, regardless of whether there is a single coating or more than one, all the chemicals identified in the administrative record as used in CBM's production fall within the patent's claim for "an ink jet receiving medium."

Berger Textiles now asserts (without having provided any supporting details to Commerce during the administrative proceeding) that "CBM has a priming/coating and a top coating." App. Br. 54. Even assuming this statement is accurate, what it glosses over is that both coatings apparently have the same composition. It is unclear here whether Berger Textiles is referring to the substrate, the composition of which it never disclosed, or some other material. The distinction Berger Textiles seeks to draw between top and bottom coatings is, therefore, meaningless as a factual matter, just as it has no bearing on whether CBM has "been primed/coated" with "a solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric." As long as the fabric is coated with such a solution it is within the order's coverage. Of course, an ink receptive top coat as identified in the patent would place CBM squarely within the scope's inclusionary language.

As the trial court pointed out, Berger Textiles provided internally contradictory descriptions of the product's characteristics and uses. Its own statements, quoted above, asserted it is a coated canvas intended for and usable in printing, and is marketed as such. On the other hand, the document dwelt extensively on two laboratory analyses purporting to demonstrate that CBM has inferior ink adherence properties.

There was no attempt in the Scope Request to rectify the inconsistency in marketing the product as a medium for printing, and deprecating its practical use for that application for Commerce Department scope purposes. Nor did Berger Textiles explain what use, if any, CBM has besides as a printing medium.

19 C.F.R. §§ 351.225(c)(2)(i) requires that a scope ruling request provide the following information:

A detailed description of the product and its uses, as necessary:

(A) The physical characteristics (including chemical, dimensional, and technical characteristics) of the product;

* * *

(D) The uses of the product;

Berger Textiles presented two inconsistent versions of CBM's characteristics and uses. While the request seemed to argue that inferior ink adherence properties somehow remove the product from scope coverage, it ignored Berger Textiles' own description of CBM as usable for printing. Its argument appears to be that CBM should be excluded because it is a poorly-made print canvas. The order, however, does not provide for an inferior product exclusion, and Berger Textiles points to no authority for this premise. As Commerce noted, "while Berger Textiles impugns CBM's ability to produce quality art reproduction, the product's quality does not determine whether it is subject to the *Order*." APPX 423-424.

## F. The Scope Does Not Require that Imported Artist Canvas Be Made with the Same Materials and Processes as those of the Domestic Industry

Next, Berger Textiles asserts that purported differences between its product and those produced by Ecker Textiles (and the original petitioner, Tara Materials, Inc.) warrant the former's exclusion. Whatever differences there may be in the materials used for coating Ecker Textiles' products and CBM are irrelevant to the Order's applicability. Its language applies to all products meeting the specified criteria, *i.e.*, fabric that has

been primed/coated with an "application of a solution, designed to promote the adherence of artist materials, such as . . . ink, to the fabric." There is no mention in the order of the solution's composition, nor any implication that subject merchandise must be produced in the same manner as the domestic like product.

Berger Textiles would, instead, have the Court adopt a requirement that merchandise be made of identical materials, and with the identical processes, as those for Ecker Textiles' products, to qualify as subject merchandise. Such a purported requirement appears nowhere in the order; to the contrary, the scope language describes all "tightly woven prepared painting and/or printing surfaces" meeting its terms. As long as the canvas is primed with a solution which promotes adherence of artist materials (in this case, ink), it is covered. Berger Textiles' Scope Request has established that CBM meets this criterion.

Berger Textiles quoted Tara Materials' descriptions of its own domestic production process at the time of the original investigation. It did not, however, even attempt to explain how and why those descriptions would in any way limit the descriptive language in the Order with respect to imported merchandise. It is, of course, that language which determines the scope. CBM's qualities must be evaluated against that language, not by reference to the processes used by Ecker Textiles or Tara Materials.

Berger Textiles attempts to distinguish its products because they "contain{} no acrylic 'gesso' priming/coating that 'promote{s} the adherence of artist materials.'" Whether or not Berger Textiles calls its coating gesso or something else is immaterial for

scope evaluation purposes. The word "gesso" appears nowhere in the scope language, making Berger Textiles' argument that its products are excluded because they are not made with "gesso" completely beside the point.

By the same token, the use of acrylic as a coating material by Ecker Textiles (and previously Tara Materials), and not by Berger Textiles, is irrelevant. The word "acrylic" appears nowhere in the Order as an inclusionary or exclusionary factor. A polyvinyl acetate/acrylate type polymer-based coating is just as much a "solution, designed to promote the adherence of artist materials" within the Order's coverage as any other ink-receptive coating, with or without acrylic as a material. Berger Textiles has simply ignored that there is no exclusionary language for canvas coated with the chemicals it uses. *Saha Thai Steel Pipe Public Company Limited v. United States*, 101 F.4th 1310, 1324 (2024) ("the Order contains no such express exclusions.") As this Court has instructed, "'merchandise facially covered by an order may not be excluded from the scope of the order unless the order can reasonably be interpreted so as to exclude it.' Mid Continent, 725 F.3d at 1301 (emphasis omitted)." *Sunpreme Inc. v. United States*, 946 F.3d 1300, 1309 (Fed. Cir. 2020)

More substantively, Berger Textiles shows a misunderstanding of both the Order's coverage and the nature of its own product when it claimed that "CBM does not 'promote the adherence of artist materials." APPX 00046. This misstatement stems from a flawed reading of the Order's language. The argument appears to be premised on the faulty notion that in-scope products must have a paint-receptive first coating, so that the

artist materials whose adherence they promote are limited to paint.

The Order states otherwise. Its use of the phrase "such as paint or ink" following "adherence of artist materials" means that ink is an artist material just as paint is. Coating canvas with a solution for adherence of ink is, therefore, no different than doing so for adherence of paint for scope coverage purposes. Each one is explicitly described by the Order's language.

As demonstrated above, the coating on CBM is "designed to promote the adherence of" ink. Those products have, therefore, undergone the "priming/coating" required for coverage by the Order.

Commerce dispensed with Berger Textiles' position by explaining that the term "gesso" had been used in previous rulings synonymously with "priming/coating." It was not a term of limitation but instead a shorthand reference to the various priming/coating solutions that manufacturers of artist canvas use to "promote the adherence of artist materials, such as paint or ink, to the fabric." CBM Scope Ruling at 16. Commerce's explanation comports with the scope language. As the agency recognized, the word "gesso" is not used in the order. Instead, it has been used as a general reference to the "priming/coating" solution which characterizes merchandise within the order's coverage.

Berger Textiles also sought to differentiate the chemical coating applied to its products from the type of priming solution referred to in the Order. Nevertheless, its own submission establishes the coating used on its products as "a solution, designed to

promote the adherence of artist materials, such as paint or ink, to the fabric".

Next, Berger Textiles identifies purported differences between the coating used by Ecker Textiles and that for CBM:

> The patent also reinforces the differences between Tara's acrylic gesso from the patent where the receiving medium (i.e., priming/coating) is meant for yielding "a U.V. and water resistant ink jet print", something that Tara never mentioned throughout it process with the *Order* and its print canvas scope ruling. Moreover, Tara never mentioned ethylene-vinyl acetate (EVA). Instead, it continually focused on its "specific" acrylic "gesso" bottom "adherence" priming/coating formula, characteristics, and advantages.

APPX 42. Whatever differences there may be in the materials used for coating Ecker Textiles' products and CBM are irrelevant to the Order's applicability. Its language applies to all products meeting the specified criteria, *i.e.*, fabric that has been primed/coated with the "application of a solution, designed to promote the adherence of artist materials, such as . . . ink, to the fabric." There is no mention in the order of the solution's composition.

## G.     Conclusion

For all the foregoing reasons, Plaintiff-Appellee Ecker Textiles requests that this Court affirm the judgment of the Court of International Trade and find that the Commerce Department's Final Scope Ruling on the Antidumping Duty Order on Certain Artist Canvas from the People's Republic of China: Berger Textiles' Canvas Banner Matisse (Aug. 15, 2023) is supported by substantial evidence and in accordance with law.

Respectfully submitted,

/s/    George W. Thompson

George W. Thompson
Thompson & Associates, PLLC
1638 R Street, NW
Suite 312
Washington, DC 20009
Telephone: 202-413-1564

Dated: May 5, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 25-1213

**Short Case Caption:** Printing Textiles, LLC v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 8,874 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 05/05/2025

Signature: /s/ George W. Thompson

Name: George W. Thompson